# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

Sherry L. Duffie,

                Plaintiff,       Case No. 14-cv-14148
                                  Hon. Judith E. Levy
v.                               Mag. Judge David R. Grand

The Michigan Group, Inc. –
Livingston d/b/a Re/Max Platinum,

                Defendant.

_____/

# OPINION AND ORDER DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [18]

      This is a Fair Labor Standards Act ("FLSA") case in which plaintiff Sherry L. Duffie, a former employee of defendant The Michigan Group, Inc. ("TMG"), claims that she was improperly denied overtime pay.  Pending is defendant's motion for summary judgment.  (Dkt. 18.)

## I.    Factual Background

      Plaintiff began working for Re/Max All Stars, a real estate company, in 1998.  Plaintiff began working for defendant in 2008, after defendant merged with her then-employer.  (Dkt. 1 at 3.)  Plaintiff alleges that after she began working for defendant, Kandis Thompson,

defendant's "Controller," classified plaintiff as an hourly employee. (Dkt. 22 at 10.)   After defendant became her employer, plaintiff was paid only "straight time" (her normal hourly pay) for hours worked in excess of forty per week.   (Id.)   In January 2009, Joseph DeKroub, defendant's owner allegedly told Thompson that nobody was to work more than forty hours per week. (Id. at 11.)   In turn, plaintiff alleges that Thompson told her not to record more than forty hours per week, and that she would receive compensatory time off in lieu of overtime pay.   (Id.)[1]   From 2008 until the end of her employment in March 2014, plaintiff received $52,000 a year in pay.   (*See generally* Dkt. 22-6.)   At all times during that period, she was classified as an hourly employee. (Id.; Dkt. 22-5 at 8.)

Defendant contends that in 2011, plaintiff assumed some or all of Thompson's job duties as Controller.   (Dkt. 18 at 9-10.)   Defendant states that Thompson, in her role as controller, was "responsible for the department, oversaw the flow of money into, out of and between bank accounts, supervised and approved time off for subordinates, made wage/salary recommendations and whether an IT Director position

_____

[1] Only public employers are permitted to offer compensatory time in lieu of overtime compensation.  29 U.S.C. § 207(o).

2

should be created and helped find the IT director," as well as "recommended a computer program, and set up the books. She made recommendations on moving money and if Dekroub was unavailable, could move money on her own to avoid overdrafts. She assessed whether plaintiff had the ability to perform her job and told Dekroub that she did." (Dkt. 18 at 8-9 n.3.)

After the 2008 merger, plaintiff was transferred to a department in defendant's Brighton office called "Central." (Dkt. 22 at 13.) Defendant states that in 2011, after assuming Thompson's job duties, plaintiff moved into Thompson's office and stopped handing in timesheets. (Dkt. 18 at 10.) In turn, plaintiff asserts that she only assumed some of Thompson's responsibilities. (Dkt. 22 at 13.) Plaintiff argues that she spent seventy to eighty percent of her time on basic bookkeeping duties, and the other twenty percent of her time on duties she assumed from Thompson along with other tasks.

On March 17, 2014, defendant terminated plaintiff's employment. Plaintiff filed suit on October 28, 2014, asserting claims against defendant for violation of the FLSA and for unjust enrichment. Defendant filed a motion for summary judgment on September 8, 2015.

3

(Dkt. 18.)  After the motion was fully briefed, oral argument was held on November 17, 2015.  On December 1, 2015, the Court ordered supplemental briefing on the accrual date of plaintiff's unjust enrichment claim.  (Dkt. 29.)  The supplemental briefing was filed, and the motion is now ripe for determination.

## II.   Legal Standard

Summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The Court may not grant summary judgment if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248.  The Court "views the evidence, all facts, and any inferences that may be drawn from the facts in the light most favorable to the nonmoving party."  *Pure Tech Sys., Inc. v. Mt. Hawley Ins. Co.*, 95 F. App'x 132, 135 (6th Cir. 2004) (citing *Skousen v. Brighton High Sch.,* 305 F.3d 520, 526 (6th Cir.2002)).

## III.   Analysis

The FLSA provides that "no employer shall employ any of his employees...for a workweek longer than forty hours unless such

4

employee receives compensation for his employment in excess of [40 hours per week] at a rate not less than one and one-half times the regular rate at which he is employed." 29 U.S.C. § 207(a)(1). However, the FLSA exempts "bona fide executive, administrative, or professional capacity" employees from this requirement. 29 U.S.C. § 213(a)(1).

Defendant does not dispute that it violated the FLSA with regard to its hourly employees during the period at issue in this case by offering compensatory time rather than overtime pay. Instead, defendant argues that, when plaintiff was given some or all of Thompson's duties in 2011, she became an exempt employee under either the executive or administrative exemptions listed in § 213(a)(1).

"FLSA overtime exemptions are affirmative defenses on which the employer has the burden of proof, and those exemptions are to be narrowly construed against the employers seeking to assert them." *Thomas v. Speedway SuperAmerica, LLC*, 506 F.3d 496, 502 (6th Cir. 2007) (internal quote marks and citations omitted). "The defendant must establish through 'clear and affirmative evidence' that the employee meets every requirement of an exemption." *Ale v. Tenn.*

*Valley Auth.*, 269 F.3d 680, 691 n.4 (6th Cir. 2001) (quoting *Roney v. United States*, 790 F. Supp. 23, 26 (D.D.C. 1992)).

## A. Executive Exemption

To show that an employee is a bona fide executive employee, the defendant must show that plaintiff was an employee:

> (1) Compensated on a salary basis at a rate of not less than $455 per week (or $380 per week, if employed in American Samoa by employers other than the Federal Government), exclusive of board, lodging or other facilities;
>
> (2) Whose primary duty is management of the enterprise in which the employee is employed or of a customarily recognized department or subdivision thereof;
>
> (3) Who customarily and regularly directs the work of two or more other employees; and
>
> (4) Who has the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees are given particular weight.

29 C.F.R. § 541.100(a).

### a. Salary Basis

"An employee will be considered to be paid on a "salary basis" within the meaning of [the FLSA] if the employee regularly receives each pay period on a weekly, or less frequent basis, a predetermined

6

amount constituting all or part of the employee's compensation, which amount is not subject to reduction because of variations in the quality or quantity of the work performed." 29 C.F.R. § 541.602. It is the defendant's burden to show that the plaintiff received a predetermined amount under the salary basis test. *Orton v. Johnny's Lunch Franchise, LLC*, 668 F.3d 843, 849 (6th Cir. 2012). Defendant has not done so here.

Defendant argues that plaintiff was consistently paid $52,000 a year in $2,000 biweekly increments from 2011 until she was terminated in 2014. Plaintiff, in turn, argues that she was not salaried at any time during her employment.

Plaintiff was listed as an hourly employee throughout her employment, even during the time that she was allegedly being paid a salary. (*See generally* Dkt. 23-10.) From 2008 until 2011, plaintiff states that she handed in hourly time sheets, but was illegally compensated in straight time pay or compensatory time off that she was not allowed to use, rather than overtime wages for those hours worked each week over forty. From 2011 on, plaintiff stopped handing in timesheets due to the perceived futility of recording her hours for

7

unusable compensatory time off, but continued to track her hours worked. (Dkt. 18-25 at 71.)  Al Wicke, defendant's hourly-classified maintenance man, also states that he was paid in the same manner during the same period for overtime hours worked. (Dkt. 22-8 at 2.)

Plaintiff has provided paystubs showing that, prior to defendant merging with her employer in 2008, she was classified as a non-exempt hourly employee who received time-and-a-half overtime. (Dkt. 22-6 at 2-11.)  When defendant merged with plaintiff's former employer, and before defendant claims plaintiff became an exempt employee, defendant began paying plaintiff straight-time overtime in lieu of time-and-a-half overtime until January 2009. (Id. at 13-21.)  In January 2009, defendant began offering compensatory time off in lieu of pay. (Id. at 22-95.)

On none of those paystubs did defendant indicate that plaintiff was being paid as an exempt salaried employee, nor was there any difference in how plaintiff was paid pre- and post-exempt status. In January 2012, after plaintiff allegedly became an exempt employee, defendant changed its paystubs, and plaintiff was again classified as a *non-exempt* hourly employee. (Id. at 95-135.)  Plaintiff's paystubs

8

indicate that she was paid as a non-exempt hourly employee until she was terminated in March 2014.  (Id.)

To be clear, plaintiff's paystubs showed that she was paid identically both as an hourly employee and as an allegedly "exempt" employee, and that for most of the time she was an "exempt" employee, defendant stated on every paystub that she was non-exempt and was being paid hourly.  This evidence alone is sufficient to create a genuine issue of material fact as to whether plaintiff was, as defendant argues, a salaried employee.[2]

Despite this evidence, defendant contends that it has established that plaintiff was paid a salary because her paycheck was for the same amount each week.  Defendant argues that the only relevant consideration in establishing that plaintiff was paid a salary is "what compensation [plaintiff] actually received."  (Dkt. 18 at 31 (citing *Orton*, 668 F.3d at 848).)

In *Orton*, the Sixth Circuit addressed the impact of changes made in 2004 to the FLSA's salary-basis test.  Under the old test, an employer

---

[2] Employers may pay exempt salaried employees using an hourly payroll system while still maintaining the exemption.  *Acs v. Detroit Edison Co.*, 444 F.3d 763, 767-68 (6th Cir. 2006).  This does not, however, relieve employers from showing that their employees are actually guaranteed a salary.  *Id.*

9

was required to show that an employment agreement established a salary. *Orton*, 668 F.3d at 847 (citing 29 C.F.R. § 541.118(a)). In 2004, the regulation changed to the test the Court outlined above: salary consists of a predetermined amount, not subject to reduction based on quality or quantity of work performed. *Id*. (citing *Baden-Winterwood v. Life Time Fitness, Inc.*, 566 F.3d 618, 627 (6th Cir. 2009)). The *Orton* court found that the district court had erroneously granted an employer's motion to dismiss because it used the employment-agreement test rather than the updated subject-to-reduction test, and that plaintiff's allegations that his pay was improperly reduced were sufficient to state a claim under Fed. R. Civ. P. 12(b)(6). *Id*. at 849.

Defendant relies on the "actual deduction" test described in *Baden-Winterwood*, 566 F.3d at 630-631, and referenced in *Orton*, to argue that plaintiff must show that actual deductions from her pay were made to overcome the fact that she was paid the same amount each week. This improperly shifts defendant's burden in presenting its affirmative defense that it paid plaintiff a salary on to plaintiff. *See Orton*, 668 F.3d at 848.

10

Here, defendant has provided no evidence and no policy establishing that plaintiff's pay was predetermined and not subject to reduction based on the quality or quantity of her work performed. Defendant does not even argue that it classified plaintiff as salaried. *See, e.g., Renfro v. Indiana Michigan Power Co.*, 370 F.3d 512, 516 (6th Cir. 2004) (holding that employees classified as salaried by their employer were eligible for the administrative exemption even though their employer required them to make up for time missed from work in order to receive their salary). An employee is not required to show that her pay was subject to actual deductions under the salary-basis test when her employer has made no argument that her pay was *not* subject to deductions.

Plaintiff alleges that she always worked more than forty hours each week, and that defendant illegally offered compensatory time in violation of the FLSA for hours worked beyond forty. Defendant does not dispute that it violated the FLSA as to its hourly employees, but instead declares without supporting evidence that plaintiff's capped pay constitutes a salary because she stopped receiving pay after she worked forty hours each week.

11

Employers are still required to make a showing that an employee's "predetermined" pay was not subject to reduction. *Orton*, 668 F.3d at 848; *Baden-Winterwood*, 566 F.3d at 630-31; *see also Acs v. Detroit Edison Co.*, 444 F.3d 763, 767-768 (6th Cir. 2006) (holding that an employer met the salary-basis test where it showed that it guaranteed 1/26th of an employee's pay every two weeks even if the employee did not work forty hours per week). Defendant does not argue that plaintiff's pay was not subject to reduction if she had not worked at least forty hours each week. Instead, defendant argues that plaintiff's pay was predetermined and she must therefore show that defendant violated a policy it cannot show that it had.

It is not enough under the salary-basis test for an employer to show only that the employee received the same amount of pay each week, as doing so would negate the remainder of the test. This is true particularly where the employer does not dispute either that it illegally offered compensatory time in lieu of overtime pay for its hourly employees, capping pay for all employees at forty hours each week, or that the employee asserting rights under the FLSA always reached and exceeded that cap every pay period.

12

Accordingly, a genuine issue of material fact exists as to whether plaintiff was paid a salary and was therefore covered by the FLSA's executive exemption.  Summary judgment must be denied.

### b. Primary Duty of Management of the Enterprise or a Customarily Recognized Department or Subdivision Thereof

The "primary duty" of an executive employee must be "management of the enterprise in which the employee is employed or of a customarily recognized department or subdivision thereof."  29 C.F.R. 541.100(a).

> The term 'primary duty' means the principal, main, major or most important duty that the employee performs. Determination of an employee's primary duty must be based on all the facts in a particular case, with the major emphasis on the character of the employee's job as a whole.  Factors to consider when determining the primary duty of an employee include, but are not limited to, the relative importance of the exempt duties as compared with other types of duties; the amount of time spent performing exempt work; the employee's relative freedom from direct supervision; and the relationship between the employee's salary and the wages paid to other employees for the kind of nonexempt work performed by the employee.

29 C.F.R. 541.700(a).

13

Defendant argues that plaintiff was the manager of "Central," one of its business units. The unit performed what defendant calls "'central office' functions: financial, accounting, bookkeeping, payroll, and loading listings." (Dkt. 18 at 11.) Defendant also relies heavily on plaintiff's résumé as evidence of her job duties.[3] (*See* Dkt. 18-10.)

As a threshold matter, defendant does not contend that the majority of plaintiff's time was spent on exempt management duties. Plaintiff states, and defendant does not dispute, that she spent seventy to eighty percent of her performing non-exempt bookkeeping duties. *See* 29 C.F.R. § 541.301(e)(5) (stating that "bookkeepers . . . generally will not qualify as exempt professionals.").

> The amount of time spent performing exempt work can be a useful guide in determining whether exempt work is the primary duty of an employee. Thus, employees who spend more than 50 percent of their time performing exempt work will generally satisfy the primary duty requirement. Time alone, however, is not the sole test, and nothing in this section requires that exempt employees spend more than 50 percent of their time performing exempt work. Employees who do not spend more than 50 percent of their time performing exempt duties may nonetheless meet the

---

[3] However, defendant does not note that plaintiff lists herself as having the same job from 2008 until 2014, even though her promotion – and transition to salaried status – allegedly occurred in 2011.

14

primary duty requirement if the other factors support such a conclusion.

29 C.F.R. 541.700(b).

The other factors are, per 29 C.F.R. 541.700(a), the relative importance of the exempt duties as compared with other types of duties, the employee's relative freedom from direct supervision, and the relationship between the employee's salary and the wages paid to other employees for the kind of nonexempt work performed by the employee.

In short, defendant must establish that 1) plaintiff performed exempt duties and 2) plaintiff's exempt work constituted her primary duty under the factors listed in 29 C.F.R. 541.700(a).

### 1. Plaintiff's "Exempt Duties"

Defendant must establish that plaintiff held management duties that would have qualified her as an exempt executive employee. 29 C.F.R. § 541.102 sets forth a variety of activities that constitute "management."

> Generally, "management" includes, but is not limited to, activities such as interviewing, selecting, and training of employees; setting and adjusting their rates of pay and hours of work; directing the work of employees; maintaining production or sales records for use in supervision or control; appraising employees' productivity and efficiency for the

15

purpose of recommending promotions or other changes in status; handling employee complaints and grievances; disciplining employees; planning the work; determining the techniques to be used; apportioning the work among the employees; determining the type of materials, supplies, machinery, equipment or tools to be used or merchandise to be bought, stocked and sold; controlling the flow and distribution of materials or merchandise and supplies; providing for the safety and security of the employees or the property; planning and controlling the budget; and monitoring or implementing legal compliance measures.

Id.  Defendant contends that plaintiff performed at least nine of these activities between 2011 and 2014: 1) interviewing and selecting employees; 2) training employees; 3) directing the work of employees; 4) maintaining sales records for use in supervision or control; 5) planning the work; 6) determining the techniques to be used; 7) apportioning the work among employees; 8) appraising employees' productivity and efficiency for the purposes of recommending changes in status; and 9) monitoring or implementing legal compliance measures.

First, defendant argues that plaintiff interviewed and selected employees.  Defendant states that plaintiff interviewed Valery Kruczynski and gave feedback regarding her qualifications for a bookkeeping job, and that plaintiff reviewed résumés and conducted

16

interviews of replacements when Kruczynski left that job.  (Dkt. 18 at 13.)

With regard to Kruczynski, plaintiff argues that she considered her at the request of Jennie Stuedle, defendant's real estate sales manager, who felt that plaintiff better understood the bookkeeping duties necessary for the position.  (Dkt. 22 at 24.)  Plaintiff also states that after she interviewed Kruczynski, DeKroub determined that Kruczynski should be hired, and DeKroub determined that it should be at the rate of $37,000 a year.  (Id.)  Plaintiff also testified that she conducted three or four interviews in 2014 during another bookkeeper search. (Dkt. 18-25 at 39-40.)

At most, defendant has shown that plaintiff interviewed some potential employees.  However, DeKroub, defendant's owner, testified that "it would be [his] responsibility to say, 'Let's hire this one, if you really like them,' or 'Forget that one, let's run with this one.'"  (Dkt. 22-4 at 17.)  DeKroub "was the one that was going to decide whether they were worth the money that we would have to pay them to hire them." (Id.)  Defendant has established that, in the course of three years, plaintiff conducted, at most, five interviews of potential bookkeepers,

17

and that she did not make the final decision to select any of them for the position.

Second, defendant contends that plaintiff trained employees. This is based on plaintiff calling a staff meeting to "go over [employees'] job manuals as a part of a cross training effort." (Dkt. 18 at 21.) However, DeKroub stated Stuedle, rather than plaintiff, was the one who initiated the cross training efforts. (Dkt. 22 at 25 (citing Dkt. 22-4 at 6).)

Defendant also states that plaintiff trained another employee, Linn Felker, on various processes. (Dkt. 18 at 21; Dkt. 18-25 at 21-22.) To the extent defendant has offered evidence to show that plaintiff trained employees, defendant has shown that plaintiff participated in (but did not conduct) one training session initiated by a superior, and conducted sporadic training of one other employee over the course of three years.

Defendant also argues that plaintiff "directed employees to prepare a procedural manual." (Dkt. 18 at 16.) However, defendant states only that plaintiff called a meeting and asked staff to "[p]lease bring the job manual you have been creating." (Id.) Defendant provides

18

no evidence that plaintiff actually initiated or designed the requirement to create the job manuals.

Third, defendant offers the declarations of three employees who state that they considered plaintiff to be their supervisor to show that plaintiff directed their work. (Dkts. 18-6, 18-7, 18-8.) Plaintiff, in turn, testified that her requests to other employees were sporadic, did not constitute direction of their work, and that supervision was not one of her primary duties. (Dkt. 22 at 27-28.)

Defendant offers instances during which it contends plaintiff directed the work of those and other employees. (Dkt. 18 at 22-23.) On review of these instances, and in the light most favorable to the plaintiff, they could reasonably be construed as a senior employee with experience reminding employees of the proper procedures to be followed (for instance, reminding employees that the dress code is in effect at all times, notifying employees of improper deposits that needed to be corrected, and reminding employees of the purpose of certain procedures). Even those instances that hewed more toward supervision appear to be both sporadic in nature and directed toward a single employee, Linn Felker.

19

Fourth, defendant argues that plaintiff maintained and updated contracts for its real estate agents, which allegedly constituted the maintenance of sales records for use in supervision or control. (Dkt. 18 at 17.)   Plaintiff argues that she only "entered numbers for agent contracts after Steudle provided instructions on how the contract was to be structured." (Dkt. 22 at 29.)   Defendant does not state how a contract for a real estate agent constitutes a "sales record" for the purposes of the FLSA.   Maintaining contracts that established the "broker fee" for agents (Dkt. 18 at 17) is not clearly a "sales record" for the purposes of the FLSA, and defendant has not provided authority to establish that they are.

Fifth, defendant cites a handful of e-mails and deposition testimony that it claims show plaintiff planned the work of other employees. (Id. at 19-20.)   Again, these instances are sporadic in nature, and do not appear to show that the plaintiff engaged in routine planning of the work others would be doing.   Defendant also relies on plaintiff's desire to have defendant hire other employees to take on some of plaintiff's work as evidence that plaintiff planned the work of those new employees.   (Id. at 19.)   However, an employee asking her

employer to hire a new employee and for the employer to give the new hire unspecified excess work does not, absent more, show that the employee is directing the work of the new hire.

Sixth, defendant argues that plaintiff determined a variety of techniques to be used in conducting Central's operations. Defendant argues that plaintiff prepared a checklist to follow in processing real estate transactions. (Dkt. 18 at 14.) Defendant does not, however, establish that plaintiff determined the techniques that the checklist enshrined. Instead, defendant only establishes that plaintiff created a checklist for employees to use to ensure that they followed the technique.

Defendant next argues that plaintiff drafted procedures to pay brokers and agents with corporations. (Dkt. 18 at 14-15.) Plaintiff responds that all she did was add a single word to a computer program at DeKrouub's request to make generating reports easier. (Dkt. 22 at 33-34.) It is unclear what "technique" or "procedure" defendant is arguing plaintiff determined in this instance.

Defendant next argues that plaintiff drafted banking procedures so that remote offices could make deposits. Plaintiff states that the

21

"procedure" she devised was to deposit the checks in accordance with their bank's availability policies, but differently than she had been depositing them, to ensure quicker availability of funds.  (Dkt. 22 at 28.) To the extent that plaintiff devised a technique, it appears to consist of figuring out how bank deposits worked.

Defendant next argues that plaintiff "devised procedures to pay remote agents at closing."   (Dkt. 18 at 15.)   This appears to be derivative of the previous agent payment "procedure" that plaintiff "devised."

Defendant also argues that plaintiff "generated a daily report that would reveal mistakes [in the transfer of escrow funds to defendant's general account], and would contact offices and employees about lapses to enforce the process, so checks did not bounce."   (Dkt. 18 at 16.) Defendant states that "[defendant's] procedures dictated" the transfers, (Id.), not that plaintiff designed the procedures.  Defendant seems to be arguing that plaintiff's efforts to *enforce* procedures constitute the *determination* of those techniques, which is not what the regulations envision.

Defendant further argues that plaintiff established and enforced the procedure regarding tax IDs by sending an e-mail stating that employees were required to confirm tax ID numbers and correct addresses. (Dkt. 18 at 16.) Plaintiff argues that, in effect, what she did was to remind employees to check information already required by existing procedures before putting that information into the system. (Dkt. 22 at 29.) Again, it is unclear how this is a "technique" that plaintiff "determined" rather than a reminder to employees of the already established procedure. Following defendant's argument, any reminder by one employee to another of the proper method to do something is the former employee "determining a technique" for the purposes of the FLSA.

Finally, defendant argues that plaintiff "proposed measures to avoid liability for agents' dues." (Dkt. 18 at 17.) Defendant states that "Steudle asked Plaintiff if [defendant's] agent contract required [defendant] to pay those dues." (Id.) Plaintiff reviewed the contract, and replied that "[i]t would be a good idea to state that this is required to be paid by the agent annually to be an agent with our company, maybe even . . . state that we are unable to pay them unless dues are

current." (Id.)  It is unclear how informing a superior of what a contract says constitutes the determination of a technique to be used in the business, particularly when the "technique" is something already in the contract that plaintiff did not draft and is not responsible for enforcing. Again, defendant attempts to convert plaintiff's numerous efforts to remind others of proper procedure into the determination of the procedure itself.

Seventh, with respect to whether plaintiff apportioned work among employees, defendant does not specifically state how plaintiff did this.  Defendant apparently rests on the same declarations and evidence used to argue that plaintiff directed the work of employees.  At most, this seems to show that plaintiff sporadically asked or recommended that people do certain tasks, rather than showing plaintiff routinely did so as a part of her job duties.

Eighth, defendant argues that because plaintiff managed human resources, she appraised employees' productivity and efficiency for the purposes of recommending changes in status. Her relevant duties, as identified by defendant, included keeping the personnel files in her office, giving out "hiring packages," drafting and placing ads for

employees, receiving résumés at her e-mail address, and "gather[ing] facts about terminations from managers." (Dkt. 18 at 12.) Defendant also refers to an e-mail that plaintiff sent reminding employees that company dress code was in effect at all times. (Id. at 19 (citing Dkt. 18-19).) Notably, Steudle read and approved the e-mail before plaintiff sent it out. (Dkt. 22 at 30.) None of this definitively constitutes appraising employees' productivity and efficiency for the purposes of recommending changes in status under the FLSA. Instead, it shows a human resources employee retaining files, giving out paperwork, and serving as the receiver of résumés for jobs inside and outside of her department.

Defendant also argues that because plaintiff gave feedback on Kruczynski to Steudle, she "appraised employee productivity for the purpose of recommending changes in status." (Dkt. 18 at 13-14.) Defendant cites no case law saying that giving feedback on an employee's performance to superiors, when those supervisors are the ones with the power to hire and fire, constitutes the sort of appraisal and recommendation process contemplated under this regulation.

Ninth, defendant argues that plaintiff monitored and implemented legal compliance measures.  Defendant contends that plaintiff's résumé entry stating that she "implemented procedures to process real estate transactions and assure all documentation to be . . . in compliance with state real estate laws" constitutes "mapping out procedures to assure legal compliance."  (Dkt. 18 at 14.)  First, the Court is loath to use a résumé, in which applicants often use a recommended mix of action verbs and even slight puffery, as evidence of a plaintiff's actual job duties.  Second, the FLSA is concerned with the specific duties plaintiffs actually have in their employment, not the bullet-pointed gloss of those duties plaintiffs may provide to other employers.

What defendant actually states plaintiff did is "prepare[] a checklist (a process itself) to follow in processing real estate transactions."  (Id.)  As set forth above, creating a checklist organizing the procedures that should be followed does not, by itself, show that the creator of the checklist created the procedure outlined.  Defendant also argues that plaintiff "admits she was responsible for processing transactions in compliance with law."  (Id.)  Presumably, all of

defendant's employees are responsible for conducting all of their work in compliance with the law.  That does not make them managers.

Defendant also argues that "Plaintiff was responsible for 'Maintaining [defendant's] escrow account in compliance with state law.'"  (Id.)  Her primary duty seems to have been "deal[ing] with the auditor and respond[ing] to requests for information or documents."  (Id.)  Defendant does not establish how responding to an auditor's requests for documents constitutes monitoring or implementing a legal compliance measure.

Defendant next argues that plaintiff "investigated legal requirements and drafted procedures to pay brokers or agents with corporations[.]"  (Id.)  However, plaintiff's deposition shows that she asked defendant's attorney whether an alteration in the internal method of a transaction used to pay brokers was legal.  (Dkt. 18-25 at 66.)  Defendant's attorney, not plaintiff, determined that the plaintiff's proposed method would be legally compliant.  Accordingly, defendant's attorney, rather than plaintiff, was the one monitoring a legal compliance measure.

Defendant next argues that plaintiff investigated the legal requirements for setting up two escrow accounts.  (Id. at 15.)  With DeKroub's approval, plaintiff changed the procedure.  (Id.)  To this extent this shows that plaintiff "implemented a legal compliance measure," she asked the auditor who happened to be in the office if having a second escrow account would be permitted legally.  (Dkt. 18-25 at 65.)  Defendant makes no argument that asking a third party if a procedure is legal constitutes the monitoring or implementation of a legal procedure by the person asking the question.

Finally, defendant argues that "Plaintiff was the person responsible for assuring that TMG followed the required garnishment processes[.]"  (Id. at 16.)  Plaintiff, however, stated that although she was responsible for assuring that the company followed the required processes, she "did speak with Bill Russell . . . our in-house Counsel, at times when I had things that were questionable on garnishments." (Dkt. 18-25 at 27.)  Defendant does not establish that the "garnishment processes" at issue were legal compliance measures.  At most, this creates a genuine issue of material fact as to whether plaintiff or in-

28

house counsel was truly responsible for monitoring legal compliance measures.

In summary, defendant has shown that plaintiff may have had the following exempt duties: conducting five interviews in three years, sporadically training and directing the work of one employee, and sporadically directing the work of two other employees. Other allegedly exempt duties are either contested, or require more support to warrant summary judgment for defendant.

Defendant also identifies other tasks that it argues constitute managerial duties. These include managing insurance policies for nine entities, dealing with the IRS over penalties, investigating and pricing accounting software, and disputing unemployment claims. (Dkt. 18 at 17-19.) Defendant argues, without further evidence, that these are self-evidently managerial duties.

With regard to insurance, defendant argues only that plaintiff "was the person required to know when policies expired." (Id. at 18.) However, defendant does not show that plaintiff had any authority to determine if a policy should be renewed, to change the terms of any insurance policy, or make *any* independent decision about insurance.

29

The requirement that an employee keep track of certain factual information, without more, is insufficient to establish that an employee was acting in a managerial role.

With regard to dealing with the IRS, defendant alleges that plaintiff protested a 2013 IRS penalty in a letter she composed, and did so without Steudle or DeKroub's knowledge. (Dkt. 18 at 18.) However, the letter itself consists of plaintiff disputing the imposition of a penalty for late mailing of W-2 and 1099 forms on the ground that plaintiff timely mailed them. This is, at most, an administrative task. Plaintiff did not negotiate or bind defendant to any resolution; she only informed the IRS that defendant had complied with the agency's requirements and asked it to check its records again.

Next, defendant argues that plaintiff investigated alternatives to the "Accountmate" software, ultimately recommended QuickBooks, and defendant purchased QuickBooks "as a result of her investigation[.]" (Dkt. 18 at 18.) Again, defendant has not shown that plaintiff had the authority to or actually did make the decision that defendant would switch to QuickBooks, nor that she made the purchase of the software. An employee who is familiar with software determining what it would

30

cost to change to different software and recommending that her superiors do so is not acting as a manager absent some additional control over how, when, or to what extent that software change occurs.

Finally, defendant argues that plaintiff lowered costs by disputing every unemployment claim. (Dkt. 18 at 19.) According to plaintiff, Thompson would never respond to unemployment claims, apparently under the theory that claimants needed the money. (Dkt. 18-25 at 56; Dkt. 18-17.) Plaintiff began "disputing" those claims, which consisted of filling out "a form from the State of Michigan asking you on a fact finding the hours for a person, why they were dismissed, if they were dismissed, if they quit." (Dkt. 18-25 at 56.) She "just took the time to fill them out, and by doing so corrected errors." (Id.)

Defendant asks that the Court look at plaintiff's use of the word "disputed" and determine that she was acting in a managerial role. However, based on plaintiff's uncontroverted description of her own work, it appears that her work was more rote and mechanical in nature. Plaintiff filled out state forms that Thompson never did. Defendant does not argue that plaintiff bound it to any position on the validity of unemployment claims, and based on plaintiff's description of her work,

31

she only provided requested facts to a state agency.   Thompson's decision not to complete forms requested by the state of Michigan does not make plaintiff's performance of that formerly abandoned task into a managerial duty.

## 2. Plaintiff's Job Title

Defendant argues that various titles plaintiff used from 2011 on show her managerial role.   Plaintiff used a variety of titles in her job, although it does not appear that defendant assigned her a particular title.   Plaintiff signed certain documents as "Controller."  (Dkt. 18 at 10; Dkt. 18-3 at 3-10.)  At other times, plaintiff referred to herself as "Office Manager," "Agent," and "Administrative Manager."  (Dkt. 18 at 10.)

Plaintiff's title is irrelevant.   "The FLSA requires the employer to make FLSA exemption decisions based on the employee's actual job duties, not the employee's job title, and the good faith requirement imposes an affirmative burden."  *Martin v. Ind. Mich. Power Co.*, 381 F.3d 574, 585-86 (6th Cir. 2004) (internal citation omitted).  "A job title alone is insufficient to establish the exempt status of an employee. The exempt or nonexempt status of any particular employee must be

determined on the basis of whether the employee's salary and duties meet the requirements of the regulations in this part." 29 C.F.R. 541.2.

This is doubly so where, as here, plaintiff's title is not the result of her employer's determination that such a title applied, but instead of the plaintiff's decision to identify herself apparently without guidance or input from her employer.

### 3. Whether Plaintiff's "Exempt Duties" Were Her "Primary Duties"

Because defendant has provided evidence that plaintiff arguably had some exempt duties, and because those duties constituted less than fifty percent of her duties, the Court must analyze those duties under the factors listed in 29 C.F.R. 541.700(a) to determine if they were her primary duties. Those factors are: 1) the relative importance of the exempt duties as compared with other types of duties; 2) the employee's relative freedom from direct supervision; and 3) the relationship between the employee's salary and the wages paid to other employees for the kind of nonexempt work performed by the employee.

Defendant argues that because plaintiff performed some exempt duties, they were the most important duties she performed. (Dkt. 25 at

3-4.)  This is tautological, and removes the agency the defendant must show in its expectations of its employees to meet its burden.

Defendant has identified very few exempt duties that plaintiff held.  Defendant relies on a handful of non-binding cases to argue that the existence of these exempt duties make them her *per se* primary duties.  *See, e.g., Slusser v. Vantage Builders, Inc.*, 576 F. Supp. 2d 1207, 1220-21 (D.N.M. 2008) (holding that "courts have found management duties primary even where managers have spent 90 or 95 percent of their time performing non-exempt work" and collecting cases).

The parties agree that plaintiff spent at least 70 to 80 percent of her time on non-exempt bookkeeping work.  Defendant has not made a showing that those instances where plaintiff may have conducted exempt work constituted her primary duties, because defendant has not established that "[p]laintiff's principal value to [d]efendant was" in the performance of her exempt duties.  *Jackson v. Jean Coutu Group (PJC) USA, Inc.*, Case No. 06-cv-194, 2007 WL 1850710, at \*5 (S.D. Ga. June 26, 2007).  This is particularly so where the overwhelming majority of duties defendant identifies are not exempt duties, and defendant makes

no argument that the small number of exempt duties plaintiff performed were her most important duties.

Defendant does not specifically argue that plaintiff was relatively free from direct supervision. Plaintiff notes throughout her brief that her decisions were routinely subject to the approval of Steudle and DeKroub. Steudle testified that plaintiff had no authority over agent contracts (Dkt. 22 at 28-29); that she, rather than plaintiff, handled employee discipline over the dress code (Id. at 30); and that the company's attorney, rather than plaintiff, generally handled employee discipline and unemployment disputes (Id. at 32-33). Plaintiff also contends that she did not have hiring and firing authority, and that the one instance of her "hiring" an employee consisted of conveying an offer from DeKroub. (Dkt. 22 at 24.)

Defendant provides no counter to this argument. It appears from the record that even in the exercise of plaintiff's few arguably exempt duties, she had little to no freedom from supervision. Plaintiff either acted at the directive of Steudle and DeKroub, or requested permission from either of them to act.

29 C.F.R. 541.202(b) lays out factors to be considered in determining whether an employee acts with "discretion and independent judgment":

> [These factors] include, but are not limited to: whether the employee has authority to formulate, affect, interpret, or implement management policies or operating practices; whether the employee carries out major assignments in conducting the operations of the business; whether the employee performs work that affects business operations to a substantial degree, even if the employee's assignments are related to operation of a particular segment of the business; whether the employee has authority to commit the employer in matters that have significant financial impact; whether the employee has authority to waive or deviate from established policies and procedures without prior approval; whether the employee has authority to negotiate and bind the company on significant matters; whether the employee provides consultation or expert advice to management; whether the employee is involved in planning long- or short-term business objectives; whether the employee investigates and resolves matters of significance on behalf of management; and whether the employee represents the company in handling complaints, arbitrating disputes or resolving grievances.

Id.

36

On balance, and for the reasons set forth above, these factors have not been met by defendant such that summary judgment would be warranted.

Finally, defendant argues that plaintiff was paid significantly more than other bookkeepers at her job – $52,000 a year as opposed to $21,840, $29,120, and $35,006 a year for other bookkeepers.  (Dkt. 22-7 at 3-4.)  This, defendant argues, shows that plaintiff was paid more than other employees for the same kind of non-exempt work plaintiff performed.

Defendant's argument neglects one critical non-exempt employee, however: plaintiff, prior to 2011.  Defendant does not contend that plaintiff was an exempt salaried employee before she assumed Thompson's duties in 2011.  Plaintiff was paid the same amount both as a non-exempt bookkeeper and as an allegedly exempt "Controller".  (Dkt. 22 at 13.)  Plaintiff was also a long-tenured employee; defendant does not argue that any other non-exempt bookkeeper had plaintiff's level of experience or longevity.

Defendant has not met its burden of showing that the potentially exempt duties it identified were plaintiff's primary duties.  Accordingly,

37

it has failed to establish that the second prong of the FLSA executive exemption applies to plaintiff, and summary judgment must be denied.

### c. Customarily and Regularly Directing the Work of Two or More Other Employees

Under 29 C.F.R. 541.104, an exempt executive must direct the work of two or more other full-time employees, or their equivalent. Defendant, relying on the declarations of three other bookkeepers, contends that plaintiff customarily and regularly directs the work of, at the least, those bookkeepers.

Assuming that the bookkeepers are equivalent to full-time employees, defendant has not met its burden of establishing that plaintiff customarily and regularly directed the work of those bookkeepers. Although defendant points to sporadic instances that could be construed as plaintiff directing work, and provides declarations from employees stating that plaintiff directed their work, plaintiff argues that she did not, in fact, customarily and regularly do so, and that her "direction" was instead coordination with those employees. Plaintiff's testimony, combined with the seeming infrequency of instances during which she actually could be considered to have

38

directed others' work, creates a genuine issue of material fact that precludes summary judgment.

### d. Authority to Hire or Fire Other Employees or Whose Suggestions and Recommendations as to the Hiring, Firing, Advancement, Promotion or any Other Change of Status of Other Employees are Given Particular Weight.

Defendant argues that plaintiff interviewed Kruczynski to be a bookkeeper, and informed DeKroub that Kruczynski's "background in Quickbooks was what we were looking for[.]"   (Dkt. 18 at 24.) Defendant also argues that plaintiff later recommended DeKroub and Steudle fire Kruczynski.   Plaintiff agrees that her recommendations were given weight "on two isolated occasions over three years." (Dkt. 22 at 36.)   Defendant also argues that plaintiff interviewed two other people before her termination in 2014.   (Dkt. 18 at 25.)   However, defendant does not argue that those interviews were given weight.

To show that an employee's suggestions and recommendations are given "particular weight," the employer must show, among other things, the "frequency with which such suggestions and recommendations are made or requested; and the frequency with which the employee's suggestions and recommendations are relied upon."  29 C.F.R. 541.105.

This "does not include an occasional suggestion with regard to the change in status of a co-worker." Id.

Defendant has shown that it requested plaintiff give suggestions and recommendations four times in three years, and that it relied in some part on her suggestions and recommendations twice in those three years. Defendant argues that because there were so few hiring and firing situations in Central, the Court must instead look to the relative size of the workforce and the total number of times an employee was hired or fired.

The issue here is that, because there were so few such scenarios, plaintiff's input as to the hiring and firing of one employee could be characterized either as an "occasional suggestion" or as routine participation. Defendant has established that, in the four situations plaintiff participated in, it relied on her input twice. At the summary judgment stage, those two instances are insufficient to conclusively establish that defendant relied on plaintiff's input often enough that her input was given "particular weight."

Defendant has failed to meet its burden in establishing that plaintiff was subject to the FLSA's executive exemption. Accordingly, the Court must deny summary judgment as to this argument.

## B. Administrative Exemption

Defendant claims that plaintiff is also exempt under the FLSA's administrative exemption, 29 C.F.R. § 541.200. To show that the administrative exemption applies, defendant must show that plaintiff was an employee:

> (1) Compensated on a salary or fee basis at a rate of not less than $455 per week (or $380 per week, if employed in American Samoa by employers other than the Federal Government), exclusive of board, lodging or other facilities;
>
> (2) Whose primary duty is the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers; and
>
> (3) Whose primary duty includes the exercise of discretion and independent judgment with respect to matters of significance.

Id.

As set forth above, this argument fails on the salary basis alone, as defendant has not established that plaintiff was paid a salary.

41

Under 29 C.F.R. § 541.201, "[w]ork directly related to management or general business operations includes, but is not limited to, work in functional areas such as tax; finance; accounting; budgeting; auditing; insurance; quality control; purchasing; procurement; advertising; marketing; research; safety and health; personnel management; human resources; employee benefits; labor relations; public relations, government relations; computer network, internet and database administration; legal and regulatory compliance; and similar activities."

Defendant does not specifically argue that plaintiff's primary duty was the performance of office work directly related to the management or general business operations of the employer or its customers. As mentioned previously, bookkeepers "generally will not qualify as exempt professionals." 29 C.F.R. § 541.301(e)(5). Again, defendant's "primary duty" argument begs the question – there is at a minimum a material question of fact as to whether the set of duties defendant has set forth were directly related to the management or general business operations of defendant, and were plaintiff's primary duties. Defendant has again failed to meet its burden on this factor.

42

Finally, defendant must show that plaintiff's primary duty includes the exercise of discretion and independent judgment with respect to matters of significance.   As defined under 29 C.F.R. § 541.202:

> The phrase "discretion and independent judgment" must be applied in the light of all the facts involved in the particular employment situation in which the question arises. Factors to consider when determining whether an employee exercises discretion and independent judgment with respect to matters of significance include, but are not limited to: whether the employee has authority to formulate, affect, interpret, or implement management policies or operating practices; whether the employee carries out major assignments in conducting the operations of the business; whether the employee performs work that affects business operations to a substantial degree, even if the employee's assignments are related to operation of a particular segment of the business; whether the employee has authority to commit the employer in matters that have significant financial impact; whether the employee has authority to waive or deviate from established policies and procedures without prior approval; whether the employee has authority to negotiate and bind the company on significant matters; whether the employee provides consultation or expert advice to management; whether the employee is involved in planning long- or short-term business objectives; whether the employee investigates and resolves matters of significance on behalf of management; and whether the employee represents the company in handling complaints, arbitrating disputes or resolving grievances.

§ 541.202(b).  The term "'matters of significance' refers to the level of importance or consequence of the work performed."  § 541.202(a).  "The exercise of discretion and independent judgment also does not include clerical or secretarial work, recording or tabulating data, or performing other mechanical, repetitive, recurrent or routine work."  § 541.202(e).

Defendant, relying on many of the same activities that were allegedly exempt executive activities, argues that plaintiff routinely exercised discretion and independent judgment.  Defendant argues that plaintiff formulated and implemented management policies and operating practices by 1) implementing procedures to process real estate transactions; 2) drafting procedures to pay brokers and agents with corporations; 3) drafting banking procedures; 4) devising procedures to pay remote agents at closing; and 5) adopting and enforcing techniques to avoid having checks bounce.  (Dkt. 18 at 26.)  As a threshold matter, and as discussed more fully above, defendant fails at each turn to demonstrate that plaintiff actually created or implemented these "procedures," rather than either clarifying how existing procedures worked, or communicating how procedures external to defendant's business worked to defendant.

Defendant argues that plaintiff carried out major assignments in conducting the operation of the business by 1) "switching the accounting software;" and 2) "being [defendant's] designate for the escrow audit." (Dkt. 18 at 26.)   Plaintiff investigated and priced out software alternatives, and defendant ultimately ended up choosing and purchasing plaintiff's recommended software.   It is unclear how this constitutes a "major assignment," particularly when defendant does not argue that plaintiff switched the software, but instead that plaintiff researched which software defendant might switch to, after which point defendant chose to switch to that software.   Defendant also states that plaintiff's role was to "deal[] with the auditor and respond to requests for information or documents."   (Dkt. 18 at 14.)   Defendant provides little in the way of explanation how giving requested information and documents to a third party constitutes a "major assignment" or an "exercise of discretion."

Defendant argues generally that plaintiff performed work that affected business operations to a substantial degree, relying on the same work used to argue that plaintiff formulated policies.   In the light most favorable to plaintiff, much of what she did resolved issues of

varying levels of importance to defendant, and did not affect business operations except to have its procedures run more smoothly.

Defendant argues that plaintiff had the authority to negotiate and bind the company on significant matters by "[choosing] and obtain[ing] Quickbooks and deal[ing] independently with the IRS over penalties." (Id. at 26-27.)  Again, defendant does not argue that plaintiff chose or obtained QuickBooks.  Defendant argues that *it* chose and obtained QuickBooks.  (Id. at 18.)

Plaintiff's letter to the IRS did not constitute a negotiation or a binding of defendant to the IRS on any significant matter, particularly as "[t]he issue was still pending when Plaintiff left the position[.]"  (Id.)  Further, the letter was an attempt to resolve the penalty by demonstrating that plaintiff had mailed the required documents, and thus that defendant had already complied with IRS requirements. Accordingly, plaintiff's letter informed the IRS that defendant did not need to take any further action, rather than an effort to bind defendant to some other agreement or negotiate an alternative resolution to the penalty.  (Dkt. 18-16.)

46

Defendant argues that plaintiff provided consultation and expert advice to management by consulting with state auditors and "recommend[ing] processes compliant with real estate laws." (Dkt. 18 at 27.) This section of the regulation requires the plaintiff to provide consultation to defendant, not for the plaintiff to consult with someone else and relay that information to defendant. It is also unclear what "expert advice" defendant claims to have received from plaintiff's recommendations.

Defendant argues that plaintiff investigated and resolved matters of significance on behalf of management by 1) investigating a process to pay agents' corporations and 2) investigating how to make deposits and pay agents at remote offices. As set forth above, plaintiff argues that she made minor changes to coding and figured out which branches to make deposits at. This creates a genuine issue of material fact as to whether plaintiff's actions rose to the levels contemplated in FLSA regulations.

Finally, defendant argues that plaintiff represented the company in handling complaints, arbitrating disputes, or resolving grievances by

47

1) writing a letter to the IRS; 2) disputing unemployment claims; and 3) signing evictions as "Agent". (Id. at 27.)

Even if the Court were to determine that a letter informing the IRS of the date tax returns were mailed constituted the handling of a complaint, dispute, or grievance, defendant has failed to show that plaintiff was actually authorized or expected to do so – particularly as neither Steudle nor DeKroub knew about the issue until after plaintiff left. Defendant provides no authority that would allow it to convert an hourly employee into a salaried employee under the FLSA because the employee acted outside the scope of her employment.

Plaintiff has established that she responded to every request for information the state of Michigan sent regarding unemployment claims, but that actual hearings were handled by an attorney. Defendant does not dispute that contention. Accordingly, defendant's attorney arbitrated those employment disputes.

Finally, plaintiff was instructed to sign certain eviction forms as "Agent," but actual decisions about eviction were made by DeKroub or the property manager. (Dkt. 22 at 40-41.) Defendant's insistence that plaintiff sign eviction forms as an "Agent" does not establish that she

48

actually represented the company in any complaint, dispute, or grievance that arose from the eviction.

Accordingly, defendant has failed to meet its burden in showing that plaintiff was covered by the administrative exemption. Coupled with defendant's failure to meet its burden in showing that plaintiff was covered by the executive exemption, it is clear that several genuine issues of material fact exist that preclude summary judgment on plaintiff's FLSA claim.

### C. Unjust Enrichment

Plaintiff also asserts a claim in the alternative for unjust enrichment under Michigan law for her unpaid wages. At oral argument, plaintiff's counsel clarified that although the claim is for "unpaid overtime," plaintiff is claiming that the unjust enrichment is for unpaid straight-time for hours worked over forty, rather than a restatement of her claim for time-and-a-half wages under the FLSA.

The Court requested supplemental briefing on the issue of whether this claim might be barred by the applicable six-year statute of limitations for unjust enrichment claims from the time they first accrue, as set forth at M.C.L. § 600.5813. (Dkt. 29.) Plaintiff timely filed her

supplemental brief on December 9, 2015.  (Dkt. 30.)  She argued that the claim first accrued in January 2009, when  defendant ceased paying her straight-time for her overtime hours.

Defendant filed a response on December 11, 2015.  (Dkt. 34.) Defendant argues that plaintiff's claim accrued on October 16, 2008, when defendant stopped paying plaintiff time-and-a-half overtime pay, which was twelve days outside the applicable statute of limitations period.

Under Michigan law, to sustain a claim of unjust enrichment a plaintiff must establish "(1) the receipt of a benefit by the defendant from the plaintiff and (2) an inequity resulting to the plaintiff because of the retention of the benefit by the defendant." *Morris Pumps v. Centerline Piping, Inc.*, 273 Mich. App. 187, 195 (2006).  Plaintiff alleges that the benefit defendant received was the work she performed in excess of forty hours each week, and that the inequity is the lack of straight-time pay for those hours.  Accordingly, plaintiff's claim accrued on January 22, 2009, the first day defendant stopped paying plaintiff straight-time overtime.  (*See* Dkt. 30-4.)

Defendant argues that this claim should be dismissed on the merits because common-law claims are generally preempted by the FLSA.

Defendant cites *Anderson v. Sara Lee Corp.*, 508 F.3d 181 (4th Cir. 2007), in which the Fourth Circuit Court of Appeals held that state law contract, negligence, and fraud claims were preempted under a theory of "conflict preemption" by the FLSA. *Id.* at 192-93. The *Anderson* court held that the state claims were both based on FLSA and stood "as an obstacle to the accomplishment of the full purposes and objectives of the FLSA." *Id.* at 193 (internal quotation marks and further citation omitted). This was so because the plaintiffs "rel[ied] on the FLSA for their rights, and they invoke[d] state law only as the source of the remedies for the alleged FLSA violations," which "the FLSA does not explicitly authorize states" to do. *Id.*

Defendant also relies on three other cases. In *DeSilva v. N. Shore-Long Is. Jewish Health Sys., Inc.*, 770 F. Supp. 2d 497 (E.D.N.Y. 2011), the court held that the FLSA's remedial scheme precluded a separate civil RICO action as a method for vindicating wage and hour rights established under the FLSA. *Id.* at 515. In *Barrus v. Dick's Sporting*

51

*Goods, Inc.*, 732 F. Supp. 2d 243 (W.D.N.Y. 2010), the court held that "common law claims for overtime pay are preempted by the FLSA." *Id.* at 255 (citing *Lopez v. Flight Servs. & Sys., Inc.,* Case No. 07-cv-6186, 2008 WL 203028, at *5, 7 (W.D.N.Y. Jan. 23, 2008).

In *Pacheco v. Boar's Head Provisions Co., Inc.*, Case No. 09-cv-298, 2010 WL 1323785, at *4-5 (W.D. Mich. Mar. 30, 2010), the court held that a claim for unjust enrichment resulting from nonpayment of overtime wages was barred in a case also asserting an FLSA claim. However, the court's analysis in that case was premised not on preemption by the FLSA, but instead on the particular limits of Michigan unjust enrichment claims.

The view that the FLSA can preempt even redundant state law claims "is considered . . . to be a minority view." *Monahan v. Smyth Automotive, Inc.*, 2011 WL 379129, at *4 (S.D. Ohio Feb. 2, 2011). "[E]ven where state law claims have been identical to FLSA claims, no preemption has been found." *Id.* (collecting cases). The FLSA contains a "savings clause" that expressly permits states to create their own wage and hour laws. 29 U.S.C. § 218(a). By extension, the FLSA can be read so as not to preempt remedies under state law. That is

52

particularly so where plaintiff's state law claim is not redundant of the FLSA's claim, but instead states a different legal theory than the FLSA claim.

Despite the fact that the FLSA does not bar plaintiff's unjust enrichment claim, part of her unjust enrichment claim is barred by Michigan law. In Michigan, "additional recovery under the theory of unjust enrichment is precluded by" the existence of "a legal remedy," because unjust enrichment provides an "equitable remedy." *Kingsley Assocs., Inc. v. Moll PlastiCrafters, Inc.*, 65 F.3d 498, 506 (6th Cir. 1995) (citing *Kammer Asphalt Paving Co., Inc. v. East China Twp. Schs.,* 443 Mich. 176 (1993); *City of Detroit v. City of Highland Park*, 326 Mich. 78 (1949)).

"When a plaintiff has set forth both legal and equitable claims seeking identical relief and covering the same subject matter, the proper course is generally dismissal of the equitable claim." *Romeo Inv. Ltd. v. Mich. Consol. Gas Co.,* No. 260320, 2007 WL 1264008, at *9 (Mich. Ct. App. May 1, 2007). "[A]n independent action for equitable relief will not lie where there is a full, complete, and adequate remedy at law, absent a showing that there is some feature of the case

53

peculiarly within the province of the court of equity." *Id.* (citing *ECCO, Ltd. v. Balimoy Mfg. Co., Inc.,* 179 Mich. App. 748, 751 (1989); *Basinger v. Provident Life & Accident Ins. Co.,* 67 Mich. App. 1, 5-6 n.11 (1976). The plaintiff does not have to actually recover under the legal theory for the equitable claim to be barred.  Instead, the opportunity for plaintiff to recover under a legal theory is sufficient to bar the equitable claim.

Plaintiff's FLSA claim covers the same subject matter – payment for hours worked over forty each week – and would provide a full, complete, and adequate remedy that would mirror and exceed the remedy plaintiff seeks under her unjust enrichment claim.  The statute of limitations on FLSA claims is two years after the cause of action accrued, or three years for willful violation of the statute.  29 U.S.C. § 255(a).  A new cause of action accrues under the FLSA each time the employer fails to pay proper compensation.  *See* 29 C.F.R. § 790.21.

Plaintiff may proceed with her unjust enrichment claim for unpaid straight-time pay for hours worked over forty each week.  However, plaintiff may not proceed with this claim for the three-year period prior to her filing suit, as a full, complete, and adequate remedy exists at law

54

under the FLSA.[4]  Accordingly, plaintiff may proceed with her unjust enrichment claim for the time period between January 22, 2009 and October 28, 2011.  Plaintiff must seek remedies for payments made to her before October 28, 2011 through her unjust enrichment claim, and must seek remedies for payments made to her after that date through her FLSA claim.

## IV.   Conclusion

For the reasons set forth above, it is hereby ordered that:

Defendant's motion for summary judgment (Dkt. 18) is DENIED; and

Plaintiff may proceed with her FLSA claim and her unjust enrichment claim, with the time period for her unjust enrichment claim limited to pay received between January 22, 2009 and October 18, 2011.

IT IS SO ORDERED.

Dated: January 4, 2016                         s/Judith E. Levy
Ann Arbor, Michigan                          JUDITH E. LEVY
                                                          United States District Judge

---

[4] Because Michigan law bars equitable claims where the opportunity for a legal remedy exists, and plaintiff still has the opportunity to prevail on a theory of willful violation of the FLSA with a three-year statute of limitations, the fact that she may only prevail under the two-year statute of limitations (or not at all) does not mean she may assert her equitable claim for that period of uncertain recovery.

## **CERTIFICATE OF SERVICE**

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on January 4, 2016.


s/Felicia M. Moses
FELICIA M. MOSES
Case Manager