```
 1                    UNITED STATES DISTRICT COURT
                      EASTERN DISTRICT OF MICHIGAN
 2                          SOUTHERN DIVISION

 3    SHERRY L. DUFFIE,

 4                  Plaintiff,
        -v-                                  Case No. 14-14148
 5
      THE MICHIGAN GROUP, INC. -
 6    LIVINGSTON d/b/a RE/MAX
      PLATINUM, a Michigan corporation,
 7
                    Defendant.
 8    _____/

 9                          JURY TRIAL

10
            BEFORE THE HONORABLE JUDITH E. LEVY
11             UNITED STATES DISTRICT JUDGE

12                     JANUARY 25, 2016

13
      APPEARANCES:
14
      For the Plaintiff:    Brian Farrar and Elisabeth Aurora Gusfa
15                          Sterling Attorneys at Law, P.C.
                            33 Bloomfield Hills Parkway, Suite 250
16                          Bloomfield Hills, Michigan 48304

17    For the Defendant:    William E. Pilchak and Robert N. Dare
                            Pilchak and Cohen PC
18                          3062 East Walton Boulevard
                            Auburn Hills, Michigan 48326
19
                            William T. Russell
20                          7600 Grand River Road
                            Brighton, Michigan 48116
21

22

23           To Obtain a Certified Transcript Contact:
                 Jeseca C. Eddington, RMR, CRR, FCRR
24                Federal Official Court Reporter
                   United States District Court
25         200 East Liberty Street - Ann Arbor, Michigan 48104
```

January 25, 2016

1                            **I N D E X**

2    **WITNESSES**                                              **PAGE**
       SHERRY DUFFIE
3          Cross-examination (cont.) by Mr. Pilchak.....6
           Redirect examination by Mr. Farrar..........77
4          Recross-examination by Mr. Pilchak..........96
           Redirect examination by Mr. Farrar.........100
5      AL WICKE
           Direct examination by Mr. Farrar...........101
6          Cross-examination by Mr. Dare..............109
           Redirect examination by Mr. Farrar.........114
7      KENNETH DURRANT
           Direct examination by Ms. Gusfa............115
8          Cross-examination by Mr. Pilchak...........121
       DARIN URECHE
9          Direct examination by Mr. Farrar...........122
           Cross-examination by Mr. Pilchak...........127
10     ERICA HAHN
           Direct examination by Mr. Pilchak..........146
11         Cross-examination by Mr. Farrar............156
           Voir Dire examination by Mr. Pilchak.......163
12         Cross-examination (Cont.) by Mr. Farrar....164
           Redirect examination by Mr. Pilchak........169
13         Recross-examination by Mr. Farrar..........172
           Redirect examination by Mr. Pilchak........173
14         Recross-examination by Mr. Farrar..........174
       LINN FELKER
15         Direct examination by Mr. Pilchak..........178
           Cross-examination by Mr. Farrar............185
16         Redirect examination by Mr. Pilchak........192
       KANDIS THOMPSON
17         Direct examination by Mr. Pilchak..........197

18   **DEFENSE EXHIBITS**                        **PLAINTIFF EXHIBITS**
                 **PAGE**              **PAGE**                **PAGE**
19
       D-5.........177      D-49......154        P-1.......164
20     D-13B.......36       D-50......75
       D-22........19       D-52......179
21     D-23A.......27       D-56......180
       D-23B.......28       D-59......182
22     D-24........24       D-60......73
       D-27........8        D-61......76
23     D-28........41       D-72......12
       D-31........49       D-74......14
24
25   **MISCELLANY**
             Proceedings..................................3
             Certificate................................211

1                        **P R O C E E D I N G S**

2              THE COURT:  This is the case of Sherry L. Duffie vs

3    The Michigan Group, Inc., doing business as RE/MAX Platinum,

4    case 14-14148.  Could I please have appearances for the

5    record?

6              MR. FARRAR:  Good morning, your Honor.  Brian Farrar

7    for the plaintiff.

8              MS. GUSFA:  Good morning, your Honor.  Elisabeth

9    Gusfa for the plaintiff.

10             MR. PILCHAK:  Your Honor, William E. Pilchak for the

11   defendant.

12             MR. DARE:  And Robert Dare for the defendant.

13             MR. RUSSELL:  And William Russell for the defendant.

14             THE COURT:  Okay.  Well, welcome back to everyone.

15   What do you have, Mr. Farrar?

16             MR. FARRAR:  Your Honor, I guess just briefly I

17   wanted to raise with the Court's -- bring to the Court's

18   attention a discussion I just had a few moments ago with Mr.

19   Pilchak.  And this is regarding the interstate commerce issue

20   that came up in the jury instructions.

21             THE COURT:  Oh.  Yeah.

22             MR. FARRAR:  I don't want to speak for Mr. Pilchak.

23   But it seems like from based on our discussion that defendant

24   will no longer be pursuing that or, I guess, making an issue

25   of that.

1    THE COURT:  Well, he wasn't making an issue except in
2  the jury instructions.
3    MR. PILCHAK:  Right.
4    THE COURT:  Because it's in the list of stipulations,
5  right?
6    MR. PILCHAK:  Well, that's the issue that we're --
7  there is a fairly complicated issue.  An employer is, under
8  the definition of the Fair Labor Standard Act, is merely
9  somebody who stands in relation of an employer to an employee.
10  The interstate commerce element is a whole different thing.
11  It's a whole different aspect of the case.
12    I'm just -- I had a discussion with Mr. Farrar.  The
13  defense does not want to make that a central issue either for
14  -- or an issue for either jury instructions or directed
15  verdict purposes.  Frankly, we feel that there's already
16  enough on the record with regard to interstate commerce for
17  directed purpose -- directed verdict purposes.  And we don't
18  really think there's a need to distract the jury from the
19  essential issues of the case.
20    THE COURT:  Okay.
21    MR. PILCHAK:  So I won't be requesting on the jury
22  instructions and to the extent they mention interstate
23  commerce.
24    THE COURT:  Okay.  So we'll take all of that out,
25  which we were going to do anyway.

January 25, 2016

```
 1              MR. PILCHAK:  Okay.

 2              THE COURT:  But it helps that you agree.

 3              MR. FARRAR:  And therefore, in light of that, then we

 4    will no longer need to solicit any testimony regarding that

 5    because it sounds like it's clear now that that will not be an

 6    issue in this case.

 7              THE COURT:  Well, let's be perfectly clear about

 8    whether it's an issue.  See, I had understood when I read the

 9    stipulation that you are an employer as defined by section 203

10    D, that that was what this stipulation was about.  I now

11    understand that apparently that was not what the stipulation

12    was meant to encompass.

13              So let me be perfectly clear.  It is stipulated

14    between the parties that the defendant is an employer as

15    defined by the Fair Labor Standard Act that engages in

16    interstate commerce and, therefore, potentially has liability

17    of this particular case.

18              MR. PILCHAK:  Yes, your Honor, we can stipulate to

19    that.

20              THE COURT:  Okay.

21              MR. FARRAR:  Thank you.  Nothing further.

22              THE COURT:  All right.  Well, then we will get

23    started.  And is Ms. Duffie going to be back on the stand?

24              MR. PILCHAK:  Yes.

25              THE COURT:  Okay.  I think what I'll do is have the
```

```
 1    jury come in, then have you take the stand and remind you in
 2    front of them that you're under oath just so that they
 3    understand that.  In light of the fact that it's close to
 4    9:30, I'm imagining that we'll take a convenience break at
 5    just about 11:00.  And then we'll go until 1:00 for the matter
 6    that I have at 1:00.
 7                THE CASE MANAGER:  All rise for the jury.
 8                            (Jury In)
 9                THE COURT:  Please be seated.  Welcome back to our
10    jury.  It's great to see you on a Monday morning.  And we are
11    very fortunate people not to have had three feet of snow over
12    the weekend, so, as much of the country did.  So welcome back.
13    And what we're going to do is resume right where we left off
14    on Friday, which will be Ms. Duffie on the stand.
15                And for the jury, I think I mentioned this earlier
16    with a different witness.  But once someone is sworn in to
17    tell the truth in a case, they continue to be under that oath
18    to tell the truth.  So Ms. Duffie is still sworn in this case.
19    And we were -- Mr. Pilchak was finishing up or continuing with
20    his questioning.  So please proceed.
21                Thereupon,
22                    S H E R R Y   D U F F I E ,
23    having previously been called as a witness and having been
24    first duly sworn testified as follows:
25                        CROSS-EXAMINATION (CONTINUED)
```

January 25, 2016

```
1    BY MR. PILCHAK:
2    Q.   Ms. Duffie, you will find in front of you, like you had on
3    Friday, the exhibits, Defense Exhibits, and your deposition
4    transcript, should you need to refer to it.
5             We've been talking about a number of individuals.
6    Linn Felker.  Linn Felker was in Central even before the
7    merger, correct?
8    A.   Correct.
9    Q.   I'm sorry?
10   A.   Correct.  I'm sorry.
11   Q.   And then Erica Hahn went into Central at the time of the
12   merger, correct?
13   A.   Correct.
14   Q.   And that she was there for a period of time, correct?
15   A.   Correct.
16   Q.   And then she left?
17   A.   Yes.
18   Q.   And a person by the name of Samantha Rencsak worked in
19   Central?
20   A.   Yes.
21   Q.   And then Samantha Rencsak left.  And approximately a few
22   weeks later Valery Kruczynski was hired, correct?
23   A.   I believe so.
24   Q.   Okay.  So essentially except for that gap of perhaps a
25   couple or few weeks between Rencsak and Kruczynski, besides you
```

January 25, 2016

1   between March of 2011 and March of 2014, there were at least

2   always two other people working in Central?

3   A.   And others, too.

4   Q.   Okay.  Would you turn to proposed Exhibit 27?

5           THE COURT:  Of defendant's?

6   BY MR. PILCHAK:

7   Q.   Defendant's proposed 27.  Do you identify this as an

8   e-mail from you to Erica Hahn and Linn Felker?

9   A.   Yes.

10  Q.   And is the general subject regarding work to be done?

11  A.   Yes.

12          MR. PILCHAK:  Move to admit, your Honor.

13          THE COURT:  Is there any objection?

14          MR. FARRAR:  No, Your Honor.

15          THE COURT:  Okay.  Then Defense Exhibit 27 is

16   received.

17                          (Defense Exhibit No. D-27 Admitted

18                           Into Evidence)

19          MR. PILCHAK:  And may I display it, your Honor?

20          THE COURT:  Yes.

21  BY MR. PILCHAK:

22  Q.   Ms. Duffie, the first line of this -- the first paragraph

23  of this is directed to Erica Hahn, correct?

24  A.   Yes.

25  Q.   And your statement to her was, please work with Linn so

1   she can begin getting the mail for Central and show her how to

2   input RE/MAX payables in RMS?  That was your first sentence to

3   her?

4   A.   Yes.

5   Q.   And would you agree with me that this was part of a

6   cross-training effort that you had implemented?

7   A.   Well, I didn't implement the cross-training effort.  But

8   this had been a discussion between Erica, Linn, and myself on

9   how we were going to try and cover some of Erica's time off.

10  Q.   Well, is it or is it not part of a cross-training effort?

11  A.   It is part of a cross-training effort.

12  Q.   Okay.  And so the cross-training effort is so that Linn

13  can start getting the mail for Central, correct?

14  A.   It was so that Linn could recognize the mail for what it

15  was.

16  Q.   Right.  In other words, getting the mail in and sorting

17  through it requires some recognition of what the mail relates

18  to, correct?

19  A.   The company.  Correct.

20  Q.   And who it should go to?

21  A.   Yeah.

22  Q.   Okay.  And then the second part of that first phrase is to

23  show her how to input RE/MAX payables into RMS.  And the

24  reference to RMS is the Lone Wolf Realty Management System,

25  correct?

1   A.   Yes.

2   Q.   And so you wanted Erica to show Linn how to input RE/MAX

3   payables into the Lone Wolf system?

4   A.   Yes.  She had already been teaching her how to write them

5   up and she needed to show her how to input them.

6   Q.   Okay.  And then the next statement is I have a stack on my

7   desk that I will give to both of you tomorrow.  In other words,

8   you had a stack of payables on your desk and you're giving

9   them, through that statement, to Erica so that they can input

10  them together as part of this cross-training effort, correct?

11  A.   Yes.

12  Q.   And I've already talked to Linn about the bills, credit

13  card mortgage payments, etcetera, that I need to see

14  immediately before they're posted, correct?

15  A.   Yes.

16  Q.   So you had given some direction to Linn Felker in this

17  respect, correct?

18  A.   I had shown her what I needed to see.

19  Q.   And you would agree with me that Linn Felker looked to you

20  for guidance in terms of the processes?

21  A.   If she -- yeah, she looked to me for help on them.

22  Absolutely.

23  Q.   For guidance.  I'm specifically saying guidance.

24  A.   I guess you can possibly say guidance.  I mean, it was

25  help.  We were helping each other.

January 25, 2016

1    Q.   Well, in fact, you instructed and trained Linn Felker with

2    respect to processes?

3    A.   Actually, Erica trained Linn Felker on most of them.   I

4    think I showed Linn closings.   I'm not positive.

5    Q.   You trained her on processes then?

6    A.   How to input data, absolutely.

7    Q.   And she had been working in Central longer than you?

8    A.   Yes.

9    Q.   And you understood that Felker looked to you as her

10   supervisor at least with respect to procedures?

11   A.   Probably because I was most experienced with it, yes.

12   Q.   And you were more -- most experienced with these

13   procedures even though you had worked -- or she had worked in

14   Central longer than you?

15   A.   Well, certainly on the closings that I was showing her how

16   to do.   She had never been doing those.   She had been doing

17   many other things in Central.

18   Q.   Would you turn to proposed exhibit -- defendant's proposed

19   Exhibit 72?   Do you identify proposed Exhibit 72 as an e-mail

20   from you under the -- over the signature block administrative

21   manager?

22   A.   Yes.

23   Q.   And it's an e-mail to an Aileen Heck, correct?

24   A.   Yes.

25   Q.   And it references training or references a class?

```
 1   A.   Right.  A roundtable discussion we were having.
 2             MR. PILCHAK:  Move to admit proposed Exhibit 72.
 3             MR. FARRAR:  No objection.
 4             THE COURT:  Okay.  It will be received.
 5                              (Defense Exhibit No. D-72 Admitted
 6                              Into Evidence)
 7             MR. PILCHAK:  And may I display, your Honor?
 8             THE COURT:  Yes.
 9   BY MR. PILCHAK:
10   Q.  Aileen Heck apparently had intended to stop into the
11   office and see you; is that correct?
12   A.   Yeah.  I think she was bringing in paperwork.  I'm not
13   positive.  But yes, I believe she was dropping some stuff off
14   to me.
15   Q.  Well, what I'm interested in is the statement that you
16   included, "I am having a class for my administrators tomorrow
17   from 10:00 AM until approximately noon."  Do you see that?
18   A.  I see that.
19   Q.   Okay.  So you were having a class for, quote, your
20   administrators, end quote.  Correct?
21   A.   That's what I wrote.  We were having a roundtable on
22   problems and issues that they were having in other offices.
23   Q.   And you at least partially delivered that class, correct?
24   A.   There wasn't instruction.  It was -- we had manuals and we
25   were going through the manuals to make sure nobody had
```

1   questions.  We had some difficulty transactions and it was to

2   clear up any confusion.

3   Q.  Well, did you deliver training at that session or not?

4   A.  No, it wasn't training.  No.

5   Q.  Okay.  Would you turn to page 177 of the transcript?

6           MR. FARRAR:  What line are we referring to?

7   BY MR. PILCHAK:

8   Q.  In fact, just -- you can reference page 166 starting at

9   line 22 to yourself.  Reference that to yourself.

10  A.  Okay.

11  Q.  Having reviewed the bottom of page 176 --

12  A.  Oh, I thought you said 66.

13          MR. FARRAR:  You did say 166.

14  BY MR. PILCHAK:

15  Q.  Oh, I'm sorry.  176 to page 177.

16  A.  Oh.

17  Q.  I'm sorry if I misspoke.  Having reviewed the bottom of

18  page 176, are you confident that this portion of your testimony

19  was discussing this e-mail referencing the class for

20  administrators?

21  A.  Yes.

22  Q.  All right.  And then going to page 177 at line 13, did I

23  ask you this question and did you deliver this answer at least

24  in the first sentence of your answer.

25                          "QUESTION: And did you deliver the

```
 1                                  "training?
 2                                  "ANSWER: Partially so.  But like I
 3                                  "said, it was more of a round
 4                                  "training -- more of a roundtable
 5                                  "discussion on different things."
 6   A.   Yes.
 7   Q.   Okay.  So I mean, you delivered some training in that
 8   session, correct?
 9   A.   I guess you could characterize it as training even though
10   we were all, you know, discussing things.
11   Q.   Okay.  And would you turn to proposed exhibit Defense
12   Exhibit 74.  Do you identify proposed Exhibit D-74 as an e-mail
13   chain between you and Staci Wodolan?
14   A.   Yes.
15   Q.   And is there a reference to training in this e-mail?
16   A.   Yes.  Staci was looking for a --
17   Q.   The answer is yes?
18   A.   -- referral check.  And Linn was training Valery so she
19   had not done it yet.
20            MR. PILCHAK:  Move to admit proposed Exhibit D-74.
21            MR. FARRAR:  No objection.
22            THE COURT:  Okay.  D-74 is received.
23                              (Defense Exhibit No. D-74 Admitted
24                               Into Evidence)
25   BY MR. PILCHAK:
```

January 25, 2016

1   Q.   Ms. Duffie, in your November 20th, 2012 e-mail you stated,

2   "Hi, Staci.  Sorry for the delay.  We are training new staff

3   and we are turning these around a little slow right now."

4   Those were your words in 2012?

5   A.   Yes.

6   Q.   And the new staff that you were training, would that have

7   been Samantha Rencsak who arrived in the department after Erica

8   Hahn's approximate August of 2012 departure?

9   A.   That's possible.

10  Q.   Okay.  Do you remember what type of training that you were

11  delivering to Ms. Rencsak that would take you away for such a

12  period of time that you were turning checks around a little bit

13  slowly?

14          MR. FARRAR:  Objection.

15          THE COURT:  The basis of your objection?

16          MR. FARRAR:  The form of the question.  Also I

17   believe it's a mischaracterization of her testimony.

18          MR. PILCHAK:  Well, I'll withdraw.

19          THE COURT:  Okay.

20  BY MR. PILCHAK:

21  Q.   You're telling Ms. Wodolan that you don't have your check

22  because you've been spending your time training your staff,

23  correct?

24  A.   No, that is not correct.

25  Q.   Okay.  What it is -- what is it that you're turning around

1    a little slow?

2    A.   Well, this was when Linn was processing closings.  And she

3    would have not had time to cut this check if she was training

4    Sam.

5    Q.   All right.  And why do you then say we are training staff

6    as opposed to Linn is training staff?

7    A.   We was Linn, Sam, me, and whoever was back there.

8    Q.   So you admitted just a few minutes ago that you trained

9    Linn?

10   A.   Specifically on closings.

11   Q.   And but you didn't train Samantha?

12   A.   No.  Not anything that I can recall.

13   Q.   Would you turn to proposed Exhibit D-73?  Do you identify

14   proposed Exhibit D-73 as a e-mail from you to a person by the

15   name of Kristen Knotek?

16   A.   Knotek.

17   Q.   Knotek.

18   A.   Yes.

19   Q.   And at the bottom of the first page of the exhibit, it

20   references training, correct?

21   A.   The bottom of -- yes.  Training.

22           MR. PILCHAK:  And I would move to admit proposed

23    Exhibit D-73.

24           THE COURT:  Is there any objection?

25           MR. FARRAR:  No objection, your Honor.

1            THE COURT:  Okay.

2            MR. PILCHAK:  And may I display, your Honor?

3            THE COURT:  Yes.

4   BY MR. PILCHAK:

5   Q.   Ms. Duffie, this is an e-mail from you to Kristen Knotek

6   regarding Lone Wolf training, correct?

7   A.   Correct.

8   Q.   And you are asking her is the training geared more -- let

9   me withdraw that.  You are investigating training materials

10  here, correct?

11  A.   I'm just asking the question of who the training was for.

12  Q.   Well --

13  A.   It was two different types of training.

14  Q.   You had looked at -- you had somehow learned of some

15  training materials that were offered, correct?

16  A.   She had sent me an e-mail, yes.

17  Q.   Okay.  And you were responding as -- to learn more

18  information about these training materials, correct?

19  A.   Basically just who it was for, whether it was for my

20  agents or my staff.

21  Q.   Right, right.  Okay.  So you were looking to see if --

22  where this training material -- who would benefit from this

23  training material?

24  A.   Right.  Because if this was agent training, we normally

25  would broadcast it out on our intranet for the agents so that

1    they could sign up if they wanted to do so.  Usually we set it

2    up so they could sign up through the program.

3    Q.  Well, this then says the program is mostly intended for

4    brokers, managers and office administrators and office staff

5    who would make the entries and run the reports in the system,

6    correct?

7    A.  Yes.

8    Q.  And the office administrators, managers, and office staff

9    would make the entries and run the reports from the system,

10   those would be the people in Central, correct?

11   A.  Yes.  And in our satellite offices.

12   Q.  And you said, we are all pretty trained on it, correct?

13   A.  Yes.

14   Q.  I just want to reference an exhibit that you've talked

15   about several times previously.  Exhibit 35, I just want to

16   reference this.  Your involvement in unemployment claims.  The

17   exhibit states, "I've disputed the every unemployment claim in

18   2012 --

19            MR. FARRAR:  I'm sorry.  Which exhibit are we

20   referring to?

21            MR. PILCHAK:  35.

22            MR. FARRAR:  That's not 35 I have.

23            THE COURT:  Just a minute.

24            MR. FARRAR:  It's the earlier -- I'll withdraw that.

25            THE COURT:  Oh, yeah.  It's page 2 of Exhibit 35.

1   BY MR. PILCHAK:

2   Q.   So your reference, "I have disputed every unemployment

3   claim" is what I want to reference here.  There is a process

4   for disputing unemployment claims, correct?

5   A.   It's a form, yes.

6   Q.   In fact, if you turn to Exhibit 21 already admitted -- let

7   me rephrase that.  Turn to proposed Exhibit 22.  You see a

8   one-page form?

9   A.   Yeah.  This is only one page of it though.

10  Q.   Can you identify in the upper right-hand corner that this

11  is what's known as a factfinding form?

12  A.   Yes.

13  Q.   And did you sign this form as administrative manager?

14  A.   Yes.

15            MR. PILCHAK:  Move to admit as proposed Exhibit 22.

16            THE COURT:  Is there any objection?

17            MR. FARRAR:  No objection.

18            THE COURT:  Then 22 is received.

19                      (Defense Exhibit No. D-22 Admitted

20                       Into Evidence)

21            MR. PILCHAK:  And may I display, your Honor.

22            THE COURT:  You may publish it to the jury.

23  BY MR. PILCHAK:

24  Q.   And this is a factfinding form with regard to Barbara

25  Webster, correct?

1    A.   It appears to be so.  It's not all here though.

2    Q.   That's right.  It's just the first page.

3    A.   Okay.

4    Q.   And you signed it as administrative manager, correct?

5    A.   Yes.

6    Q.   And in terms of factfinding, the factfinding process at

7    the unemployment agency is that the employer sends in their

8    version of the facts and the employee sends in their version of

9    the facts, and the unemployment agency makes a determination

10   whether a person should get benefits or not, correct?

11   A.   I do not remember exactly what is on the form.

12   Q.   I didn't ask what's on the form.

13   A.   I'm not sure what I had to fill out.  Usually it was

14   hours.  It was hours.  And if they were laid off or fired.

15   Q.   Okay.  And we're engaged in -- strike that.  Factfinding

16   does not suggest to you that there's a determination being made

17   on the facts?

18   A.   Well, I'm sure it does --

19            THE COURT:  Excuse me, sir, who just came in.  Are

20   you here for our 10 o'clock scheduling conference?

21                      (Pause In Proceedings)

22            THE COURT:  Thank you, Mr. Pilchak.

23            THE WITNESS:  I'm sorry.  Could you ask me the

24   question again?  I got distracted.

25   BY MR. PILCHAK:

January 25, 2016

```
1    Q.   Well, the factfinding, doesn't that suggest to you that
2    somebody's making a finding of fact?
3    A.   Yes.
4    Q.   Okay.  And let me now reference you to -- well, let me
5    rephrase that.  It has been your experience that people are
6    denied unemployment on the basis of what the employer -- what
7    information the employer submits to them, correct?
8    A.   Well, I would imagine if they had less than the amount of
9    credit weeks, sure.
10   Q.   Or if they had been dismissed for misconduct, correct?
11   A.   I'm not sure if I saw one ever have that happen.
12   Q.   Well, you -- okay.
13   A.   I'm not sure.
14   Q.   I want to reference you to Exhibits 21, which are already
15   admitted.  In the first line of Exhibit 21 it references
16   requesting a redetermination of benefits, correct?
17   A.   Yes.
18   Q.   So it is your experience that from time to time that the
19   unemployment agency would make a determination of benefits in
20   front of -- in favor of the employee, correct?
21   A.   That they would -- yes.
22   Q.   And then you would submit -- you would submit further
23   information just like Defense Exhibit 21 requesting a
24   redetermination, correct?
25   A.   Yes.  But this one was obviously done in mistake, in
```

1   error.

2   Q.   And in Exhibit 35 when you're saying that the rate has

3   gone down, you mean the experience rating that the company has

4   with the unemployment agency, correct?

5   A.   Right.  The percent that we paid in taxes.

6   Q.   And the reason that the rate went down is because you sent

7   in factfinding forms and requests for redetermination so that

8   the -- so that The Michigan Group did not have the experience

9   rating that it had previously?

10  A.   Right.  I filled out their forms.  And if they made an

11  error, I corrected it so that this would have increased the

12  amount we had to pay due to their mistake.

13  Q.   Sometimes these -- you reported misconduct, correct?

14  A.   I am not positive, but I believe one time there was.

15  Q.   Right.  And that was Barbara Webster, correct?

16  A.   I think that's possible, yes.

17  Q.   In an instance like Barbara Webster, in order to dispute

18  the claim, it was part of your job to go to the managers who

19  had witnessed the misconduct or who could provide information

20  about the misconduct, correct?

21  A.   Yes.

22  Q.   And this is not a duty that was ever delegated to anybody

23  other than you, such as Ms. Felker, Ms. Hahn or anybody like

24  that?

25            MR. FARRAR:  Objection.

```
 1              MR. PILCHAK:  Strike that.
 2    BY MR. PILCHAK:
 3    Q.   At least from March of 2011 through March of 2014, you
 4    were the only person in Central who went around to any managers
 5    to talk about any misconduct issues, correct?
 6    A.   I believe so.
 7    Q.   And you would agree that it would be inappropriate to make
 8    a lower level employee, like Ms. Hahn or Ms. Felker, privy to
 9    misconduct issues involving other employees?
10    A.   They were normally aware of this information.  I don't
11    believe they were ever excluded from any of this information.
12    Anything that -- I mean, anything that came into Central we
13    were all aware of.
14    Q.   Central also processed garnishments, correct?
15    A.   Yes.
16    Q.   And you were the person who was responsible for assuring
17    that the company followed the required processes for
18    garnishments, correct?
19    A.   Well, actually Erica, Linn and I all did garnishments,
20    yes.
21    Q.   Well, but you were the person who was responsible for
22    knowing the procedures, correct?
23    A.   Well, they had to know the procedures also.
24    Q.   Well, were you responsible for knowing the procedures?
25    A.   Yes, I was responsible for knowing it.
```

1   Q.   One of the things that Central did was initiate eviction

2   proceedings when that became necessary for tenants that lived

3   in duplexes owned by one of the subdivisions, correct?

4   A.   Yes.  For D & D Real Estate.

5   Q.   And would you turn to proposed Exhibit 24?

6   A.   Okay.

7   Q.   Do you identify proposed Exhibit Number 24 as a series of

8   forms with a notation in the upper left-hand corner approved

9   SCAO, which I will represent means state court administrators

10  office, related to the eviction process?

11  A.   Yes.

12  Q.   And do each of the forms bear your signature in the middle

13  left portion of the documents?

14  A.   Yes.

15         MR. PILCHAK:  Move to admit proposed Exhibit 24, your

16  Honor.

17         MR. FARRAR:  No objection.

18         THE COURT:  Okay.  They will be received -- it will

19  be received.

20                    (Defense Exhibit No. D-24 Admitted

21                     Into Evidence)

22         MR. PILCHAK:  May I display, your Honor?

23         THE COURT:  Yes.

24  BY MR. PILCHAK:

25  Q.   Ms. Duffie, you signed it here where it says signature of

1    owner of the premises or agent, correct?

2    A.   Yes.  I signed this as I was instructed.

3    Q.   Okay.  And the designation that you provided is agent and

4    that's what's provided for by the form, correct?

5    A.   Yes.  As I said, this is how I was shown to do this.

6    Q.   And with respect to these forms, these are the documents

7    that initiate the legal proceedings at the district court,

8    correct?

9            MR. FARRAR:  Objection.

10           MR. PILCHAK:  Let me rephrase the question.

11   BY MR. PILCHAK:

12   Q.   You send these in to the district court, correct?

13   A.   Yes.

14   Q.   All right.  And this initiates a legal process, correct?

15   A.   I believe so.

16   Q.   And initially at least you would be the person to whom

17   they would send the paperwork from the district court, correct?

18   A.   I'm trying to think what the paperwork would have been.  I

19   don't recall.

20   Q.   Well, you are the only person that's listed from the

21   employer in this matter?

22   A.   From D & D.  I'm assuming I would have gone if it was

23   addressed to D & D, absolutely.

24   Q.   And should it ever occur that there had to be a contested

25   hearing where proofs were taken in court, Mr. Russell might

1   then at that point in time make an appearance in the case,

2   correct?

3   A.   Yes.  Bill would do any court appearances.

4   Q.   We talked about the importance of opening the mail and

5   notice and determining who gets what.  Would you turn to

6   proposed Exhibit 23.  And specifically 23A.

7   A.   Okay.

8   Q.   Do you identify proposed Exhibit 23A as a communication

9   from the Internal Revenue Service?

10  A.   Yes.

11  Q.   And this came in the mail, correct?

12  A.   Yes.

13  Q.   And it came to your -- it eventually came to your

14  attention.  I'm not going to say it was addressed to you.  But

15  it came to your attention, correct?

16  A.   Sure.  It eventually ended up on my desk.

17  Q.   Eventually as in Linn Felker had received it?

18  A.   Any of us could have opened it.

19  Q.   Okay.  But it made it to your desk?

20  A.   Yes.

21  Q.   Okay.  And the subject matter of --

22          MR. PILCHAK:  Well, I move to admit proposed Exhibit

23   23A.

24          MR. FARRAR:  Your Honor, can we have one moment?

25          THE COURT:  Certainly.

1              MR. FARRAR:  No objection.

2              THE COURT:  Okay.  Then it will be received.

3                         (Defense Exhibit No. D-23A Admitted

4                          Into Evidence)

5              MR. PILCHAK:  And may I display it then, your Honor?

6              THE COURT:  Yes.

7    BY MR. PILCHAK:

8    Q.  And for the record, this is a document from the Internal

9    Revenue Service indicating that an intent to impose a penalty

10   for late filing of W-2 -- W-3 forms -- a W-3 form with W-2

11   forms, correct?

12   A.  Correct.

13   Q.  And the forms had been mailed regular mail, correct?

14   A.  Yes.

15   Q.  And they were contending that they did not receive them in

16   a timely fashion?

17   A.  Yes.

18   Q.  And in fact, that they were weren't mailed in a timely

19   fashion?

20   A.  It's the same thing, isn't it?  I mean, yes.

21   Q.  Okay.  And so they were proposing a penalty of $1,680,

22   correct?

23   A.  Yes.

24   Q.  And would you propose -- turn to proposed Exhibit 23B?

25   You have identified proposed Exhibit 23B as your letter to the

1    Internal Revenue Service?

2    A.   Yes.

3    Q.   In response to Exhibit 23A, correct?

4    A.   Yes.

5            MR. PILCHAK:  Move to admit proposed Exhibit 23B.

6            MR. FARRAR:  No objection.

7            THE COURT:  Let me just -- is 23B -- okay.

8    Certainly.  It is received.

9                             (Defense Exhibit No. D-23B Admitted

10                             Into Evidence)

11   BY MR. PILCHAK:

12   Q.   Ms. Duffie, this was your letter setting forth the

13   company's position as to why a penalty should not be proposed,

14   correct?

15   A.   Yes.  Because it was obviously an error.

16   Q.   You wrote the letter, correct?

17   A.   Yes.

18   Q.   And nobody else contributed to the letter, correct?

19   A.   Correct.

20   Q.   And in fact, you signed the letter administrative manager,

21   correct?

22   A.   Yes.

23   Q.   And in fact, you would agree that Ms. Steudle did not know

24   about this penalty issue, correct?

25           MR. FARRAR:  Objection.

```
 1              MR. PILCHAK:  Let me rephrase it --
 2              THE COURT:  Let's ask for the foundation for that
 3   first.
 4   BY MR. PILCHAK:
 5   Q.   Ms. Duffie, you don't believe -- based on all of the facts
 6   that you know, you have no reason to believe that Ms. Steudle
 7   knew anything about this penalty or your response, correct?
 8   A.   I don't recall.
 9   Q.   And based on all of the facts that you know, you have no
10   reason to believe that Mr. DeKroub knew anybody about the
11   penalty or your response, correct?
12   A.   I'm not sure.
13   Q.   In any case, it was within your authority in your office
14   as Central to write this letter as administrative manager
15   taking the company's position with regard to the penalty issue.
16              MR. FARRAR:  Objection.
17              THE COURT:  The basis?
18              MR. FARRAR:  To the form of the question.
19              MR. PILCHAK:  Let me rephrase it.
20              THE COURT:  Okay.
21   BY MR. PILCHAK:
22   Q.   It was within your authority to respond to the Internal
23   Revenue Service on this penalty issue?
24   A.   Because I was the one that took these to the post office.
25   I mail them personally.
```

1   Q.   Right.  And it was within your responsibility to respond

2   to this issue?

3   A.   Yes.

4   Q.   And it was your -- you decided what information would be

5   gathered, how you would respond to this issue, correct?

6   A.   I just basically told them what happened.  They were all

7   -- I mean, I didn't do anything other than say I mailed them

8   all.  Why are you saying this piece was missing when all of

9   this was there?

10  Q.   I understand what you have in the letter.  You said that

11  you mailed them, correct?

12  A.   Yes.

13  Q.   And you said that the receipt appears to be faded and

14  illegible, correct?

15  A.   That's correct.

16  Q.   So in other words, you made the decision on what

17  information should be put in here, what efforts should be done

18  in order to locate it, etcetera, correct?

19  A.   I suppose.

20  Q.   You made the decision that it wasn't worth going to the

21  post office to see if they had a record of the receipt that

22  would show all of the transactions?

23  A.   I wasn't aware that I could do that.

24  Q.   And whatever procedures were in place in Central didn't

25  require that something of this nature imposing IRS penalties

 1    had to be elevated to anybody above you within the company,

 2    correct?

 3    A.   If there was a procedure or process you said?

 4    Q.   I'm just saying.  Apparently there was nothing in place

 5    that required anything of this level of concern or this level

 6    of a problem to be forwarded to Jennie Steudle or Joseph

 7    DeKroub?

 8              MR. FARRAR:  Objection.

 9              MR. PILCHAK:  Is that correct?

10              THE COURT:  Well, overruled.  If she knows the

11    answer, she can answer.

12              THE WITNESS:  I truly do not remember who I would

13    have discussed this with.

14              THE COURT:  I think the question, Ms. Duffie, is was

15    there a manual or were there directions as to how they handled

16    challenge from the IRS or a problem with the IRS?

17              THE WITNESS:  I don't think so.

18    BY MR. PILCHAK:

19    Q.   So somebody within -- somebody within Central makes the

20    decision as to whether this needs to be escalated outside of

21    Central, correct?

22              MR. FARRAR:  Objection to form.

23              THE COURT:  Well, if she knows the answer.

24              THE WITNESS:  I'm sorry.  Could you repeat that,

25    please?

 1   BY MR. PILCHAK:

 2   Q.   So the decision is made within Central as to whether

 3   something of this nature needs to be escalated outside of

 4   Central, correct?

 5   A.   Well, Joe was in Central.  So it wouldn't be outside of

 6   Central.

 7   Q.   But Joe never learned of this as far as you know, correct?

 8   A.   As I said, I don't recall who I discussed this with.

 9   Q.   Well, I'm just asking, you can tell me that as far as you

10   know Mr. Steudle did not know about it, correct?

11   A.   Mr. DeKroub.

12   Q.   I'm sorry.  Mr. DeKroub did not know about it, correct?

13   A.   I'm not sure.

14   Q.   Well, would you turn to page 201 of your transcript?

15   Turning to line 2.  Did I ask you in March of 2015, and in fact

16   did anybody know about this penalty on September 12th, 2003

17   other than you?  You said possibly Kevin Stewart at UHY would

18   be the only one.  Correct?

19   A.   That's what I said.

20        MR. FARRAR:  Your Honor, we'd ask the rest of that

21    answer be read.

22        THE COURT:  Yeah.  Let's -- sustained.

23   BY MR. PILCHAK:

24   Q.   Well, was the full answer -- was the full question and the

25   full answer,

1                                        "QUESTION: In fact, did

2                                        "anybody know about this

3                                        "penalty on September 12th,

4                                        "2013 other than you?

5                                        "ANSWER: Possibly Kevin

6                                        "Stewart at UHY would be the

7                                        "only one, but the reason I

8                                        "responded was because this

9                                        "made no sense.  It had to be

10                                       "in error."

11    A.    Yes.

12    Q.    Now, there were no -- there was no person within The

13    Michigan Group that had a title that related to the human

14    resources function, correct?

15    A.    There was no person?  No, not --

16    Q.    Right.  There wasn't like an HR director or anything like

17    that?

18    A.    No.

19    Q.    And prior when you first joined The Michigan Group --

20    strike that.  When you first joined The Michigan Group, the

21    personnel files were kept under -- in a locked cabinet in

22    Kandis Thompson's office, correct?

23    A.    Yes.  For all the entities.

24    Q.    And then in March of 2011 when you came back to Central

25    from Ann Arbor, then you moved into Kandis Thompson's office,

1   correct?

2   A.   Yes.

3   Q.   And so the personnel files after you came back to Central

4   were kept in your office, correct?

5   A.   Yes.

6   Q.   And your office had a lock on the door, correct?

7   A.   Yes.

8   Q.   And in fact, the cabinet where the personnel files were

9   kept, that was a locked cabinet as well?

10  A.   Yes.

11  Q.   And you kept the key in a drawer in your office pushed way

12  back to the far, far back to the right-hand side behind your

13  pen drawer, correct?

14          MADAM COURT REPORTER:  I'm sorry.  You said behind

15  what?

16          MR. PILCHAK:  Your pen drawer.

17          THE WITNESS:  Yeah.  They were usually in that top

18  drawer.

19  BY MR. PILCHAK:

20  Q.   And you pushed it to the -- you kept it in the back behind

21  the pen drawer, correct?

22  A.   At night when I would leave for the day, they would be

23  behind the pen -- it was the pen box, whatever.

24  Q.   And the purpose of pushing it back there is that if

25  somebody actually were able to gain entrance to your office,

1    you were hoping that they wouldn't stumble upon the key to the

2    locked drawer?

3    A.   Well, yeah.  The cleaning people.  They would come at

4    night, so.

5    Q.   Precisely.

6    A.   But everybody else in Central knew where the keys were and

7    had keys to my office.

8    Q.   Right.  But the idea was that's why you pushed the --

9    that's why you had the keys in the back part of the cabinet so

10   not every Tom, Dick, or Harry who could come into your office

11   would find the keys, correct?

12   A.   Well, yeah.  Technically it was for the cleaning people

13   because they would be the only ones that would be there when no

14   one else was.

15   Q.   Well, Ken Durrant would come into your office, he was an

16   IT guy, right?

17   A.   Sure.

18   Q.   And one of the things that were kept in your office were

19   personnel policies, correct?

20   A.   Yes.

21   Q.   And in fact, if you would turn to Exhibit 13B, proposed

22   Exhibit 13B.

23            THE COURT:  What Exhibit number was that, Mr.

24    Pilchak?

25            MR. PILCHAK:  13B, your Honor.

1          THE COURT:  13B.  Okay.

2          MR. PILCHAK:  It's three pages.

3   A.   Okay.

4   Q.   Do you identify proposed Exhibit 13B as salaried

5   personnel, office personnel policies bearing your handwriting

6   in the second paragraph?

7   A.   Yes.

8   Q.   And they were signed on the last page by Valery

9   Kruczynski, correct?

10  A.   Yes.

11         MR. PILCHAK:  Move to admit proposed Exhibit 13B?

12         MR. FARRAR:  No objection.

13         THE COURT:  Okay.  It's received.

14                       (Defense Exhibit No. D-13B Admitted

15                       Into Evidence)

16  BY MR. PILCHAK:

17  Q.   Ms. Duffie, the handwriting that appears in the second

18  line where Saturday is scratched out and Friday is written in

19  and Friday is scratched out and Thursday is written in, is that

20  in your handwriting?

21  A.   Yes, that's my writing.

22  Q.   And that's because at some point in time after this policy

23  was written, the pay dates changed -- the pay days changed,

24  correct?

25  A.   I think I did this when Valery signed it because I looked

1    at it and it didn't appear to be the correct days.

2    Q.   Right, right.  The pay days that were reflected in the

3    policy that existed had changed from whenever this policy was

4    written and this was not accurate?

5    A.   Yeah.  Because this looks like it was written in 2004.

6    Q.   Okay.  Yeah.  And the reason that you see it was written

7    in 2004 is in the lower left-hand corner, correct?

8    A.   Yes.

9    Q.   And these policies that were written in 2004 reflect one

10   concept that we've heard in this courtroom, that management

11   does not intend for the workload to necessitate overtime,

12   correct?

13   A.   Where is that at?  I don't --

14   Q.   It's in the third sentence of the paragraph entitled

15   "Hours".

16   A.   Okay.  I see it.

17   Q.   Right.  And just for the record, Ms. Kruczynski's

18   signature appears on the third page, correct?

19   A.   Yes.

20   Q.   Now, these personnel policies, they were kept in your

21   office, correct?

22   A.   Yes.

23   Q.   And when new employees were hired into Michigan Group, you

24   would be the person who would give them the personnel policy,

25   correct?

```
 1   A.   No.  This -- no.  Normally I would give them to the
 2   manager that was hiring them.  The packets were in the drawer
 3   with all their forms.  The W-4 and the I-9 and everything was
 4   clamped together in my file cabinet drawer.
 5   Q.   You would normally give them to the managers who hired the
 6   employees to give to the employee they hired?
 7   A.   Right.  I had packages for Select Title, Michigan United
 8   Mortgage, RE/MAX, and LaVita Bistro.
 9   Q.   And you then gave the personnel policies to Ms.
10   Kruczynski?
11   A.   I'd pull the packet out of my drawer, and yes.
12   Q.   Because you hired her?
13   A.   Joe hired her.
14   Q.   I want to go through that process a bit.  Before Ms.
15   Kruczynski was hired, you were interested in obtaining somebody
16   who had experience in QuickBooks, correct?
17   A.   Yes.
18   Q.   And -- you had converted Central over to QuickBooks
19   sometime in 2012, correct?
20   A.   I believe 2012.
21   Q.   And you had prior experience with QuickBooks, correct?
22   A.   Yes.
23   Q.   And nobody else in Central had experience with QuickBooks,
24   correct?
25              MR. FARRAR:  Objection.
```

1               MR. PILCHAK:  Strike that.

2    BY MR. PILCHAK:

3    Q.  As far as you know, nobody else in -- well, let me

4    rephrase it.  At that point in time you weren't relying upon

5    anybody else in Central to do QuickBooks work prior to Ms.

6    Kruczynski being hired, correct?

7    A.  No, that's not correct.  Linn was doing a lot of work in

8    QuickBooks.

9    Q.  Prior to 2013?

10   A.  Yes.

11   Q.  Well, you needed to hire a person in addition to Linn in

12   order to work on QuickBooks' material, correct?

13   A.  Yes, we needed an additional person.

14   Q.  And you interviewed Valery Kruczynski, correct?

15   A.  Jennie asked me to talk to her after she had gotten the

16   resumé to find out if she knew QuickBooks.

17   Q.  My question to you, Ms. Duffie, is you interviewed Valery

18   Kruczynski, correct?

19               MR. FARRAR:  Objection.  Asked and answered.  And I

20    believe this was covered last week quite a lot.

21               THE COURT:  All right.  Well, let's have it one more

22    time and then we'll move on.

23               MR. PILCHAK:  Well, she hasn't actually talked about

24    it in cross.

25               THE COURT:  Go right ahead.  So overruled.

```
 1              MR. PILCHAK:  Other people have.
 2   BY MR. PILCHAK:
 3   Q.   You interviewed her, correct?
 4   A.   To find out if she knew QuickBooks.
 5   Q.   And neither Mr. DeKroub nor Ms. Steudle were present at
 6   the interview; correct?
 7   A.   No.
 8   Q.   That's correct?
 9   A.   That's correct.
10   Q.   And after you interviewed her, you felt that she had
11   enough experience in QuickBooks, correct?
12   A.   She knew QuickBooks, yes.
13   Q.   And you felt that she was a bright enough person to be
14   employed, correct?
15   A.   Sure.
16   Q.   And then you told Jennie Steudle about the interview,
17   correct?
18   A.   Yes.
19   Q.   And Steudle told you that if you felt that Valery had the
20   knowledge of QuickBooks, that you should go talk to Mr.
21   DeKroub, correct?
22   A.   Yes.
23   Q.   And you told Mr. DeKroub that her background in QuickBooks
24   was what you were looking for, correct?
25   A.   That I thought it might be, yes.
```

1  Q.   And Mr. DeKroub authorized an expenditure for Ms.

2  Kruczynski, correct?

3  A.   Yes, he indicated in an e-mail to me to offer her the job.

4  Q.   And you were -- you actually were the person who conveyed

5  the job offer to her?

6  A.   Right.  It was from a e-mail.  Joe and I were sitting

7  there typing the e-mail together.

8  Q.   I see, okay.  And turn to Exhibit 28.  Would you identify

9  that as the e-mail chain in which you conveyed the job offer?

10  A.   Yes.

11        MR. PILCHAK:  Move to admit proposed Exhibit 28.

12        MR. FARRAR:  No objection.

13        THE COURT:  Okay.  Exhibit 28 is received.  And you

14  may publish it to the jury, if you wish.

15                    (Defense Exhibit No. D-28 Admitted

16                     Into Evidence)

17        MR. PILCHAK:  Thank you, your Honor.

18  BY MR. PILCHAK:

19  Q.   Ms. Duffie, this paragraph here is the first paragraph to

20  Ms. Kruczynski in this Exhibit, correct?

21  A.   I'm sorry.  I was reading it.  Could you repeat that?  I

22  apologize.

23  Q.   The paragraph that's up on the screen that starts Will

24  Steinmetz and his assistant Sherry.

25  A.   Oh.

1           MR. FARRAR:  Which e-mail are we referring to,

2     because that's not the right page?

3           MR. PILCHAK:  Second page of 28.

4           MR. FARRAR:  So not -- okay.  Thank you.

5           MR. PILCHAK:  I mean, e-mail chains, right,

6     unavoidably read from back to front?

7           THE COURT:  But we want the record and everyone to be

8     clear on what page you're on.

9           MR. PILCHAK:  I see.

10          THE COURT:  If you can just say second page.

11          MR. PILCHAK:  Yes.

12    BY MR. PILCHAK:

13    Q.   Ms. Duffie, we're starting with --

14    A.   The back page.

15    Q.   -- the second page and moving forward because of the

16    nature of the e-mail chains.

17    A.   Yes.

18    Q.   The first sentence says that Will Steinmetz and his

19    assistant Sherry provided me with a copy of your resumé.  That

20    was your words, correct?

21    A.   Yes.

22    Q.   And your words were, "I am currently looking for someone

23    to assist in the accounting department."  Correct?

24    A.   Yes.

25    Q.   And when you said accounting department, did you mean

1     Central?

2     A.   Yes.

3     Q.   Okay.  So you agree Central was the accounting department?

4     A.   Central was a conglomeration of everything.

5     Q.   And so just in terms of the way you referred to it in

6     day-to-day parlance, on this particular occasion you referred

7     to Central as the accounting department, correct?

8     A.   That's what I said in the e-mail, yes.

9     Q.   Okay.  And then you ask if she was still looking for

10    employment.  And you ask what would be a convenient time for

11    you to interview, correct?

12    A.   Yes.

13    Q.   And when you said, "I am currently looking for somebody to

14    assist in the accounting department," you didn't say Mr.

15    DeKroub was or Ms. Steudle was or even we were, correct?

16    A.   No, I didn't word it that way.

17    Q.   Okay.  And then going to the first page, the next

18    communication in the e-mail chain --

19              MR. FARRAR:  Your Honor, I can't see the top of the

20     e-mail.

21              THE COURT:  Okay.  I believe, do you have it on your

22     desk?

23              MR. FARRAR:  Okay.

24              MR. PILCHAK:  We'll cover the bottom part of the

25     communication then move up.

1            THE COURT:  Okay.

2    BY MR. PILCHAK:

3    Q.   The next at the bottom of page 1 of Exhibit 28 is, I

4    dropped off letters of recommendation at your office.  Correct?

5    A.   Yes.  I see that.

6    Q.   And then Ms. Kruczynski dropped off letters of

7    recommendation from various prior employers and people who knew

8    her, correct?

9    A.   I believe so, yes.

10   Q.   And she brought them to your attention.  They were dropped

11   off for you, correct?

12   A.   It looks like she had dropped them at the front desk and

13   somebody must have brought them back to Central.

14   Q.   Right.  And then, in fact, you confirmed towards the third

15   of the way down on the first page is that after the letters of

16   recommendation were brought to the front desk, they brought

17   them back to you?

18   A.   Right.

19   Q.   And did they have your name written on the envelope or

20   something?

21   A.   I don't recall.

22   Q.   And you indicated that you were finally able to speak to

23   Joe.  That's a conversation we just talked about, correct?

24   A.   Yes.

25   Q.   And he had authorized 35,000 to start, right?

1    A.    Yes.

2    Q.    And the whole purpose of hiring Ms. Kruczynski was to take

3    QuickBooks work off of your desk, right?

4    A.    No, that wasn't the entire reason to hire Valery.  We were

5    short a person in Central for many things.

6    Q.    Well, one of the -- you were doing the bulk of the

7    QuickBooks work, correct?

8    A.    Linn and I were both doing it.

9    Q.    Well, but if you hired Ms. Kruczynski, she could take

10   QuickBooks work off of your desk, right?

11   A.    Well, then all three of us would be able to do it.  We

12   would be able to spread the work around more.

13   Q.    Well, was Ms. Felker complaining about her workload?

14   A.    She was overloaded a good deal of the time, yes.  We all

15   were.

16   Q.    When Ms. Kruczynski started working in Central, you found

17   that she made mistakes, correct?

18   A.    Sure.

19   Q.    And you felt that she was moving too slowly on a lot of

20   the processes, correct?

21   A.    It was taking her a little bit longer to learn some of the

22   things.

23   Q.    And you and she had discussions regarding the pace of the

24   work, correct?

25   A.    I'm sure we did.

January 25, 2016

```
 1    Q.  And at one point in time you took her aside and told her
 2    that if she was going to be able to keep up that she needs to,
 3    quote, move with the program, correct?
 4    A.  She was complaining that she could not keep up.
 5    Q.  And you told her she needs to move with the program,
 6    correct?
 7    A.  We all had to keep up.
 8    Q.  Did you tell her that?
 9    A.  Yes.
10             THE COURT:  Ms. Duffie, if you can, answer the
11    question.
12             THE WITNESS:  Yes.
13             THE COURT:  Thank you.
14    BY MR. PILCHAK:
15    Q.  There were some other problems with her.  She dressed
16    inappropriately for work, correct?
17    A.  There was a day that she showed up in a pink jogging suit.
18    Q.  And sometimes you were unable to locate her, correct?
19    A.  Yes.
20    Q.  One time you found her sitting in a truck with a vendor,
21    correct?
22    A.  Yes.
23    Q.  You talked to Jennie Steudle on how to deal with that,
24    correct?
25    A.  Actually, somebody had complained to Jennie Steudle about
```

1    Valery in the parking lot.  And Jennie came to me and told me

2    what was going on and told me that we couldn't have that.

3    Q.  And she told you you've got to stop that, correct?

4    A.  She said I needed to say something.

5    Q.  Okay.  And she said -- okay.  Steudle told you to say

6    something to her to stop the conduct that you found

7    problematic, correct?

8              MR. FARRAR:  Objection.  I believe a

9    mischaracterization of testimony.

10             THE COURT:  Why don't you ask the question a slightly

11    different way.

12   BY MR. PILCHAK:

13   Q.  You -- Ms. Steudle directed you to have the conversation

14   with Ms. Kruczynski regarding being unable to locate her and

15   sitting with a vendor in the truck, etcetera, correct?

16   A.  The conversation was that she was telling me I needed to

17   tell Valery not to be sitting in a parking lot with a vendor.

18   Q.  Okay.  And eventually you went to both Jennie and Joe to

19   discuss Valery's performance, correct?

20   A.  I don't recall particularly doing that.  I know I had

21   talked to Jennie at one point.  And then Jennie -- and then Joe

22   brought it up to me at a later point.

23   Q.  In any case, you had a discussion with Jennie and Joe

24   about Valery's performance, correct?

25   A.  Yes.

1    Q.   And Joe had no firsthand knowledge about Valery's
2    performance, correct?
3            MR. FARRAR:  Objection.  He's asking her to testify
4     what someone else's knowledge was.
5            THE COURT:  Okay.  Sustained.
6    BY MR. PILCHAK:
7    Q.   Ms. Duffie, as far as you know, Mr. DeKroub had no
8    firsthand knowledge about how Valery was performing in Central,
9    correct?
10   A.   No.  I think only what Jennie had told him.
11   Q.   And you would agree with me that Jennie got pretty much
12   her perspective in terms of Valery's performance from you,
13   correct?
14   A.   No.  I wouldn't say that necessarily.  We both had issues.
15   She had had issues with Valery herself personally.
16   Q.   Well, I'm talking about her learning procedures, etcetera.
17   A.   Both.  We both did.
18   Q.   In any case, after your discussions with Joe and Jennie
19   about performance, you were authorized to place an ad in
20   Craigslist, correct?
21   A.   Yes.  I was directed to put an ad in.
22   Q.   And you actually drafted the language for the ad, correct?
23   A.   I believe so.
24   Q.   And the purpose of the ad was to find a replacement for
25   Valery, right ?

1    A.   Yes.

2    Q.   And when you set up the ad, people responding

3    electronically with their e-mails to the ad, those responses

4    would go to your e-mail address, correct?

5    A.   Yes.  Because I was the person that put the ad in.

6    Q.   And you collected a number of e-mails, correct?

7    A.   There were a few, yes.

8    Q.   And if you would turn to proposed Exhibit 31.  Do identify

9    proposed Exhibit 31 as a compilation of resumés that you

10   received by e-mail from candidates in response to the

11   Craigslist ad you had written and posted?

12   A.   Yes.

13        MR. PILCHAK:  Move to admit proposed Exhibit 31.

14        MR. FARRAR:  No objection.

15        THE COURT:  Okay.  It will be received.

16                    (Defense Exhibit No. D-31 Admitted

17                    Into Evidence)

18        MR. PILCHAK:  May I display, your Honor?

19        THE COURT:  Yes.

20   BY MR. PILCHAK:

21   Q.   In the lower right-hand corner, the documents are

22   paginated.  I would like you to turn to page 0072.

23   A.   Seven two.

24   Q.   That is your handwriting in the upper right-hand corner,

25   correct?

1    A.   Yes.

2    Q.   Does Friday 9:00 AM mean that you interviewed her on

3    Friday at 9:00 AM?

4    A.   I believe so.

5    Q.   And the lower part of the comment there says good real

6    estate background, correct?

7    A.   Yes.

8    Q.   And then you wrote the comment, little rough, correct?

9    A.   Yes.

10   Q.   That was a observation that you made about her personally,

11   correct?

12   A.   Yeah.  She was in jeans.

13   Q.   And if you turn back to page 75.  This is an e-mail from

14   somebody by the name of Amy Perkins, correct?

15   A.   Yes.

16   Q.   And it says interview 3-7-14, 4:00 PM.  Does that mean

17   that you interviewed her on March 7th, 2014?

18   A.   I would guess I did.

19   Q.   Okay.  And apparently you talked to her about the

20   25-minute commute that would be involved from Williamston to

21   Brighton, correct?

22   A.   Right.  Yes.

23   Q.   And you talked to her about some other things such as late

24   hours?

25   A.   Yeah.  I'm not sure what I might have been questioning.

1    Q.   And then there's a restaurant, it says restaurant

2    bookkeeping experience; is that correct?

3    A.   Yes.  BK experience.  I'm guessing bookkeeping.

4    Q.   And construction bookkeeping experience.  Is that what we

5    see there?

6    A.   I think that's probably what it is.

7    Q.   And good personality, correct?

8    A.   Right.

9    Q.   You wrote these comments so that you might be in a

10   position to make a recommendation on one of these applicants,

11   correct?

12   A.   Actually I knew that I would be giving all of these to

13   Jennie.  So I just wanted my notes on there so when she asked

14   me I would know who we were talking about.

15   Q.   Because -- well, you think Jennie has the ability to

16   assess skills for bookkeeping?

17            MR. FARRAR:  Objection.

18            MR. PILCHAK:  I'll withdraw it.

19   BY MR. PILCHAK:

20   Q.   Likewise, on the Victoria Fryatt resumé, which is at page

21   0086.

22   A.   Eight six.

23   Q.   You interviewed her and made comments about her, correct?

24   A.   Right.  I did.

25   Q.   And then the top page 0066 --

1   A.   Zero zero six six?

2   Q.   The top Exhibit -- top page of that Exhibit.

3   A.   Okay.  Yes.

4   Q.   Over on the right it says you interviewed her on March

5   8th, correct?

6   A.   Saturday, March 8th at 10:00 AM.

7   Q.   Okay.  And it says she would like $22 an hour, correct?

8   A.   Yes.

9   Q.   And starting at the bottom you have a question mark.  Too

10  rigid.  You said good personality, reserved, very interested

11  and very sharp, correct?

12  A.   Yes.

13  Q.   And this particular resumé you wrote the words offered her

14  $20 an hour to start?

15  A.   Yes.  I told her I thought that Joe would only go 20 to

16  see if she would still be interested.

17  Q.   It says offered her.  You didn't offer --

18  A.   It was a note to myself for something that I needed to ask

19  Joe.

20  Q.   It's true that at some point in time while you were in

21  Central that Mr. DeKroub offered to relieve you of

22  responsibility of doing bookkeeping for LaVita Bistro, correct?

23  A.   Yes.  I think sometime in 2014.

24  Q.   And in fact, you refused to let him take those duties from

25  you, correct?

January 25, 2016                                                            53

1    A.   No.  I told him if that's what he wanted to do,

2    absolutely.  I did not ever say no to Joe DeKroub.  I wouldn't

3    say no to Joe DeKroub.

4    Q.   Okay.  Your resumé, Exhibit 7, indicates that you were

5    responsible for payables, correct?

6    A.   Yes.

7    Q.   And you would agree with me that you did not have to call

8    Mr. DeKroub to pay such routine things such as the electric

9    bill or the cable bill or things like that, correct?

10   A.   No.  I was instructed when I came to Central in 2011 which

11   bills that you paid first every month.  And which bills you

12   paid just based on due dates.

13   Q.   Okay.  And if there was an irregular bill then if it was a

14   one-time event, then you would contact Mr. DeKroub to find out

15   if he had authorized the expenditure?

16   A.   Depending on what it was.  I mean, if it was something

17   that wasn't usual, you know, the light bill, the phone bill,

18   you know.

19   Q.   But at all times even when Mr. DeKroub had authorized

20   either a routine bill or a one-time event, it was always your

21   challenge as to when the bill would be paid, correct?

22   A.   As I said, I was instructed to pay specific bills at

23   certain times and then pay bills based on their due dates.

24   Q.   Okay.  Would you turn to proposed Exhibit 66?  Do you

25   identify proposed Exhibit 66 as communications with a vendor

```
 1  regarding payments that are 30 plus days past due?
 2  A.  Yes.
 3          MR. PILCHAK:  Move to admit proposed Exhibit 66.
 4          THE COURT:  Is there any --
 5          MR. FARRAR:  Your Honor, I'd like to raise a
 6  relevance objection.
 7          THE COURT:  Would you like a sidebar?  I don't want
 8  to discuss it -- we're going to have a sidebar.  Maybe this is
 9  a good time to take a little break.
10          JUROR 2:  Yes, please.
11          THE COURT:  Please rise for the jury.  And remember,
12  just like last week, not to discuss the case amongst
13  yourselves until you're instructed to begin deliberations.
14                          (Jury Out)
15          THE COURT:  Mr. Pilchak, what would be the relevance
16  of this?
17          MR. PILCHAK:  The witness just testified that she
18  paid bills as instructed when they were due.  Our purpose is
19  to show that she actually exercised significant discretion
20  consistent with the administrative duties as to which bills
21  would be paid.  And in this particular case, it's a 20-year
22  vendor who's, in essence, begging for payment.  And Ms. Duffie
23  delays and does not make the payment.
24          THE COURT:  Okay.  Let me read this.  Because I just
25  -- please be seated, anybody who would like to be seated.  So
```

1    you're saying that Ms. Duffie had the responsibility to decide

2    what to pay and what not to pay and she failed to pay the

3    20-year vendor and the 20-year vendor got sort of pissed off

4    for lack of a legal term?

5              MR. PILCHAK:  Right.

6              THE COURT:  Okay.  Let me hear the response.

7              MR. FARRAR:  Your Honor, I don't -- looking at this

8    e-mail, I don't think it says any of that.  She's here to

9    testify.  She testified.  I mean, this is -- looking at this,

10   I don't even believe there's a response from her.  These are

11   e-mails directed to her.  But they're not probative of the

12   reason behind why this was not being paid or who made the

13   decision not to pay, allegedly pay this vendor.

14             It's not as if there's some e-mail from Ms. Duffie

15   saying that, you know, this is why I didn't pay it or

16   something.  I mean, it's just e-mails to her with no response.

17   And further, I'd just note this isn't a termination case where

18   performance is at issue.  So I don't see the relevance in

19   this.

20             THE COURT:  Mr. Pilchak, I don't see how these

21   e-mails are relevant.  For the reasons Mr. Farrar is stating,

22   which is that they are e-mails only from this Jeff Thompson to

23   Ms. Duffie without her saying -- if she were to have an e-mail

24   in here, back off Thompson, I'm making decisions here, or

25   something like that.  But I think you can ask her.  Why don't

1    you ask her about -- he's a snow removal guy, right?  Salt and

2    snow guy?

3                MR. PILCHAK:  Um-hum.

4                THE COURT:  Ask her how she made those decisions.

5    But the exhibit doesn't move the ball forward in terms of any

6    material issue in your case.  All right.  So why don't we all

7    --

8                MS. GUSFA:  Just the one issue about scheduling.  I

9    believe we had said that the next witnesses that we will be

10   calling would be here at 11:00.  And so I'm just getting

11   concerned because we've had to turn them away three times.  So

12   I'm just wondering --

13               THE COURT:  Well, this is now in your court.  I mean,

14   I think Mr. Pilchak's finishing up.

15               MR. PILCHAK:  Very, very close to being done.

16               MS. GUSFA:  Great.

17               THE COURT:  So it depends on how much time you have

18   for redirect.

19               MS. GUSFA:  And then I believe the witness needs to

20   use the restroom.

21               THE COURT:  Okay.  Let's all use the restroom.

22               THE WITNESS:  Thank you, so much.

23               THE COURT:  All right.  So the Court is in recess for

24   a moment here.

25                              (Brief Recess)

```
 1            THE COURT:  Anything before we bring the jury in?

 2            MR. FARRAR:  No, Your Honor.

 3            MR. PILCHAK:  No, Your Honor.

 4            THE COURT:  You can be seated in the event it takes

 5     them a minute.

 6            THE CASE MANAGER:  All rise for the jury.

 7                         (Jury In)

 8            THE COURT:  Welcome back.  Now court time is like dog

 9     years where one year is seven years.  If we say five minutes,

10     it's probably 15.  But we do our best to keep everything

11     moving.  So please be assured we're being productive and doing

12     our best.  Okay.  So Mr. Pilchak.

13     BY MR. PILCHAK:

14     Q.  Ms. Duffie, when you assumed the position in Central in

15     March of 2011 after being in Ann Arbor prior to that, it's true

16     that you did not ask Mr. DeKroub for a raise, correct?

17            MR. FARRAR:  Objection.  Relevance.

18            THE COURT:  Overruled.

19            THE WITNESS:  No.

20     BY MR. PILCHAK:

21     Q.  And one of the reasons you didn't ask for a raise at that

22     point in time is that you knew you would have to get up to

23     speed --

24     A.  Yes.

25     Q.  -- for the assignment, correct?
```

1    A.   Yes.

2    Q.   And you would have to prove yourself, correct?

3    A.   Yes.

4    Q.   And then we've talked about Exhibit 35 in other context.

5    But you would agree that when Ms. Steudle said save this

6    information for your discussion with Joe, that was on the

7    subject of you talking to Joe about getting a raise, correct?

8    A.   I'm not sure.

9              THE COURT:  What Exhibit number is that, please?

10             MR. PILCHAK:  Thirty-five, your Honor.

11             THE COURT:  Thirty-five.  Okay.  I was looking at 36.

12   BY MR. PILCHAK:

13   Q.   You're not sure, Ms. Duffie?

14   A.   No, I'm not sure what the discussion with Joe would have

15   been.

16             MR. FARRAR:  Your Honor, I would object.  Because

17   this is not something she wrote.  It's asking her to interpret

18   someone else's words.

19             THE COURT:  Okay.  Sustained in that she's already

20   said I'm not sure.

21             THE WITNESS:  I'm not sure.

22             MR. PILCHAK:  No, actually --

23             THE COURT:  If you have a question that she can

24   answer, please proceed.

25   BY MR. PILCHAK:

1    Q.   Would you turn to page 284 and see if that refreshes your

2    recollection?

3              THE COURT:   And that's of her deposition?

4    BY MR. PILCHAK:

5    Q.   Yes.   Of your deposition.   Let me rephrase the question.

6    In your communications with Ms. Steudle, she wanted you to go

7    to Mr. DeKroub, speak up and ask for a raise, correct?

8              MR. FARRAR:   Objection for the same basis we just

9    discussed.

10             THE COURT:   Okay.   Sustained.   Try rephrasing the

11   question.

12   BY MR. PILCHAK:

13   Q.   Ms. Duffie, you had conversations with Ms. Steudle about

14   the prospect of a raise, correct?

15   A.   I think at one point we had talked about it in January of

16   2014.

17   Q.   Okay.   And she was encouraging you -- you can put your

18   transcript down.   We're not referencing it right now.   She was

19   encouraging you to speak to Joe DeKroub about a raise, correct?

20   A.   Yeah.   She had mentioned that to me.   Yes.

21   Q.   But you just never did, did you?

22   A.   As I said, it was in January of 2014 right before I left.

23   Q.   But you never did?

24   A.   No.

25   Q.   One of the duties that Central did was compiling

1   information regarding agents and their sales, correct?

2   A.   Yes.

3   Q.   And one of the things that Central did was compiling

4   statistics regarding whether or not they had paid their full

5   desk fee, correct?

6   A.   Yeah.  That was automatically set up in Lone Wolf to

7   calculate if you asked it.

8   Q.   Right.  Right.  And as agents' contracts came up for

9   renewal, you would pull a report and provide it to Ms. Steudle,

10  correct?

11  A.   Either Valery, Linn, or myself would run a report for her.

12  Q.   But you did that?

13  A.   We all did it.

14  Q.   But you did it?  That's all I'm asking.

15  A.   I did it, too.  We all did it, yes.

16  Q.   And the report would illustrate who had not paid their

17  full desk fee, correct?

18  A.   There were like three pages to the report.  I'm not -- I'm

19  sure it was in there somewhere.

20  Q.   And Ms. Steudle would use the report to renegotiate

21  contracts, correct?

22  A.   As far as I know, yes.

23  Q.   In other words, if somebody hadn't paid their desk fee in

24  the prior year, they may have to increase the percentage of

25  their three percent commission that gets paid with each deal?

1    A.   And I don't know how they made those decisions.

2    Q.   I'm getting to the end, Ms. Duffie.  But I do want to ask

3    you with regard to Exhibit Number 7, Defense Exhibit 7, you

4    would agree that your statement of your duties in that resumé

5    with regard to RE/MAX Platinum is accurate, correct?

6              MR. FARRAR:  Objection.  Asked and answered.

7              THE COURT:  I'll permit it.

8              MR. PILCHAK:  I'm sorry?

9              THE COURT:  I said I'll permit it.

10             THE WITNESS:  You asked me if this was accurate?  Is

11    that what you said?

12   BY MR. PILCHAK:

13   Q.   Yes.  It's not --

14             THE COURT:  And he said specifically with respect to

15    RE/MAX Platinum.

16             THE WITNESS:  Just for the RE/MAX Platinum.  This is

17    a highlight of what I was doing.  Obviously I'm trying to find

18    another job.  And I would gloss it up a little.  I mean,

19    accounts payable sounds so much better than cutting checks.

20    But I mean, so yes, I guess.

21   BY MR. PILCHAK:

22   Q.   But you stand by your statement that in the third bullet,

23   that one of your duties was implementation for procedures to

24   process real estate transactions and assure that all

25   documentation is complete and in compliance with real estate

```
 1  laws, right?
 2  A.   Basically what I was doing was working with procedures
 3  that had been in place for years.
 4  Q.   I understand.  But that -- you stand by your statement
 5  that that was one of your duties, implementation of procedures
 6  to process real estate transactions and assure all
 7  documentation to be complete and in compliance with real estate
 8  laws, correct?
 9  A.   I was processing real estate transactions.
10  Q.   And you implemented procedures to assure that the
11  documentation was complete and in compliance with real estate
12  laws, correct?
13  A.   No.  Basically I carried through on procedures that were
14  already in place.
15  Q.   Okay.  Are you saying that your statement that you
16  implemented them is a misstatement?
17  A.   No.  It's just a glossier version of, you know, reading an
18  instruction manual on how to do things.
19  Q.   Okay.  And the fourth bullet where it says that you
20  maintain the real estate escrow account in compliance with
21  state real estate laws, that's an accurate statement of your
22  responsibilities, too, correct?
23  A.   I deposited checks within 48 hours.
24  Q.   And the purpose of this resumé -- you mailed it out to
25  employers, correct?
```

1    A.   Yes.

2    Q.   And the purpose was to try to find employment, correct?

3    A.   Yes.

4    Q.   And the purpose of trying to find employment was to get

5    money, correct?

6    A.   To have a job, yes.

7    Q.   And they would pay you money, correct?

8    A.   Well, I hope they would pay me.

9    Q.   Yeah?

10   A.   I mean, I guess I don't understand.

11   Q.   Well, to the extent that you're trying to now characterize

12   this as glossing over or enhancing in not representing the

13   responsibilities that you're setting -- that you actually did,

14   I guess my question to you is should anybody have any --

15             MR. FARRAR:  I object to the --

16             MR. PILCHAK:  -- concern that you're glossing over or

17   embellishing any of your statements here today to get somebody

18   else to --

19             THE COURT:  Just a minute, Ms. Duffie.

20             MR. FARRAR:  I would just object and ask that the

21   commentary at the beginning be stricken.  And then the

22   question was very long and confusing.  I just ask that it be

23   reworded.

24             THE COURT:  Can you just make a slightly shorter

25   question?

```
 1  BY MR. PILCHAK:
 2  Q.   To the extent that this resumé might reference or it might
 3  represent any glossing over or enhancing or embellishing of
 4  what you actually did at RE/MAX Platinum, do we need to be
 5  concerned about whether you're embellishing or glossing over or
 6  enhancing any of your testimony today?
 7            MR. FARRAR:  Objection.  Argumentative.
 8            THE COURT:  She can answer.
 9            THE WITNESS:  No.
10  BY MR. PILCHAK:
11  Q.   Ms. Duffie, you were in charge of the payroll from March
12  of 2017 through -- March of 2011 through March of 2014,
13  correct?
14  A.   I input the payroll, sure.
15  Q.   But you were in charge of the whole payroll function,
16  correct?
17  A.   No, I don't believe so.
18  Q.   Well, who else was in charge of payroll, if not you?
19  A.   Well, the managers.  The managers of the entities would
20  give me the hours, confirm any hours, give me rates of pay.
21  Q.   But you processed the payroll?
22  A.   I typed it into QuickBooks and generated checks.
23  Q.   Was there anybody that was more responsible for processing
24  payroll than you?
25  A.   Well, ultimately, like I said, the pay rates and any
```

1    conditions of employment came from the managers.  They all had

2    to provide me with hours, wages, any of the info that I was

3    putting into QuickBooks.

4    Q.  Well, I understand that they might give you the wage rate.

5    But in terms of the payroll practices for the company, you were

6    the person that were responsible, were you not?

7    A.  I was the one that was typing into QuickBooks.

8    Q.  And you -- throughout the entire time if there are any

9    problems or issues or improprieties with regard to how hourly

10   employees were paid, you never changed those practices,

11   correct?

12             MR. FARRAR:  Objection.  I believe this has all been

13    covered.

14             THE COURT:  Sustained.

15   BY MR. PILCHAK:

16   Q.  And Ms. Duffie, you would agree with me that you had more

17   than enough work to do every week to fill 40 hours of your

18   time, correct?

19   A.  I'm sorry.  I had more than enough work to fill my day?

20   Q.  Yes.

21   A.  Yes.

22   Q.  There was no realistic prospect that you would ever be

23   sent home for lack of work, correct?

24   A.  I don't think any of us would.

25   Q.  Right.  And you were allotted more vacation time than you

1   could use, correct?

2   A.   My vacation time, it was structured when I was at RE/MAX

3   All Stars before the merge.  And whatever it was was carried

4   through.

5   Q.   But you testified on direct to your attorney that you

6   could never even use all of the vacation time that you had?

7   A.   No, I really --

8            MR. FARRAR:  Objection.  Mischaracterization of her

9   testimony.

10           THE COURT:  Sustained.

11           MR. PILCHAK:  Well, you testified that you could only

12   take seven or nine days of vacation, correct?

13           THE COURT:  Exactly.  Okay.

14           THE WITNESS:  I said -- I didn't say that I could

15   only take that.

16   BY MR. PILCHAK:

17   Q.   That you did only take?

18   A.   I did only take seven or eight days of vacation a year.

19   Q.   So you were allotted more vacation time than you even were

20   able to use, correct?

21   A.   I used less than -- sure, I definitely used less.

22   Q.   And the company had a system where even hourly employees

23   were paid 40 hours if they worked less or if they worked more

24   because they had this banked time system, correct?

25   A.   Everybody used that.

1    Q.   Well, the system was in place, correct?

2    A.   As of 2009, I believe.

3    Q.   Right.  And for 2011 through 2014, you processed your own

4    paycheck, correct?

5    A.   Yes.

6    Q.   Wouldn't you agree with me that all of those factors, all

7    of those circumstances essentially guaranteed that you would be

8    paid 40 hours per week?  And in fact, that's exemplified by the

9    fact that you were paid 40 hours a week for years and years and

10   years?

11           MR. FARRAR:  Objection.  Just to the form.

12           THE COURT:  Can you rephrase the question?  I want to

13    hear it again.

14   BY MR. PILCHAK:

15   Q.   Don't you agree with me that all of those circumstances --

16   you had more than enough work, never a prospect you'd be sent

17   home early for lack of work, you couldn't use all of the

18   vacation time you had available, the company had a system where

19   even hourly employees were paid 40 hours, and you would process

20   your own paycheck.  Wouldn't you agree with me that all of

21   those circumstances --

22           MR. FARRAR:  Objection as to form.

23           THE COURT:  Sustained as to form.  I don't think we

24    heard any testimony about hourly employees being paid 40

25    hours.

1              MR. PILCHAK:  That's the bank time system.  We talked

2      extensively about it.

3              THE COURT:  Okay.  Can you break your question down?

4      BY MR. PILCHAK:

5      Q.  Ms. Duffie, all of the circumstances of employment at

6      RE/MAX Platinum in essence guaranteed your -- that you would be

7      paid your salary amount, whatever you call it, or your 40 hours

8      per week every week, did they not?

9      A.  Because I was told that I could not get paid for any hours

10     over 40, that I had to bank the time.  So I never received

11     payment for anything that I worked over 40 hours.

12     Q.  I just have a few questions about what your attorney asked

13     you on his questions.  Turn to page 38, please.  I'm sorry.

14     Exhibit 38.  This is the statement about collecting 1099's.

15     A.  Oh, wait.  I'm sorry.

16     Q.  Exhibit 38.

17     A.  Sorry.  I was on 37.  Okay.

18     Q.  Right.  It's agreed you have to get tax ID numbers for

19     people that you send 1099's to, correct?

20     A.  Yes.  You have to have a -- yes.  You have to have a

21     number.  You can't do a 1099.

22     Q.  There's two ways to approaching it.  Either you collect

23     them at the time you do business with them or you call them at

24     the end of the year and get the number then, correct?

25              MR. FARRAR:  I'll object.  I mean, we've discussed

1    this exhibit I'm sorry to say a lot.  I mean, it seems like

2    we're getting very repetitive here.

3            THE COURT:  Overruled.

4            MR. PILCHAK:  I haven't discussed it.

5            THE COURT:  He has his opportunity to discuss it.

6    BY MR. PILCHAK:

7    Q.  Simple question.  Did you either do it at the time you do

8    business or you do it at the end of the year, correct?

9    A.  And the procedure that we had is we were supposed to input

10   that when we put the vendor in as a new vendor.

11   Q.  Can you answer my question?

12   A.  I did.

13   Q.  Okay.

14   A.  We did it when we first did business.

15   Q.  And apparently prior to this e-mail that you sent out,

16   people had not been collecting the tax ID numbers at the time

17   they did business, correct?

18   A.  It appears that they had neglected to do so.

19   Q.  All right.  And that's why you say under -- going forward

20   under no circumstances are checks to be written to outside

21   vendors without confirming tax ID number, correct?

22   A.  Yes.  And that's repeating the procedure.

23   Q.  Okay.  Would you say that's implementing the procedure?

24   A.  No.

25   Q.  Would you turn to Exhibit 35?  This is the e-mail

1    regarding saving labor hours on brokers who had corporations.

2    Isn't it true that prior to January of 2013 there had been a

3    complicated process with regard to figuring out agents,

4    commissions, and deductions when they had corporations?

5    Correct?

6    A.   Yeah.  It was a manual -- it turned it into a manual

7    process instead of an automated process.  So I changed a word

8    on how the agents were added.

9    Q.   Well, in determining how to fix this problem, one of the

10   first things you did is you contacted the State of Michigan,

11   correct?

12   A.   Yes.  I asked a question.

13   Q.   And you could not get a straight answer from the State of

14   Michigan, correct?

15   A.   No.  They really couldn't give me an answer.

16   Q.   Then you spent some time researching it on your own,

17   correct?

18   A.   Yes.  I Google'd it.

19   Q.   And one of the things that you found was something in the

20   Michigan Association of Realtors archives, correct?

21   A.   Yes.  It was an article.

22   Q.   And you made a presentation of a proposal based upon what

23   you found in the Michigan Association of Realtor archives to

24   Bill Russell, correct?

25   A.   I printed it and gave it to him, yes.

1    Q.   Okay.  And you made that suggestion to him to see whether

2    or not it would pass muster, correct?

3    A.   I asked him if it was okay to do that.

4    Q.   And he said -- well, you proposed whatever was in the

5    archives article to him, correct?

6    A.   I let him read it, yes.

7    Q.   And he agreed that what you had put into his hand would

8    solve the problem you were trying to solve?

9    A.   No.  He agreed that it would be acceptable.  It would be

10   within whatever the law was or whatever the requirement was.

11   Q.   And whatever you proposed to him involved the problem that

12   you had, correct?

13   A.   Well, in telling me that it was within the law, I could go

14   in and change one word in the software and wouldn't have

15   mistakes or manual calculations being done.

16   Q.   Ms. Duffie, you testified about making -- in fact, there

17   are some e-mails in your exhibits about making travel

18   arrangements, correct?

19   A.   Yes.

20   Q.   A number of those are business travel events, correct?

21   A.   It was a mixed bag.  Business and he would go to Florida

22   and back.

23   Q.   And that's the type of duty that easily could be delegated

24   to somebody paid less than you such as Erica or Linn, correct?

25            MR. FARRAR:  Objection.  Form.

```
 1              THE COURT:  Can you restate your question?
 2   BY MR. PILCHAK:
 3   Q.  Making travel arrangements is something that easily could
 4   have been delegated to Erica or Linn, employees that were paid
 5   less than you, correct?
 6              THE COURT:  You can answer.
 7              THE WITNESS:  Joe usually asked me direct.  Joe or
 8   Judy asked me directly or contacted me directly just to do it.
 9   I don't know if either of those ladies ever did any of his
10   arrangements.
11   BY MR. PILCHAK:
12   Q.  Ms. Duffie, do you remember testifying about one of your
13   exhibits which discusses Erica Hahn's requested days off?
14   A.  Do you have something I could see?  I think there were
15   several.
16              THE COURT:  Were there several on her days off?
17              THE WITNESS:  I think there were several
18   communications.
19              MR. PILCHAK:  Well --
20              THE COURT:  I think we all recall that.
21              MR. PILCHAK:  Right.
22              THE COURT:  So Mr. Pilchak, if you want to generally
23   ask her about it.
24              MR. PILCHAK:  Right.  Let me just get to the Exhibit.
25              THE COURT:  Okay.
```

1    BY MR. PILCHAK:

2    Q.   If you turn to defense proposed Exhibit 60, do you

3    identify defense proposed Exhibit 60 as an e-mail from you to

4    Erica Hahn regarding her requested dates?

5    A.   Yes.  This is sent to Erica and Jennie Steudle.

6    Q.   Okay.  And do you recall that the Exhibit that you

7    presented was dated approximately May 3, 4, 5, somewhere in

8    that time period, 2012?

9    A.   Wait a minute.  You're talking about something different

10   than this e-mail?

11   Q.   Yeah.  Let me find your e-mail if we need to do it.  Well,

12   in any case, I don't want to leaf through it.

13           THE COURT:  Is there any objection?  Are you asking

14   to have this admitted?

15           MR. PILCHAK:  Moving to admit.

16           MR. FARRAR:  We'd raise a relevance objection.

17           THE COURT:  Overruled.  Do you have any other

18   objection?

19           MR. FARRAR:  No, Your Honor.

20           THE COURT:  Okay, then.  It's received.

21                             (Defense Exhibit No. D-60 Admitted

22                             Into Evidence)

23   BY MR. PILCHAK:

24   Q.   Ms. Duffie, this is an e-mail dated May 7th, 2012 where

25   you're requesting that Erica put those requested dates that she

1    wanted off on a monthly calendar so that you and she can go

2    over them and see what days will work, correct?

3    A.   Yes.   Jennie Steudle had directed me to send this and ask

4    to forward it in a calendar format.

5    Q.   You heard Mr. DeKroub's testimony that he would confer

6    with you and say you need to deal with your employees so they

7    respect you as the boss.   You were in court when he testified

8    --

9          MR. FARRAR:   I'd object to the characterization of

10   Mr. DeKroub's testimony.

11         THE COURT:   Okay.   Let him --

12   BY MR. PILCHAK:

13   Q.   You would agree that he said in words or substance that he

14   at times coached you to deal with your employees so they would

15   perceive you as the boss?

16   A.   No, that never happened.

17         MR. FARRAR:   Objection.

18         THE COURT:   Overruled.

19   BY MR. PILCHAK:

20   Q.   I'm just asking if you heard him testify to that?

21   A.   I heard him say that, but that never happened.

22   Q.   He never told you to coach your employees and deal with

23   your employees?

24   A.   No, no.

25   Q.   I just want to go through a number of exhibits that

1   haven't been admitted for the jury.  Turn to proposed Exhibit

2   50.  Do you identify proposed Exhibit 50 as an e-mail to Erica

3   Hahn directing her to send a certain letter?

4   A.  Yes.  This was is some minor or some notes I left her when

5   I was covering for her when she was off on vacation.

6            MR. PILCHAK:  Move to admit proposed Exhibit 50.

7            MR. FARRAR:  Your Honor, I would just object to

8   relevance.  It's repetitive and cumulative.  But other than

9   that, we have no objection.

10           THE COURT:  Let me understand, Ms. Duffie.  This is

11  something that you sent to Erica because you were doing

12  Erica's job when she was on vacation?

13           THE WITNESS:  Yeah.  I was receiving all the

14  information on the D & D Real Estate.  At that time she had

15  been handling that.  And she had been off.  And Dave Vowell,

16  the manager, came in and told me that Erica needed to do that.

17  And I thought I had left her -- I left her a series of notes

18  on her desk.  But I thought I might have neglected because

19  Dave called me back and asked me why it hadn't been done.

20           THE COURT:  Okay.  It will be received.

21                              (Defense Exhibit No. D-50 Admitted

22                              Into Evidence)

23  BY MR. PILCHAK:

24  Q.  And turn to proposed Exhibit 53.  Could you identify

25  proposed Exhibit 53 as instructing Ms. Felker to do a transfer

1    of money?

2    A.   Is there more than one page to this?

3    Q.   I'm just asking if you can identify the e-mail?

4    A.   I can identify this.

5    Q.   All right.

6         MR. PILCHAK:  Move to admit proposed Exhibit 53.

7         MR. FARRAR:  Same objection.  Relevance and

8    repetition.

9         THE COURT:  Sustained.

10   BY MR. PILCHAK:

11   Q.   Turn to proposed Exhibit 61.  Would you identify proposed

12   Exhibit 61 as an e-mail to Barbara Webster?

13   A.   Yes.

14   Q.   And do you agree that the subject matter is directing her

15   to appear at the Brighton office in September 2011.

16   A.   This was her reminder from Erica and I that we needed her

17   to fill in for Erica.

18   Q.   And did you sign it -- strike that.

19        MR. PILCHAK:  Move to admit proposed Exhibit 61.

20        MR. FARRAR:  Your Honor, we've raised the same

21   objections.

22        THE COURT:  This will be received.  It's slightly

23   different.

24                           (Defense Exhibit No. D-61 Admitted

25                            Into Evidence)

```
1              MR. PILCHAK:  I have no further questions.
2              THE COURT:  Okay.
3              MR. FARRAR:  I was starting to worry I wasn't going
4    to get a chance to get back up here.
5              THE COURT:  Mr. Farrar, redirect.
6              MR. FARRAR:  Thank you, your Honor.
7                         REDIRECT EXAMINATION
8    BY MR. FARRAR:
9    Q.   All right.  Good morning, Ms. Duffie.
10   A.   Good morning.
11   Q.   And as you saw, Mr. Pilchak showed you a bunch of
12   exhibits.  And I certainly don't intend to go through all of
13   those.  But I do have a few questions I just want to clear up
14   for you.
15   A.   Okay.
16   Q.   I guess just to be clear, at any point while you were
17   working at RE/MAX Platinum, were you anyone's supervisor?
18   A.   No.
19   Q.   Did you have any even authority to delegate any work?
20   A.   No.
21   Q.   I want to show you what's already in evidence as Defense
22   Exhibit 7.  There's a copy of your resumé.  You've been asked a
23   lot of questions about it already.  And again, Ms. Duffie, let
24   me just begin, why did you prepare this resumé?
25   A.   To try to find a better job.
```

1    Q.   Last week when you were testifying, you mentioned a lot of

2    your duties while you were in Central at RE/MAX Platinum.   Why

3    didn't you write on your resumé that you print the e-mails for

4    Mr. DeKroub?

5    A.   I don't really know of anybody that would put their day to

6    day details of what they do on their resumé.

7    Q.   Well, okay.   But why didn't you write that you enter names

8    and addresses of real estate agents?

9    A.   I was trying to gloss up my resumé in order to find a

10   better job.   And data entry wasn't really what I wanted to

11   highlight.

12   Q.   And when I'm looking through your resumé, I don't see any

13   reference to booking travel arrangements or RSVP'ing on behalf

14   of the owner and his wife?

15   A.   No.   Same reasoning.

16   Q.   Okay.   Now, in fact, looking at your resumé during this

17   entire period when you were at RE/MAX Platinum, there's no

18   mention that I see of any promotion.   Am I missing something?

19   A.   No.   It stayed the same from 2008 until 2014 when I left.

20   Q.   What stayed the same?

21   A.   My job responsibilities were -- I didn't have a promotion.

22   I didn't receive a raise, so.

23   Q.   Now, you were shown some documents where you signed your

24   name as controller?

25   A.   Yes.

1    Q.   Do you remember that?

2    A.   Yes.

3    Q.   And you were shown other documents where you signed as

4    administrative manager?

5    A.   Yes.

6    Q.   Why did you use those titles?

7    A.   The controller was on federal documents and I was shown

8    that I had to do that that way.  I assumed it had to be a title

9    of that sort in order to sign that document.

10   Q.   So is it your testimony nobody gave you the title

11   controller?

12   A.   No.

13   Q.   Did anyone give you the title administrative manager?

14   A.   No.  I loaded that in my Gmail so that when I was doing

15   inquiries for Joe DeKroub I would be able to obtain information

16   that he needed.

17   Q.   Did anyone ever give you any other title other than

18   bookkeeper?

19   A.   No.

20   Q.   And just to be clear, when you were using those other

21   titles from time to time -- administrative manager,

22   controller -- there was no promotion associated with that,

23   right?

24   A.   No.

25   Q.   And no raise?

1   A.   No.

2   Q.   Okay.  Now, Mr. Pilchak also asked you about -- this is

3   going back to Thursday -- about some classes you took after

4   high school.  Do you remember that?

5   A.   Yes.

6   Q.   Did you get any college credit for any of those classes?

7   A.   No.

8   Q.   What about a diploma, did you get a diploma?

9   A.   No.

10  Q.   Did you even get a transcript for those classes?

11  A.   No, no.  They were basically seminars.  And one was a

12  class on measuring and molding of plastic.

13  Q.   And just to be clear, there was no college degree or

14  anything like that?

15  A.   No.

16  Q.   Now, you also testified on Thursday, I believe, that

17  before going to RE/MAX, you were a vice president or general

18  manager in your parent's business, right?

19  A.   Yes.

20  Q.   I don't -- unless I missed that I don't believe Mr.

21  Pilchak asked you how much you were making in that job.  So let

22  me ask you now.  How much were you making as general manager or

23  vice president of your parent's business?

24  A.   Between 20- and 30,000, I believe.

25  Q.   And that's per year?

1    A.   Right.

2    Q.   And when you started at RE/MAX going back to 1998, how

3    much were you making?

4    A.   I started somewhere between $12 and $14 per hour.

5    Q.   While we're on the topic of your parent's business, I

6    believe you were asked about some of the work you did after

7    high school for that business.

8    A.   Right.

9    Q.   And you were asked about your familiarity with some

10   regulations.  Do you recall that line of questioning?

11   A.   Yes.

12   Q.   And I believe you were asked if you were familiar with

13   things like OSHA and the Fair Labor Standards Act, right?

14   A.   Yes.

15   Q.   Now, what did you mean when you said you were familiar

16   with those?

17   A.   Well, I made sure I hung the OSHA poster in the lunchroom.

18   And I think there was a minimum wage type poster, too, that you

19   were required to have for your employees to see.

20   Q.   So other than hanging posters, what really was your --

21   like what did you actually do regarding the enforcement of

22   those regulations?

23   A.   Made sure the current posters were hung.

24   Q.   Okay.  Now, Mr. Pilchak also used some real estate terms

25   when he was cross-examining you last week.  Do you remember the

1   word escheat?

2   A.   Yes.

3   Q.   I think it was even written up at one point.

4   A.   Yes.

5   Q.   How did you learn that word?

6   A.   Well, the very first time I learned that word was when my

7   mother passed away.  Apparently she had some money from I think

8   overpayment on a car insurance policy or something.  That was

9   the first time.  But then it was a term known in the real

10  estate -- you know, in real estate when you had money for a

11  certain period of time in an account.

12  Q.   You were also asked a lot of questions about an audit?

13  A.   Yes.

14  Q.   While you were at RE/MAX Platinum --

15  A.   Yes.

16  Q.   So from I guess from 2008 up until the time of your

17  separation in 2014, how many audits were you involved in?

18  A.   One.

19  Q.   One time?

20  A.   One time.

21  Q.   Okay.  So when you mentioned it on your resumé, what

22  exactly did you do regarding that one audit?

23  A.   I provided the state auditor with check stubs and

24  paperwork, you know, as she requested it.

25  Q.   Anything else?  Or was that the extent of your

 1  involvement?

 2  A.   That was pretty much it.

 3  Q.   There was some testimony also about Kandis Thompson.

 4  A.   Okay.

 5  Q.   Do you know who she is?

 6  A.   Yes.

 7  Q.   And did there -- by the way, who told you in 2009 that

 8  you'd no longer be getting paid any overtime?

 9  A.   Kandis Thompson.

10  Q.   And did there come a time when Ms. Thompson left the

11  company to go to another company?

12  A.   Yes.   That was in 2011.

13  Q.   And when she left in 2011, did you take over some of her

14  responsibilities?

15  A.   Yes.

16  Q.   Did you take over all of her responsibilities?

17  A.   No.

18  Q.   And Ms. Duffie, I'm sorry if I sound like a broken record.

19  But when you took over some of her responsibilities, did you

20  get any kind of promotion?

21  A.   No.

22  Q.   Did you get a raise?

23  A.   No.

24  Q.   Did you get a new title?

25  A.   No.

January 25, 2016

```
1    Q.   And when you took over some of her responsibilities in
2    2011, how much -- do you know how much she was making?
3    A.   How much Kandis was making?
4    Q.   Yes.
5    A.   67,5 I think.
6    Q.   So that would be $67,500?
7    A.   Yes.  I believe so.
8    Q.   And how much were you making?
9    A.   52,000.
10   Q.   And did that ever change?
11   A.   No.
12   Q.   You were shown a copy of your complaint last week.  And in
13   it you wrote you were the administrator for three branch
14   offices.  Do you remember that?
15   A.   Yes.
16   Q.   In the complaint itself?
17   A.   Yes.
18   Q.   What does that actually mean when you say I was
19   administrator for three branch offices?
20   A.   I did all of the accounts payable and the agent billing
21   and payroll.
22   Q.   Turning your attention to Exhibit 62 already in evidence.
23   And I'm going to try to go through these quickly.  Do you
24   remember this e-mail?
25   A.   Yes.
```

1    Q.   Okay.  Why did you send this e-mail?

2    A.   We had an issue -- oh.  An error was made on a deposit in

3    2012 and I had already closed the year out.  So I went to

4    Jennie Steudle and we contacted Chet Hill and he asked that I

5    copy him in and send an e-mail directed to Debbie explaining

6    what it had caused, what the problem had become.

7    Q.   Ms. Duffie, were you Ms. Webber's boss?

8    A.   No, Chet was.

9    Q.   Were you ever her boss?

10   A.   No.

11   Q.   In fact, did you even work in the same office as her?

12   A.   No.

13   Q.   And do you see her boss copied on that e-mail?

14   A.   Yes.

15   Q.   Thank you.

16              THE COURT:  Mr. Farrar, when you identify an Exhibit,

17    if you could say D-62.  You both used numbers instead of one

18    using numbers and the other letters.  So just want the --

19              MR. FARRAR:  Just for the record, this was D-62.

20              THE COURT:  Okay.  Thank you.

21   BY MR. FARRAR:

22   Q.   Now, Ms. Duffie, Mr. Pilchak also asked you about some

23   procedure -- there was almost an accident.  These are the

24   hazards of doing trials, I guess.

25              THE COURT:  Lawyering is very dangerous.

```
 1   BY MR. FARRAR:
 2   Q.   You were asked about some procedures for depositing checks
 3   after closings.  Do you remember that?
 4   A.   Yes.
 5   Q.   Now, who created those procedures?
 6   A.   Who created the procedures?
 7   Q.   Do you know who created the procedures?
 8   A.   No.  They were in place prior to the merge.
 9   Q.   Did you create them?
10   A.   No.
11   Q.   What exactly did you do with respect to any of these
12   procedures?
13   A.   I just, I changed how we deposited the checks for the
14   satellite offices.
15   Q.   I'm showing the witness, and I'm watching my step while I
16   do it.
17            THE COURT:  Thank you.
18            THE WITNESS:  Yes.  Do.
19   BY MR. FARRAR:
20   Q.   D-37 already in evidence.  Now you were asked a lot of
21   questions about this, Ms. Duffie.
22   A.   Um-hum.
23   Q.   With respect to this document, what exactly were you --
24   what exactly did you do here?
25   A.   I was adjusting for -- we couldn't do our ATM deposits
```

January 25, 2016

1    anymore.  So we had a separate account.  And I was adjusting

2    how the checks were deposited because the bank posted them

3    different than the other way we were doing it.

4    Q.  And so I want to be clear, is it your testimony you

5    weren't actually creating any of these procedures?

6    A.  No.  This was the regular procedures, but we had to adjust

7    for the banks posting dates.

8    Q.  Thank you.  You were also shown an eviction notice.  Do

9    you remember that?

10   A.  Yes.

11   Q.  Now, I won't put it up on the screen.  But was that about

12   regarding D & D, one of Mr. DeKroub's companies?

13   A.  Yes.  Those would only be for D & D.

14   Q.  And who made the decision to evict tenants?

15   A.  Ultimately Joe DeKroub.  Dave Vowell would normally start

16   that process and discussion with Joe.

17   Q.  And who is Dave Vowell?

18   A.  He's the manager of D & D Real Estate.

19   Q.  So just to be clear, you had nothing to do with any

20   decision to evict people, right?

21   A.  No.  After they would meet, then I would be instructed as

22   to do what -- what to do next with them, which was the 7-day to

23   quit.

24   Q.  And is it your testimony you were basically just sending

25   out the letters on behalf of them?

1   A.   Yes.

2   Q.   And I believe on that letter you signed your name as

3   agent.  Do you recall that?

4   A.   Right.

5   Q.   Why did you write agent on that eviction letter?

6   A.   That's the way I was taught to do those when Kandis taught

7   me in 2011.

8   Q.   You were also asked questions about interviewing and

9   hiring and that type of stuff.  Do you recall that?

10   A.   Yes.

11   Q.   Just to be clear, did you ever -- did you ever make a

12   decision alone to hire anybody?

13   A.   No.

14   Q.   Who made that decision?

15   A.   Joe.  Joe or the managers if it was in another office.

16   But Joe.

17   Q.   And you were shown -- and I'm referring to D-28 -- just

18   one moment.  And for the record, I'm showing the witness the

19   entire paragraph of this e-mail.  July 12th, 2013 was anyone in

20   your office when you sent this e-mail?

21   A.   Yes.  Joe.

22   Q.   Thank you.  And you were shown, Ms. Duffie, on -- just a

23   moment ago you were shown a lot of resumés?

24   A.   Yes.

25   Q.   I want to draw your attention to one of them.  And this is

1    particularly D-31 page 75.  Do you recall this?

2    A.   Yes.

3    Q.   What's the position that this resumé is regarding?

4    A.   This was for the bookkeeper position.

5    Q.   And I'll draw your attention to the date right there.  Did

6    you write that date up there?

7    A.   Yes.

8    Q.   And how long was that before you stopped working at the

9    company?

10   A.   A week.

11   Q.   Thank you.  And all those -- one moment.

12          THE COURT:  Okay.

13          MR. FARRAR:  Your Honor, if I may have one moment to

14   look over my notes here.

15          THE COURT:  Please.

16   BY MR. FARRAR:

17   Q.   And that resumé I just showed you for the bookkeeper

18   position.

19   A.   Yes.

20   Q.   About a week before you left, that could have been -- is

21   it possible that was for your replacement?

22          MR. PILCHAK:  Objection.

23          THE COURT:  Sustained.  She's already testified that

24   she created it to get a new job.

25          MR. PILCHAK:  To replace --

```
 1              THE COURT:  Oh, I'm sorry.  I thought you were
 2    talking about Defense Exhibit 7.  Which resumé?
 3              MR. FARRAR:  One of the resumés that was for a
 4    bookkeeper position.  It was just up there and she was asking
 5    about it.
 6              MR. DARE:  31.
 7              MR. PILCHAK:  She testified it was for a replacement
 8    for Kruczynski.
 9              MR. FARRAR:  I don't believe that was her testimony.
10              THE COURT:  Okay.  Well, why don't you ask --
11              MR. FARRAR:  You know, I'll withdraw it.  It's
12    probably confusing.  I'll withdraw it.
13              THE COURT:  Thank you.
14    BY MR. FARRAR:
15    Q.  I want to draw your attention, as we kind of wrap up here,
16    to D-11.
17              MR. FARRAR:  Just give me one moment, your Honor.
18              THE COURT:  Okay.
19    BY MR. FARRAR:
20    Q.  These are D-11 that were entered.  Specifically page 13.
21    This was introduced into evidence last week during cross.  Ms.
22    Duffie, this is your pay stub, right?
23              MR. PILCHAK:  Objection.  Beyond the scope.
24              THE COURT:  Overruled.
25              MR. FARRAR:  I would note this was introduced during
```

1    cross.

2              THE COURT:  It's already overruled.

3              MR. FARRAR:  Thank you.

4    BY MR. FARRAR:

5    Q.   And Ms. Duffie, tell me what is this -- can you tell by

6    looking at this how many hours you worked?

7              THE COURT:  Let's get the time period just to be

8     clear.

9              MR. FARRAR:  Thank you, your Honor.

10   BY MR. FARRAR:

11   Q.   Ms. Duffie, do you see the -- can you tell the time period

12   that this pay stub is from?

13   A.   October 31 to November, I think, 13th, 2008.

14   Q.   Can you tell by looking at this pay stub how many hours

15   you worked?

16   A.   No.  Because the additional hours are in the other taxable

17   portion.

18   Q.   And can you tell me, what do you mean they were in the

19   other taxable?

20   A.   Well, it shows 80 hours.  And then there's an additional

21   $337.50 in other taxable, so.

22   Q.   Okay.  What about this document here?  And this is page

23   14.  And it appears to be the pay period immediately preceding

24   the one I just showed you.  How about here, can you tell how

25   many hours you worked?

January 25, 2016

1  A.   No.  Because the additional hours are in other taxable.
2  There's no hours listed.
3  Q.   What about this one here?  This is the pay period from
4  November 14th to November 27th, 2008.
5  A.   That would be the same.  It doesn't show the amount of
6  hours in the other taxable.  We'd have to calculate it out at
7  25 an hour.
8  Q.   What about this one year, 11/28/2008 to December 11th,
9  2008?
10  A.   Yeah.  Same thing.  There's an additional 125.  Which that
11  one would be easy, five extra hours.  So that would have been
12  85 hours.
13  Q.   Why are your hours that you worked overtime shown in this
14  other taxable column?
15      MR. PILCHAK:  Objection.  Calls for speculation.
16      THE COURT:  If you know.
17      THE WITNESS:  I know that they put that in the other
18  taxable so that it didn't show 85 hours as opposed to 80.
19  BY MR. FARRAR:
20  Q.   And why do you believe that happened?
21  A.   Because --
22      MR. PILCHAK:  Objection.  Speculation.
23      THE COURT:  Sustained.  If you can lay a foundation,
24  you can proceed to try to lay a foundation.
25      MR. FARRAR:  Thank you, your Honor.  Your Honor, may

```
 1   I just have one moment to confer with co-counsel here?
 2             THE COURT:  Yes.
 3   BY MR. FARRAR:
 4   Q.  Ms. Duffie, going back to Exhibit, Defendant's 11 and I'll
 5   put up I guess page 16 just so we have something up here.  I
 6   can actually say page 14.  That's the pay period from 10-17 to
 7   10-30.
 8             When you see how you were paid in this pay period,
 9   that other taxable amount, was that your overtime rate or
10   straight time?
11   A.  It would be straight time.
12   Q.  And what do you mean by straight time?
13   A.  My $25 per hour rate.
14   Q.  So I want to make sure I'm understanding you.  It's your
15   testimony that when they were paying you in this other taxable.
16   A.  Yes.
17   Q.  You were or were not getting paid your time and a half
18   rate?
19   A.  No.  That was straight time.  The first time that my
20   paycheck appeared that way, I believe I asked Kandis.
21   Q.  So do you know why then that you were paid other taxable
22   instead of your time and a half rate?
23   A.  Why I wasn't paid the time and a half rate?
24   Q.  Yes.
25   A.  I don't know.
```

January 25, 2016                                                94

1   Q.   And you can confirm that you were paid --

2   A.   Straight, yes.

3   Q.   Thank you.  And turning your attention to D-14 already in

4   evidence, this is a timesheet, right?

5   A.   Yes.

6   Q.   And looking at this timesheet, can you tell how many hours

7   you worked over 80 during that pay period?

8   A.   Yes.  That was 8.  That would have been when I was still

9   in Ann Arbor.

10  Q.   So this was before you went to Central?

11  A.   Right.

12  Q.   Now, I believe you testified on Thursday that from March

13  2011 until March -- well, from roughly October 2011 until March

14  2014, you averaged about 15 hours a week in overtime.

15  A.   Right.

16  Q.   Was that your testimony?

17  A.   Um-hum.

18  Q.   Here it looks like that amount is less than 15.  Can you

19  explain that?

20  A.   Well, it was in March.  It was still the slow time of

21  year, for one thing.  And like I said, I was in Ann Arbor the

22  bulk of the time.  So it would have been less then.

23  Q.   So just so I'm clear, when you say it was March, what do

24  you mean by that?

25  A.   Well, the real estate market really doesn't pick up until

January 25, 2016                                                    95

1    like April or May.  So during the winter months, it's much

2    slower.

3    Q.   And the -- is it your testimony then that the 15 hours a

4    week is an average throughout the whole year?

5    A.   Right.  Yeah.  If you average the year, yes.

6    Q.   So does that mean there were some months and weeks when

7    you were making less than -- when you were working less than 15

8    hours?

9    A.   And some that I was working definitely more, yes.  It just

10   depended on the time of year.

11   Q.   And this was before you went to -- this timesheet was

12   before you went to Central, right?

13   A.   Correct.

14   Q.   Can you describe how your hours changed, if at all, once

15   you went to Central?

16   A.   I was working a lot more hours when I was in Brighton

17   because I had taken on 11 more entities to do the bookkeeping

18   for, so.  Plus Brighton was the main office.  So even as far as

19   real estate closings, you know, in the busy part of the season,

20   you know, we could have 20 do 25 closings in a day everyday

21   for, you know, weeks through the busy period.  So yeah it was a

22   lot more additional work.

23           MR. FARRAR:  Your Honor, no further questions.

24           THE COURT:  Okay.

25           MR. PILCHAK:  Just a couple.

January 25, 2016                                    96

```
 1              THE COURT:  Go right ahead.  Now's the perfect time

 2       for that.

 3                        RECROSS-EXAMINATION

 4      BY MR. PILCHAK:

 5      Q.  Ms. Duffie, you worked more hours once you went back to

 6      Central because you took on additional duties?

 7      A.  That was part of it.  But there was obviously more

 8      activity in the Brighton office than there would have been in

 9      Ann Arbor.

10      Q.  And as you testified, you assumed all of Kandis Thompson's

11      duties that you knew her to perform?

12              MR. FARRAR:  Objection.  That was not the testimony.

13              MR. PILCHAK:  You testified to that --

14              THE COURT:  I did not hear that testimony.  So ask it

15       -- start over with that question about what she did and what

16       she didn't.

17      BY MR. PILCHAK:

18      Q.  Ms. Duffie, maybe -- you testified that you took over all

19      of the -- all of Kandis' duties that you knew her to perform,

20      did you not?

21      A.  The ones that I was aware of.

22      Q.  Right.

23      A.  There were a lot that I was not aware of at the time.

24      Q.  So when you came back to Central, you worked more hours

25      because you were performing Kandis' duties, correct?
```

1    A.   No.  Because I was taking on additional entities.  And

2    there was more activity in Brighton than there was in Ann

3    Arbor.

4    Q.   I'm a little confused because I thought you testified

5    previously that on average you worked 15 hours per week.  Now

6    you're telling us that you didn't work -- or 15 hours of

7    overtime per week.  Now you're telling us you didn't work 15

8    hours of overtime --

9    A.   I didn't say that.

10   Q.   -- during the winter months?

11   A.   Not always.

12   Q.   The timesheet that Mr. Farrar just showed you, that was

13   the last timesheet that you prepared, correct?

14   A.   Right.

15   Q.   And after that you started recording your hours in the

16   journal, right?

17   A.   Yeah.

18   Q.   You were collecting those resumés that we just looked at

19   in Exhibit 31 because you had told Jennie Steudle what you

20   thought about Valery's performance and the company was looking

21   for a replacement, correct?

22   A.   They had told me that I needed to replace Valery.

23   Q.   Can you answer the question?

24   A.   I did.  I did put the ad in Craigslist because they told

25   me I needed to get rid of her.

1   Q.   And you placed the ad and all the resumés went to you?

2   A.   Because I was the person that put the ad in Craigslist,

3   yes.

4   Q.   Exhibit D-37, did I -- this is the banking procedures that

5   Mr. Farrar just put up on the screen.

6   A.   Yes.

7   Q.   Did I misunderstand your testimony to me on Thursday?

8   Didn't you write this and create this document?

9   A.   Well, I wrote it, but I took it from the procedures that

10  were already in effect.  The only thing we were changing is how

11  the bank processed our deposits.

12  Q.   This was written to deal with the fact that they were not

13  -- that those banks in Flagstar were not taking your deposits,

14  correct?

15            MR. FARRAR:  Objection.  Asked and answered.

16            MR. PILCHAK:  Well, she just said she didn't write

17   it.

18            THE COURT:  Overruled.

19            MR. PILCHAK:  I'm sorry.

20            THE COURT:  Okay.

21  BY MR. PILCHAK:

22  Q.   You wrote this because the banks no longer took the

23  deposits for 1st National, correct?

24  A.   Well, they wouldn't take the ATM deposits for 1st

25  National.  So Joe opened an account at Flagstar that they could

1    do a deposit to.  And it changed because of the way that their

2    dates posted.

3    Q.   When you say --

4    A.   They were still going to the same bank.  They're not

5    sticking it in the ATM.

6    Q.   But this is -- this is dealing with a change in

7    circumstances.  You wrote this because there had been a change

8    that you had to deal with, correct?

9    A.   Well, yeah.  They wouldn't take the deposits.

10   Q.   Right.

11   A.   So all we're changing is how we deposit them.  We didn't

12   put them into the ATM.  We walked into the bank and put them

13   into the account.

14   Q.   You wrote and implemented a new process to deal with a

15   problem that came up while you were in Central, correct?

16            MR. FARRAR:  Objection.  Asked and answered.

17            THE COURT:  Overruled.

18            THE WITNESS:  I changed a deposit.  I changed the

19    type of deposit.

20   BY MR. PILCHAK:

21   Q.   And you reported to Kandis when you were in Ann Arbor,

22   correct?

23   A.   Yes.

24   Q.   But Webster, she didn't report to you?

25   A.   No.  Because when I was in Ann Arbor, there was not a

1    manager down there.  We had Joe down there.

2              MR. PILCHAK:  Nothing further.

3              THE COURT:  Any redirect?

4              MR. FARRAR:  Very, very brief.

5                         REDIRECT EXAMINATION

6    BY MR. FARRAR:

7    Q.   Ms. Duffie, the hours that you testified to, the 15 hours

8    of overtime you worked per week.

9    A.   Yes.

10   Q.   Was that an average throughout the year?

11   A.   That was an average.  In the wintertime it could have been

12   four to five or whatever.  And in the busy time it could be up

13   to 20, 25 hours.

14             MR. FARRAR:  Nothing further.

15             THE COURT:  Okay.  All right.  Nothing further, Mr.

16   Pilchak?

17             MR. PILCHAK:  Nothing further, your Honor.

18             THE COURT:  Okay.  Then Ms. Duffie, you may step

19   down.  Now, what I'd like to do is try to push on through

20   until one o'clock when I have another matter.  I did ask

21   Felicia to let me know if everyone for the one o'clock is here

22   early, then she'll let us know and everyone can have lunch in

23   this case and we'll take care of it.

24             So is everyone okay to keep going?  Just put your

25   hand up if you want a break right now.  Need a break.  Okay.

1    All right.  Does the plaintiff wish to call any further

2    witnesses?

3            MR. FARRAR:  Yes, your Honor.  And Ms. Gusfa was just

4    going outside to get our next witness.

5            THE COURT:  Oh, fantastic.  And who is your next

6    witness?

7            MR. FARRAR:  One moment, your Honor.  We would call

8    Al Wicke to the stand.

9            Thereupon,

10                   **A L B E R T   W I C K E ,**

11   having been called as a witness and having been first duly

12   sworn testified as follows:

13           THE COURT:  Thank you.  You can have a seat in the

14   witness box.  And I don't know if there's any water in there.

15           THE WITNESS:  No need.

16           THE COURT:  If you're fully hydrated, then we'll just

17   get started.

18                        DIRECT EXAMINATION

19   BY MR. FARRAR:

20   Q.   Good afternoon, Mr. Wicke?

21   A.   Good afternoon.

22   Q.   I had to check my watch there.  It was going off all

23   morning.  Are you currently employed?

24   A.   Yes.

25   Q.   And where are you employed?

1    A.   Advanced Medical Solutions.

2    Q.   Now, until today, you and I have never spoken about Ms.

3    Duffie or anything about the case; is that right?

4    A.   Correct.

5         MADAM COURT REPORTER:  Counsel, can you please have

6    the witness spell his name?

7         MR. FARRAR:  Sure.  Could you please spell your name

8    for the court reporter?

9         THE WITNESS:  Last name?

10        MADAM COURT REPORTER:  First and last.

11        THE WITNESS:  Albert Carl Wicke.  Last name is

12   W-I-C-K-E.

13        MADAM COURT REPORTER:  Thank you.

14   BY MR. FARRAR:

15   Q.   Thank you.  And just can you tell the jury just briefly

16   what kind of work you're in?

17   A.   Maintenance.

18   Q.   And did there come a time when you worked for the

19   defendant RE/MAX Platinum?

20   A.   Yes.

21   Q.   And what period of time was that?

22   A.   I believe summer of '08 to early '15.

23   Q.   Okay.  What kind of work did you do for RE/MAX Platinum?

24   A.   Maintenance.

25   Q.   And when you worked for RE/MAX Platinum, who did you

1  report to?

2  A.   Joe DeKroub.   Jennie.

3  Q.   And when you worked for RE/MAX, were you paid hourly or

4  salaried?

5  A.   Hourly.

6  Q.   Who set your rate of pay?

7  A.   Joe DeKroub.

8  Q.   Did anyone else set your rate of pay?

9  A.   No.

10  Q.   And how many hours a week did you work on average?

11  A.   Forty.

12  Q.   Did you ever work over 40 hours a week?

13  A.   Yes.

14  Q.   And when you did work over 40 hours a week, did the

15  defendant pay you overtime?

16  A.   No.

17  Q.   How did you get paid?

18  A.   Straight time.

19  Q.   What do you mean by straight time?

20  A.   If I worked 45 hours, I got my wage at 45 hours.

21  Q.   Are you familiar with something called comp time?

22  A.   Yeah.

23  Q.   And what's your understanding of how that works?

24  A.   I took comp time through them.  If I worked 50 hours, I

25  could take ten hours vacation, I guess you'd call it.

January 25, 2016

1   Q.   Were you also paid on comp time?

2   A.   What do you mean by that?

3   Q.   I'll rephrase that.  And when you worked over 40 hours

4   instead of paying you for the 40 hours, sometimes did the

5   defendant make you make it up in vacation?

6   A.   No, never made me.

7   Q.   But did you choose to?

8   A.   Yes.

9   Q.   And while you were working for RE/MAX, did you come to

10  know the plaintiff, Sherry Duffie?

11  A.   Yes.

12  Q.   Just how did you get to know her?

13  A.   When RE/MAX and Michigan Group merged.

14  Q.   And did you ever see her while she was working?

15  A.   Occasionally.

16  Q.   And are you familiar with something called Central?

17  A.   Yes.

18  Q.   And just based on your observations, who was in charge of

19  Central?

20  A.   Sherry.

21  Q.   Okay.  And what makes you think Sherry or say Sherry was

22  in charge of Central?

23  A.   That's where everybody went when they had a question.

24  Q.   Okay.  Now, did you have occasion recently to speak to the

25  defendants' attorneys?

1   A.   Yes.

2   Q.   In fact, did you speak with them last Thursday?

3   A.   Tuesday or Thursday, yeah.

4   Q.   Have you said previously that Jennie Steudle was the head

5   of Central?

6   A.   Yeah.  I mean, overlooked it, yeah.  Sure.

7   Q.   So just so we're clear now, would you say as you sit here

8   you'd say Jennie Steudle was, in fact, in charge of Central?

9   A.   I'd say overlooking it, yeah.  I mean, making sure it ran

10  good.  But not a hundred percent of the time.

11  Q.   Okay.  And are you familiar with a few other people by the

12  name of Erica Hahn and Linn Felker?

13  A.   Yeah.

14  Q.   Do you know them?  And based on your observations, who was

15  directing their work?

16          MR. DARE:  Objection.  Foundation.

17          THE COURT:  What was the question?

18          MR. FARRAR:  I asked him if he was familiar with some

19  other employees and I asked, based on his observations, who

20  was directing their work.

21          THE COURT:  If you know.  Do you know, Mr. Wicke, who

22  directed people's work?

23          THE WITNESS:  No, not really.  My work was directed

24  by a few different people.

25          THE COURT:  Okay.  Then the objection is sustained.

January 25, 2016

 1            MR. FARRAR:  I'm sorry.  Your Honor, I'd like to

 2    refresh the witness' recollection.  May I approach?

 3            THE COURT:  Yes.  Tell us what you're going to show

 4    him.

 5            MR. FARRAR:  I'm referring counsel and the Court to a

 6    prior statement under oath from Mr. Wicke dated July 28th

 7    2015.  May I approach?

 8            THE COURT:  Yes, you may.

 9    BY MR. FARRAR:

10    Q.  Now, Mr. Wicke, I'll direct your attention to paragraph 11

11    of that statement.  When you've had an opportunity to review

12    it, just let me know.

13    A.  Sure.

14    Q.  And does that refresh your recollection?

15    A.  Yeah.

16    Q.  And would you agree after reviewing it that, in fact, it

17    was Jennie Steudle who was in a supervisory role directing the

18    work of Linn Felker, Erica Hahn, and Valery Kruczynski?

19    A.  Yeah.  On the bigger end of it.  I mean, like, she oversaw

20    everybody.

21    Q.  Right.

22    A.  But in that area, if I had a question about Central or

23    where Linn was or anything of that nature, I went to Sherry.

24    Q.  But you would agree that Sherry, Ms. Duffie, was not

25    directing the work of Linn, Valery, and Erica?

January 25, 2016

 1               MR. PILCHAK:  Objection.

 2               MR. DARE:  Objection.  Leading.

 3               MR. FARRAR:  And who was --

 4               THE COURT:  Sustained.  Please rephrase your

 5    question.

 6    BY MR. FARRAR:

 7    Q.   I would draw your attention back to paragraph 11 --

 8               THE COURT:  And tell us what it is he's looking at.

 9    He's looking at a prior statement made under oath.  What is

10    the date of the statement?

11               MR. FARRAR:  Yes, your Honor.  It's dated July 28th.

12               THE COURT:  Of what year?

13               MR. FARRAR:  2015.

14               THE COURT:  Okay.

15    BY MR. FARRAR:

16    Q.   Let me know, again, when you've had an opportunity to

17    review it.

18    A.   Okay.

19    Q.   Now, Mr. Wicke, was Ms. Duffie directing Linn Felker,

20    Valery Kruczynski, or Erica Hahn based on your observations?

21               MR. DARE:  Objection.  Leading.

22               THE COURT:  Overruled.

23               THE WITNESS:  Occasionally.  I'm sure they went to

24    her for direction.

25    BY MR. FARRAR:

January 25, 2016

1    Q.   Now, I understand you spoke to the defendant's attorneys

2    recently --

3              THE COURT:  Just so the jury -- there will be a jury

4    instruction that there's no -- nothing wrong, nothing

5    impermissible about lawyers talking with witnesses throughout

6    cases.  But you'll have an instruction on that later.

7    BY MR. FARRAR:

8    Q.   But Mr. Wicke, did you specifically state this in

9    paragraph 11, Sherry Duffie was not directing Felker,

10   Kruczynski, or Hahn?  Was that your statement?  Answer yes or

11   no?

12   A.   In the words, no.  But I signed it, so I'll --

13   Q.   So you would agree with that statement that you signed,

14   right?

15   A.   Yeah.

16   Q.   And after speaking to the defendant's attorneys now, has

17   your testimony changed?

18   A.   No.

19   Q.   So then you would agree that Sherry Duffie was not

20   directing these other people's work, right?

21   A.   Yeah.

22   Q.   Thank you.

23             MR. FARRAR:  I have nothing further for this witness.

24             THE COURT:  Okay.  Well, if you'll stay there, Mr.

25   Wicke, we may have Mr. Dare.

1          MR. FARRAR:  And your Honor, may I go retrieve the

2     statement from the witness?

3          THE COURT:  Sure.

4          MR. FARRAR:  Thank you.

5          THE WITNESS:  You're very welcome.

6                    CROSS-EXAMINATION

7     BY MR. DARE:

8     Q.   Good afternoon, Mr. Wicke.

9     A.   Good afternoon.

10    Q.   Now, you -- is it correct that you'd performed work for

11    several of Mr. DeKroub's businesses?

12    A.   That's correct.

13    Q.   So can you tell me where physically you would perform this

14    sort of I think you referred to it as maintenance work?

15    A.   Yeah.  His home.  RE/MAX Platinum in Brighton.  RE/MAX

16    Platinum in Hartland.  RE/MAX Platinum in Ann Arbor.  And

17    RE/MAX Platinum in Fenton.

18    Q.   Okay.  So you would agree with me that on a given week you

19    could be performing, you know, work at one day at one of those

20    businesses, another day at another one of those businesses.  So

21    you weren't in RE/MAX Platinum everyday?

22    A.   Correct.

23    Q.   So you were on the road quite a bit to all those different

24    sites?

25    A.   Very much.

January 25, 2016

1  Q.   Okay.  So then it's fair to say that you actually spent

2  most of your time away from RE/MAX Platinum performing the work

3  at all those different sites?

4  A.   Yes.

5  Q.   And you also were shown the statement that you had

6  provided.  And according to that statement -- and you may look

7  at it again if you need to refresh your recollection.

8          THE COURT:  I think Mr. Farrar just took it.

9          MR. DARE:  Oh, if he needs it.

10         THE COURT:  Okay.

11  BY MR. DARE:

12  Q.   That you visited Central three times a week to submit

13  receipts for expenses?  Do you remember that?

14  A.   I tried to make it that much, yes.

15  Q.   And so tell me how were -- for those purchases that you

16  were looking for reimbursements for, how were you making those

17  payments?  Was it your own card, a company credit card?

18  A.   Company credit card.  Occasionally mine.

19  Q.   Okay.  And that was the RE/MAX Platinum company credit

20  card?

21  A.   Yes.

22  Q.   Okay.  And who gave you that card?

23  A.   I believe I got that card before Sherry was in that

24  position from Kandis Thompson.

25  Q.   So then when you would go in, you'd go to RE/MAX to drop

January 25, 2016

111

```
 1   off these receipts looking for reimbursements?
 2   A.   Um-hum.
 3   Q.   How physically can you do it?  Did you place them in a
 4   bin?  Did you put them in a folder on someone's desk?  How did
 5   you do it?
 6           MR. FARRAR:  Your Honor, beyond the scope of direct.
 7           THE COURT:  I think it goes -- I think it's a fair
 8   question.  I'll permit it.
 9           THE WITNESS:  In the beginning stages it was Erica
10   Hahn I took them to.
11   BY MR. DARE:
12   Q.   Okay.
13   A.   Then after Erica was moved to short sale, I gave them to
14   Linn Felker.
15   Q.   Okay.  But how would you do it?  Would you hand it to
16   them?  Would you place it in some sort of bin?  How would you
17   --
18   A.   No.  I usually tried to hand it to them.
19   Q.   So how long would that take you to hand it to them?
20   A.   Couple of seconds.
21   Q.   Okay.  Couple of seconds.  So your observations about
22   them, the dynamics between the individuals there in Central
23   that you've described, those were based on those few seconds
24   that you were then there in Central submitting those receipts?
25   A.   Yes.
```

January 25, 2016

112

1   Q.   Okay.  So nobody ever explained to you in addition to your

2   few seconds there, no one ever explained to you the management

3   structure or anything like that at Central?

4   A.   No.

5   Q.   So you have no reason to believe that you have a better

6   idea of who supervised Linn Felker than Linn herself; is that

7   right?

8   A.   No --

9            MR. FARRAR:  Objection.  Asking what others would

10   agree to.

11            MR. DARE:  I'm asking if he has any reason to

12   believe.

13            THE COURT:  Overruled.  And let's just see -- I think

14   we may have another witness here.  And just for the jury, it's

15   standard in all cases that witnesses not sit through other

16   witness' testimony unless they're either the client or a

17   client representative.

18            So all those who have been here have the Court's

19   permission.  But witnesses don't know that.  And we've had

20   more than one occasion where they walk in, no one sees them

21   and they've set there for some period of time.  But usually no

22   harm, no foul.  Go ahead.

23   BY MR. DARE:

24   Q.   Okay.  So you'd already mentioned that you were paid for

25   your hours worked over 40, right?

1    A.   Correct.

2    Q.   And you had no reason to believe that work performed for

3    different companies had to be combined for overtime pay; is

4    that right?

5    A.   Correct.

6    Q.   Okay.  And you knew that at that time when you were there

7    that Ms. Duffie was in charge of payroll; is that right?

8    A.   Correct.

9    Q.   So from March 2011 or October 2011 to March 2014, Ms.

10   Duffie, who you knew to be in charge of payroll, did not pay

11   you time and a half for overtime; is that right?

12   A.   Yes.

13           MR. FARRAR:  Objection.

14           THE COURT:  Sustained.  She's processing payroll, Mr.

15    Dare.  She's not paying payroll.

16   BY MR. DARE:

17   Q.   So you'd also -- strike that.  If you had a question about

18   something in Central, you would go to who?  Would you go Sherry

19   Duffie?

20   A.   On occasion, yes.

21   Q.   Okay.  Is it your understanding that at RE/MAX Platinum

22   that Jennie Steudle was in a higher position than Sherry

23   Duffie?

24   A.   Yes.

25   Q.   Okay.  But it was your understanding that Sherry Duffie

January 25, 2016

```
 1   was the head of Central?

 2   A.   Tell you the truth, I don't know who's the head of what.

 3   Q.   Okay.  Just one minute.

 4             MR. DARE:  Nothing further.

 5             THE COURT:  Okay.

 6             MR. FARRAR:  Very briefly.

 7             THE COURT:  Certainly.

 8                          REDIRECT EXAMINATION

 9   BY MR. FARRAR:

10   Q.   Mr. Wicke, at any time when you were working for the

11   defendant, did they pay you your time and a half?

12   A.   No.

13   Q.   And they never said you were salaried, right?

14   A.   Correct.

15   Q.   You were an hourly worker and the company never paid you

16   time and a half; is that correct?

17   A.   Correct.

18             MR. FARRAR:  Nothing further.

19             THE COURT:  Well, Mr. Wicke -- oh, are we all done?

20             MR. PILCHAK:  Oh, yes.

21             THE COURT:  Mr. Wicke, thank you, very much for being

22   here.  I understand you've been waiting a while.  And we

23   really appreciate your patience.  So you are released to

24   leave.

25             THE WITNESS:  Thank you.
```

```
 1              MR. FARRAR:  And we are getting our next witness,
 2    your Honor.
 3              THE COURT:  Okay.  And who is your next witness?
 4              MS. GUSFA:  Your Honor, our next witness is Mr. Ken
 5    Durrant.
 6              THE COURT:  Okay.  Mr. Durrant, would you step
 7    forward --
 8              MS. GUSFA:  Durrant with a T.
 9              THE COURT:  Mr. Durrant.  You can come forward a
10    little bit.
11              THE WITNESS:  Oh, okay.  Hi.
12              THE COURT:  Please raise your hand.
13              Thereupon,
14              K E N N E T H    D U R R A N T ,
15    having been called as a witness and having been first duly
16    sworn testified as follows:
17              THE COURT:  Okay.  Then the that's our witness box.
18    You can have a seat there.
19                          DIRECT EXAMINATION
20    BY MS. GUSFA:
21    Q.   Good afternoon, Mr. Durrant.
22    A.   Hi.
23    Q.   Where are you currently employed?
24    A.   I work in Ann Arbor for a company call AmeriNet.
25              MADAM COURT REPORTER:  Witness, can you spell your
```

1    first and last name and also the company --

2          THE COURT:  Every time you call a witness, what we're

3    going to ask you to do is say could you please state your name

4    and spell it.

5          THE WITNESS:  K-E-N-N-E-T-H, D-U-R-R-A-N-T.

6          MADAM COURT REPORTER:  And the company name you just

7    mentioned?

8          THE WITNESS:  AmeriNet?

9          MADAM COURT REPORTER:  Yes.

10         THE WITNESS:  A-M-E-R-I-N-E-T.

11         MADAM COURT REPORTER:  Thank you.

12   BY MS. GUSFA:

13   Q.  So I believe you had just said you work for AmeriNet.  And

14   what kind of work do you do there?

15   A.  I'm a network services engineer.  So I specialize in F5

16   Networks and networking.  High end computer network equipment.

17   Q.  And did you ever work for the defendant in this case,

18   RE/MAX Platinum?

19   A.  I did.

20   Q.  And when was that?

21   A.  I started in 2009 and worked to 2015.

22   Q.  And what kind of work did you do for the defendant?

23   A.  I was a consultant hired by Mr. DeKroub.  And basically my

24   role was to help everybody get past their technology hurdle.

25   Q.  And when you worked at RE/MAX, were you familiar with

1   something called Central?

2   A.   I think Central was just because it was the largest

3   building in Brighton.  And that's where the --

4   Q.   Just to clarify, it's a building in Brighton or --

5   A.   I would say so.  The main staff was there, yes.

6   Q.   And did you work in Central?

7   A.   I did.

8   Q.   And who was your supervisor when you worked in Central?

9   A.   Kind of everybody.  I really was an independent contractor

10  paid under Corvus, Inc., which is my company.  And really

11  whether you are an agent or, you know, a manager, I helped with

12  your needs.

13  Q.   So there's a -- is there a difference between people that

14  would ask for your help with a computer problem versus who

15  actually is your supervisor?

16  A.   Basically I was just a go to person.  I was a resource

17  that everybody utilized at RE/MAX.

18  Q.   And who was your boss?

19        MR. PILCHAK:  Objection.

20        THE WITNESS:  Joe DeKroub.

21        MR. PILCHAK:  Objection.  Assume a fact not in

22  evidence.  He said he was consultant billed through Corvus.  I

23  don't know if he had a boss.

24        THE COURT:  Okay.  Sustained.  Let's see if you can

25  establish.

1    BY MS. GUSFA:

2    Q.   Okay.  Did you have a boss at RE/MAX Platinum?

3    A.   I was kind of my own boss.  I had a contract with Joe

4    DeKroub to work there, you know, as a resource.

5    Q.   And who hired you?

6    A.   Joe DeKroub.

7    Q.   And is it -- so was Joe DeKroub your boss?

8             MR. PILCHAK:  Objection.  Calls for legal conclusion.

9             THE COURT:  Yes.  He has said he's an independent--

10    that he owns his own company.  DeKroub contracted with him.

11    So sustained.

12    BY MS. GUSFA:

13    Q.   Okay.  All right.  Do you know the plaintiff, Sherry

14    Duffie?

15    A.   Yes.

16    Q.   And how do you know her?

17    A.   Through working with everybody at RE/MAX Platinum.

18    Q.   And based on your knowledge, Ms. Duffie wasn't the head of

19    Central, was she?

20             MR. PILCHAK:  Objection.  Leading.

21             MS. GUSFA:  I can rephrase the question.

22             MR. PILCHAK:  Foundation also.

23             THE COURT:  Please.  Sustained.

24    BY MS. GUSFA:

25    Q.   Okay.  So you just said you know the plaintiff, Sherry

1    Duffie.  And based on your knowledge, was Ms. Duffie the head

2    of Central?

3            MR. PILCHAK:  Objection.  Foundation and leading.

4     Same question.

5            THE COURT:  Sustained.  Break it down.  See what he

6     knows.

7    BY MS. GUSFA:

8    Q.   Okay.  So do you know the plaintiff Sherry Duffie?

9    A.   Yes, I do.

10   Q.   And how do you know her?

11   A.   Through being a colleague working with her, yes.

12   Q.   And where do you work with her or when you did work with

13   her, where was that?

14   A.   Well, it started out she was in kind of the -- not

15   closing.  But where they actually do the real estate deals.

16   And then there was a time when she was in Ann Arbor at our Ann

17   Arbor location as we opened that.  And then she got pulled back

18   to Brighton where she was an accountant.

19   Q.   So you were working with her at the Brighton office at

20   some point, yes?

21   A.   Yes.  And Ann Arbor.  Because I would make visits.  That

22   was part of my gig is to go out and make sure everybody was,

23   you know, moving forward.

24   Q.   Okay.  And were you working with her in Central?

25   A.   Yes.

1    Q.  And based on your knowledge, was Ms. Duffie the head of

2    Central?

3            MR. PILCHAK:  Same objection.

4            THE COURT:  Do you have any knowledge of what Ms.

5    Duffie's job duties and roles were?

6            THE WITNESS:  I think it was more or less accounting

7    and preparing financial statements.  And you know, she was a

8    resource like anybody else.

9            THE COURT:  And how do you know that?

10           THE WITNESS:  Just from the interactions, the

11   questions, the -- you know, if somebody had a problem, they

12   could go to anybody and get it solved.

13           THE COURT:  Okay.

14   BY MS. GUSFA:

15   Q.  And who was in charge of Central?

16   A.  In charge of -- ultimately, Joe DeKroub.  It's his

17   business.  He's in charge of everything, so.

18           MS. GUSFA:  And no further questions.

19           THE COURT:  Okay.  I'm sorry.

20           MR. PILCHAK:  I have a couple of questions.

21           THE COURT:  This is the part where you get

22   cross-examined.

23           THE WITNESS:  Getting hungry.

24           THE COURT:  Yeah.  I'm sorry you've been waiting.  We

25   appreciate your patience.

January 25, 2016

1            THE WITNESS:  Oh, no problem.

2                       CROSS-EXAMINATION

3    BY MR. PILCHAK:

4    Q.   Good morning, Mr. Durrant.

5    A.   Good morning.

6    Q.   You tracked where Ms. Duffie had worked.  You said she was

7    doing closings and she went to Ann Arbor and then she came back

8    to Brighton?

9    A.   Correct.

10   Q.   Do you recall that Kandis Thompson had worked in Central?

11   A.   She did, yes.

12   Q.   And do you recall that when Kandis Thompson left Central

13   and then Ms. Duffie came back from Brighton?

14   A.   From Ann Arbor to Brighton, yes.

15   Q.   I'm sorry.

16   A.   Kandis was -- she got her mortgage license.  So she was

17   selling mortgages.

18   Q.   Right.  And Kandis had been the head of Central?

19   A.   She was like the same role, whether that's a controller or

20   bookkeeper or accountant.  You know, same role.

21   Q.   And you perceived that she and Ms. Duffie were in the same

22   role?

23   A.   Correct.

24            MR. PILCHAK:  I have no further questions.

25            MR. FARRAR:  One moment, your Honor.

1        MS. GUSFA:  No further questions at this time.

2        THE COURT:  Okay.  Well, now you can step down and

3   have lunch.  While the rest of us soldier on.

4        Does the plaintiff have any further witnesses?

5        MS. GUSFA:  Just one more.  I'm just going grab that

6   person.

7        THE COURT:  Okay.  Thank you, so much.

8        THE WITNESS:  Thank you.

9        THE COURT:  And Mr. Farrar, can you tell us who you

10  believe your next witness will be?

11       MR. FARRAR:  I believe, assuming he hasn't

12  disappeared in the last few minutes, our last witness will be

13  Darin Ureche.

14       THE COURT:  All right.  Mr. Ureche, please step

15  forward.  And stop right about there and raise your right

16  hand.

17            Thereupon,

18                  **D A R I N     U R E C H E ,**

19  having been called as a witness and having been first duly

20  sworn testified as follows:

21       THE COURT:  Okay.  Then have a seat in the witness

22  box.

23       MR. FARRAR:  Your Honor, may I inquire?

24       THE COURT:  Yes.

25                      DIRECT EXAMINATION

1    BY MR. FARRAR:

2    Q.  Good afternoon, Mr. Ureche.  Just for the court reporter,

3    will you please just state your name so she can have it, your

4    full name?

5    A.  Okay.  Darin Ureche.

6         THE COURT:  And then would you spell it, please.

7         THE WITNESS:  D-A-R-I-N, Last name Ureche,

8    U-R-E-C-H-E.

9    BY MR. FARRAR:

10   Q.  And are you currently employed?

11   A.  Yes.

12   Q.  Where do you work?

13   A.  Well, employed.  I'm an independent contractor at RE/MAX

14   Platinum.

15   Q.  And can you just describe a little bit for the jury what

16   you do for RE/MAX Platinum?

17   A.  Residential real estate sales.  So I'm out everyday

18   negotiating contracts, selling houses, working with buyers and

19   sellers.

20   Q.  So just so I understand, so you're a real estate agent?

21   A.  Yes.

22   Q.  And how long have you been a real estate agent for RE/MAX

23   Platinum?

24   A.  Well, let's see.  It's easier to remember because it was

25   right around 2000.  So 15, 16 years for RE/MAX.

January 25, 2016

1   Q.   And until today you and I have never spoken about your
2   employment or Ms. Duffie or anything like that, right?
3   A.   No.
4   Q.   While you were working for or with RE/MAX, did you come to
5   know Sherry Duffie?
6   A.   Yes.
7   Q.   And how did you come to know her?
8   A.   She worked in I guess what we would call the main office
9   or whatever.  When I had a closing, I would go to Sherry.
10  That's usually who would process my file and get a check.
11          There was changes through the company.  But from the
12  time I was at the RE/MAX that we're at now, she pretty much was
13  the one I would go to get a check.  There was others involved,
14  too.
15  Q.   Sure.  Of course.  So you interacted with her while you
16  were working, right?
17  A.   Yes.
18  Q.   And while she was working as well, right?
19  A.   Um-hum.
20  Q.   Now, as a real estate agent, did you keep like normal
21  business hours?
22  A.   No.
23  Q.   Can you explain what you mean by that?
24  A.   Well, I was a very productive agent.  So you know, I
25  worked seven days a week, morning to night.  So I worked lots

1   of hours.

2   Q.   And were there times when you were in the office working

3   late at night?

4   A.   I had a habit of coming in extremely early in the morning

5   to get a lot of stuff that was leftover cleaned up for the day.

6   And then I had appointments at night.  So I was in and out of

7   the building and around RE/MAX from 5:00 AM sometimes to 8 or

8   nine o'clock at night.

9   Q.   When you came into the office extremely early, as you

10  said, did you ever see Ms. Duffie there?

11  A.   Oh, yeah.  I would always see her car.  When I'd pull into

12  the parking lot, I'd always see her maroon car sitting there

13  all by itself, so.

14  Q.   And approximately what time was this?

15  A.   You know, my time coming in was all over the map.  But I

16  think hers was kind of consistent.  I think there had been

17  times probably no earlier than maybe 6:00 AM.  Between 6:00 and

18  7:00 AM, you know, I would see her car.  If I came in at 5:00 I

19  wouldn't see anybody there.  Usually if it was between 6:00 and

20  7:00, I would see her car.

21  Q.   Were there many people other than Ms. Duffie working in

22  the office between 6:00 and 7:00 AM?

23  A.   Not usually.

24  Q.   And what about any weekends?  Did you ever have occasion

25  to work weekends?

January 25, 2016

1    A.   Um-hum.  Same thing.  You know, it was sporadic if I seen

2    her car there on the weekend.  I mean, there could be a

3    Saturday it's, you know, it's not there.  And then usually if I

4    seen her car I'd go, you know, joke with her and say hi.  What

5    are you doing here on a Saturday, so.

6    Q.   And do you recall times when that happened?

7    A.   Quite a few.  I couldn't give you dates because it was,

8    you know, random.  You know, random Saturdays.  Some Saturdays,

9    you know, I wouldn't see her car.  And then some Saturdays I

10   would.  So if you gave me an average, I don't know, maybe once

11   or twice a month.  Maybe I missed her because I wasn't there or

12   something.  I don't know.

13   Q.   Sure.  And in addition to early mornings, sometimes as an

14   agent did you have to be working late trying to close deals?

15   A.   Um-hum.

16   Q.   And on those late nights did you ever see Ms. Duffie

17   working?

18   A.   That was probably less frequent.  But yeah, I have seen

19   her there after hours.  And again, probably joking with her

20   saying, you know, working late again or something, you know.

21   Q.   And I know you can't recall any specific dates.  I'm not

22   asking you to.  But generally these interactions, would they

23   have occurred between like say October 2011 and sometime in

24   early 2014.  I know that's a big window, but is that --

25   A.   Yeah.  There is -- so, yeah.  When I went over to the new

January 25, 2016

1    RE/MAX, was it 2010 or -- I think it was 2010.  I don't know if

2    it was 2010.  I thought it was 2010.

3          There was a short period there where her car wasn't

4    there because I think she was working at the Ann Arbor office

5    maybe.  But that was only a brief time.  But the whole stand,

6    it was consistent except for that period that she was at a

7    different office.  I don't know what the dates are in there.

8    Q.  Thank you, Mr. Ureche.  I have no further questions.

9          THE COURT:  Let's see if there's some

10   cross-examination.

11         MR. PILCHAK:  Just one or two.

12         THE COURT:  You have to stick around for questions

13   from the other side.

14         THE WITNESS:  Okay.  I'm ready to go.

15         THE COURT:  Yeah.  It's lunchtime.

16                   CROSS-EXAMINATION

17   BY MR. PILCHAK:

18   Q.  Mr. Ureche, you worked with Ms. Duffie back in the RE/MAX

19   All Stars and Home Stars days?

20   A.  Yes.

21   Q.  So you came into the organization at the time of the

22   merger?

23   A.  Yes.

24   Q.  And in the 15 years that you've known Ms. Duffie, have you

25   socialized with her outside of the work environment?

 1   A.   No, never outside of the work environment.

 2   Q.   And I understand that -- are you a smoker?

 3   A.   No.

 4   Q.   Your wife's a smoker?

 5   A.   My wife is.

 6   Q.   And your wife and Ms. Duffie tend to take their smoke

 7   breaks together?

 8   A.   Yeah, I think so.

 9   Q.   And isn't it fairly well known that you do a lot of -- pay

10   a lot of attention to the stockmarket?

11   A.   Um-hum.

12   Q.   That's yes?

13   A.   I do, yes.

14   Q.   And in fact, you spend blocks of time --

15          MR. FARRAR:  Objection.

16          MR. PILCHAK:  -- on it at a time?

17          MR. FARRAR:  I just object to beyond the scope of

18   direct.  I think the relevance.

19          THE COURT:  The relevance.  You can have latitude

20   with your cross.  But relevance on this witness' stockmarket

21   activity.

22   BY MR. PILCHAK:

23   Q.   But you spend time on it?

24          THE COURT:  Well, no.  I just -- I sustained the

25   objection.

1          MR. PILCHAK:  Can I make an offer?

2          THE COURT:  After -- on our break you can proffer

3    what this witness would -- you'd like to proffer what he would

4    testify?

5          MS. GUSFA:  Can we do a sidebar?

6          THE COURT:  Let's have a sidebar.

7                    (Side Bar Conference)

8          MR. PILCHAK:  My understanding is that this witness

9    spends his time -- my understanding is that this witness

10   spends the mornings working on the symptom market and doesn't

11   arrive until 10 o'clock traditionally.

12                    (Open Court)

13         THE COURT:  I have to ask the jury, talking is fine,

14   but now we can't hear one another.  Just a little softer.

15   Thank you.

16                    (Side Bar Conference)

17         THE COURT:  Just ask him -- let's just keep moving

18   through this case.  Just ask him what time he shows up.  He

19   already said --

20         MR. PILCHAK:  I know he did.  I can't understand it.

21   He's pretty well known for that.

22         THE COURT:  Okay.  Your response?

23         MR. FARRAR:  He's already testified clearly what time

24   he gets in.  Mr. Pilchak -- I don't see how this -- whether he

25   plays the stockmarket or not is relevant to this.  He already

1    gave his time.

2              THE COURT:  And he could be playing stockmarket

3    activity at the office.

4              MR. PILCHAK:  But Jennie Steudle said that he doesn't

5    get in until 10 o'clock because everybody knows that he's on

6    the stockmarket.

7              THE COURT:  In your case and chief you can bring

8    Jennie Steudle.  We'll discuss whether that's appropriate.

9    But so just ask him one more time what time he gets in and

10   then we'll go from there.

11                        (Open Court)

12   BY MR. PILCHAK:

13   Q.  Mr. Ureche, whether it's related to any of your personal

14   activities, do you know of anything that would account for the

15   perception that you typically arrive at the office on Monday

16   through Friday at 10 o'clock in the morning?

17             MR. FARRAR:  Objection on foundation.

18             THE COURT:  Yeah.  Let's just ask him -- if you want

19   to do it from cross-examination -- isn't it true that you

20   actually arrive after 10 o'clock or around 10 o'clock.

21   BY MR. PILCHAK:

22   Q.  Mr. Ureche, isn't it true that you spend time on personal

23   issues and generally arrive at the office about 10 o'clock each

24   day?

25   A.  It's random.  I like to go clean up all my paperwork in

January 25, 2016

1    the morning and then it depends because real estate is so --

2    it's crazy.  Because no two weeks are the same.  But the

3    consistency is being in the office there and doing paperwork

4    and stuff.

5         And the stockmarket thing is on my phone.  I do

6    trades and stuff actually walking through houses with clients

7    and they don't even know it because it's so fast on the phone.

8    So that has no bearing on anything really.

9         MR. PILCHAK:  Okay.  I have no further questions.

10        THE COURT:  Okay.

11        MR. FARRAR:  Nothing further, your Honor.

12        THE COURT:  Okay.  Well, now, you may step down.  And

13   we appreciate the time you spent waiting to testify today.

14        THE WITNESS:  So I can leave then?

15        THE COURT:  Yes.  You are released.  You're out of

16   here.

17        THE WITNESS:  Thanks.

18        THE COURT:  Does the plaintiff have any further

19   witnesses?

20        MR. FARRAR:  Your Honor, the plaintiff does not

21   intend to call any further witnesses.  But before we rest,

22   there are a few issues to resolve.  And we can do that now at

23   sidebar or whatever the Court would like.

24        THE COURT:  Okay.  Well, why don't we go ahead and --

25   you're ready with your next witness?

 1          MR. PILCHAK:  We have witnesses.

 2          THE COURT:  Okay.  I just am worried that if we take

 3     a break now the jury would have like an hour and a half for

 4     lunch or so because I have a one o'clock.  But maybe that's

 5     what we'll need to do.

 6          So today will be a slightly longer lunch break.  But

 7     actually this hearing I have at 1:00 could be as short as a

 8     half hour.  So why don't we plan on a one hour lunch break.

 9     And I'll do the best I can to keep things moving.  And then

10     we'll conclude by four o'clock.

11          My case manager who can hear anything we're saying

12     says she thinks it could be as short as 15 minutes.  So yeah,

13     this is a perfect time to take a break.  So please rise for

14     the jury and plan to be back in about an hour.  And remember,

15     you won't be talking to each other or anyone else about the

16     case.

17                         (Jury Out)

18          THE COURT:  All right.  Please be seated.

19          MR. FARRAR:  Your Honor, I guess before we rest,

20     there are just a couple of other exhibits that we wanted to

21     get into evidence.  There was no objection to it in the order.

22     One is the answer.  And we just wanted to --

23          THE COURT:  The answer to the complaint?

24          MR. FARRAR:  To the complaint.  Which I believe both

25     parties listed as an Exhibit.  And there may be one other

January 25, 2016

```
 1   document like that that, you know, we don't see a need to call
 2   a witness specifically for getting it in.  If both parties
 3   agree that it's --
 4           MR. PILCHAK:  I'm not going to agree to the admission
 5   of the answer without context.
 6           THE COURT:  Yeah.  I think you'd need a witness to
 7   admit it, an Exhibit, unless it's stipulated to.
 8           MR. FARRAR:  Since there was no objection to it, it's
 9   my understanding then it was stipulated.  There's not any kind
10   of objection.
11           THE COURT:  Well, there may not be an objection.  But
12   someone still has to say what this is and how it fits into the
13   case and why it's here.  I mean, the jury may not understand
14   why it's here, but someone has to do that.
15           I mean, there's no objection as to authenticity, I
16   assume, because that was -- right.  But there could be an
17   objection to relevance through a particular witness.  There
18   could be an objection, some other objection, based on how it's
19   being used.  And we don't know that because we don't know what
20   it's here for.
21           MR. FARRAR:  Okay.  We'll take that under advisement
22   then.  Thank you.
23           THE COURT:  Sure.  All right.  To Mr. Pilchak, you'll
24   be ready in an hour with your first witness?
25           MR. PILCHAK:  Yes.
```

```
 1              THE COURT:  Okay.  So then plaintiff rests?
 2              MR. FARRAR:  I guess, your Honor, we'll just consider
 3    that and decide whether we need to call another witness this
 4    afternoon only for that purpose.
 5              THE COURT:  Sounds very good.  Okay.  Thank you.  And
 6    we will be in recess.  So you are dismissed.
 7                        (Brief Recess)
 8              THE COURT:  Okay.  And Mr. Farrar and Ms. Gusfa, does
 9    the plaintiff rest at this point or do you have additional
10    witnesses?
11              MR. FARRAR:  Your Honor, I guess do we wait for Mr.
12    Pilchak?
13              THE COURT:  Oh.
14              MR. FARRAR:  I think he's out.
15              THE COURT:  Here he is.
16              MR. FARRAR:  Before we rest, I wanted to be heard
17    again, if I may, on the issue of admitting the answer into
18    evidence.
19              THE COURT:  Okay.  What Exhibit number is it?
20              MS. GUSFA:  It's P-12.
21              MR. FARRAR:  And actually I believe the complaint --
22    for clarity I believe the complaint and answer were one
23    Exhibit on our list.  And it seems as though only the
24    complaint has been admitted, unless I'm mistaken and they both
25    were.
```

```
 1              MR. PILCHAK:  Oh, no.  The complaint was not
 2    admitted.
 3              THE COURT:  Right.  The complaint was not offered as
 4    an Exhibit as evidence in the case of anything other than
 5    there were questions about allegations she brought that she
 6    set forth in her complaint.  But okay.  So you want the answer
 7    as evidence of what in particular?
 8              MR. FARRAR:  Well, it's admissions by the defendant.
 9    And after thinking about the issue, doing a little more
10    research, I think it's our position that it's self
11    authenticating under Rule 901 and we would not need to call a
12    witness just to get this into evidence.
13              I mean, as a practical matter it's on their
14    defendant's list, too.  There's no dispute as to what this
15    document is.  It seems it would be, you know, unnecessary to
16    have us call a witness just to identify the answer and admit
17    it into evidence.
18              THE COURT:  Hold on.  There's something fundamental
19    that we're missing here though.  But let me look at 901.  I
20    have the worst evidence rule book that doesn't -- here we are.
21    Okay.  Rule 901, authenticating or identifying evidence
22    doesn't suggest that without a stipulation you can just offer
23    something that's authentic.  Show me -- tell me a little bit
24    more.
25              MR. FARRAR:  I also think the fact that both sides
```

```
 1    put it on their Exhibit list is essentially a stipulation.  I
 2    mean, there's no dispute as to what --
 3              THE COURT:  No, that's not a stipulation.  We're not
 4    going to go in that direction.  Because a stipulation is an
 5    actual agreement.  And the fact that somebody has something on
 6    an Exhibit list, you want to be exhaustively cautious with
 7    your Exhibit list.  Put everything under the sun that you
 8    might use.  And then for tactical and strategic reasons when
 9    you're zealously representing your client you make a decision
10    as to whether something should or should not be offered as an
11    Exhibit that would help your side.  And you do that through
12    witnesses.
13              MR. FARRAR:  Your Honor, I'll read just 902.
14              THE COURT:  Please do.  Okay.  We're on 902 now?
15              MR. FARRAR:  The first sentence says the following
16    items of evidence are self-authenticating.  They require no
17    extrinsic evidence of authenticity in order to be admitted.
18    And then section -- subsection 8 acknowledged documents we
19    believe, you know, pertains to this.  And if it's
20    self-authenticating, I'm not sure what a witness would do
21    other than just establish that this is the answer.
22              And I may be wrong, but I'm not aware of any rule
23    that requires evidence to only come in through witnesses.
24              THE COURT:  Okay.  Well, Mr. Pilchak, what's your
25    response to 902 saying that self-authenticating items require
```

January 25, 2016

```
 1    no extrinsic evidence of authenticity in order to be admitted?
 2              MR. PILCHAK:  I didn't hear which section --
 3              MR. FARRAR:  Subsection 8.
 4              MS. GUSFA:  It's 902 the first part of that.  And
 5    then subsection 8 of 902.
 6              MR. PILCHAK:  Subsection 8 of 902?
 7              MS. GUSFA:  Yeah.
 8              THE COURT:  Let me find that as well.  Okay.  A
 9    document accompanied by a certificate of acknowledgment that
10    is lawfully executed by a notary or another officer is such a
11    document.
12              MR. PILCHAK:  Well, I don't know how that applies to
13    this case, but.
14              THE COURT:  You're saying that the answer should be
15    admitted as an exhibit because it's an admission and it's
16    relevant to the jury's consideration.  I mean, it's relevant
17    to the case in that it's the answer to the complaint, but they
18    don't know what an answer to a complaint is.
19              MS. GUSFA:  Right.  It would be used similar to how
20    Mr. Pilchak used Ms. Duffie's resumé in his opening.  Even
21    though it didn't come into evidence quite yet through a
22    witness, it would be used in the same fashion, I suppose.  And
23    also it is part of the record already technically.
24              THE COURT:  So you're going to use it to
25    cross-examine Mr. Pilchak's witnesses?
```

1          MS. GUSFA:  Potentially possibly just as part of the

2     closing.  The same way that Mr. Pilchak used exhibits that

3     weren't in evidence yet for the opening.

4          THE COURT:  Well, no, of course.  Nothing's in

5     evidence yet during opening.  Nothing is in evidence.  And so

6     it's not like that.

7          MS. GUSFA:  Right.

8          THE COURT:  Because that's what the trial is for.

9     That's where you get your evidence in and you explain to the

10    jury what its relevance is and how you're going to use it and

11    what it means with respect to a case.  And then in closing,

12    you argue what you have shown through evidence.  In opening,

13    it's what you will show.

14         MS. GUSFA:  And I guess just the basic thrust of our

15    argument is that it is a self authenticating document as rule

16    902 says that the following items are self-authenticating and

17    they require no extrinsic evidence.  So there would be no need

18    to introduce it through a witness in it doesn't require that

19    we do so, would be our position.

20         THE COURT:  I'm going on LexisAdvance.com and I'm

21    going to do a quick search about admitting evidence without a

22    witness or a stipulation.  Unless Mr. Pilchak, do you have

23    something else?

24         MR. PILCHAK:  No, Your Honor.

25         THE COURT:  Can you -- I want to understand what -- a

139

```
 1    little bit what's at stake here just to figure out whether to

 2    hold the jury up while we do this.  What is the smoking gun

 3    here in the answer?

 4          MR. FARRAR:  Well, I mean, your Honor, maybe no

 5    smoking gun, but it is an admission.  It's something that the

 6    jury could consider when they are, you know, when they're

 7    deciding this case.  So I think it's relevant in that sense.

 8    And you know, if we use it, I imagine it would only be in

 9    reference to the closing argument:  That's probably the extent

10    of it.

11          THE COURT:  Is it the affirmative defenses?

12          MS. GUSFA:  Yeah.  It's just the affirmative defenses

13    that we would be using.  And potentially --

14          MR. FARRAR:  And potentially some of the other -- I

15    mean, it could really be any of the statements in either

16    admitting or denying facts.

17          MR. PILCHAK:  Well, I would certainly suggest that it

18    contains a lot of extraneous matters as well.  I mean, a lot

19    of things that would be likely confuse the jury.

20          MR. FARRAR:  And if I may just add, it shouldn't be

21    admitted to the extent there is reference to the counts that

22    have been dismissed.  We would have no objection to redacting

23    those portions.  I'm sure we can come to an agreement about

24    that.

25          THE COURT:  Well, I think -- hold on one second.
```

January 25, 2016

```
1         MR. FARRAR:  And your Honor, just if I may add --
2         THE COURT:  Just one minute.  I'm sorry.  Here's
3    something about judicial -- just a minute.  I'm going to tell
4    you it's not my business to try your case, but this would be
5    so totally confusing for a jury to -- this is your business
6    and your case.  But you see things in the answer that just,
7    you know, relieve plaintiff to her proofs to neither admit nor
8    deny.
9         MS. GUSFA:  We wouldn't be utilizing, you know,
10   language that they wouldn't understand.  We wouldn't be
11   reading to them or showing them a portion that would be
12   completely confusing to them.  It would be used in a slightly
13   different way.
14        MR. PILCHAK:  Well, your Honor, in that regard, if
15   you're going to -- if they're asking you to admit the entire
16   document without foundation, if we proceed to the discussion
17   of relevance beyond where we are right now, I would argue that
18   as a document to that form it should be excluded under rule
19   403 because of the likelihood that it would confuse a jury.
20        The jury is not going to know anything about neither
21   admitting nor denying or estoppel that is mentioned, etcetera.
22        THE COURT:  I'm reading a PowerPoint on how to admit
23   evidence without a witness.  Nothing relates to an answer.
24   Obviously stipulations.  There are judicial notices.  There's
25   the use in summary judgment.
```

January 25, 2016

```
 1            MR. FARRAR:  Your Honor, if I may just add, and this
 2    is a little anecdotal, but --
 3            THE COURT:  Also note this, the PowerPoint says
 4    rarely effective to prove factual disputes.  What is it, sir,
 5    Mr. Farrar?
 6            MR. FARRAR:  Well, I would just add I've seen, you
 7    know, complaints and answers admitted in other federal
 8    proceedings without a witness, even without a formal
 9    stipulation, simply on the basis that neither side objected to
10    the authenticity of the document.
11            THE COURT:  At trials you meant?
12            MR. FARRAR:  At trials, yes.  And it's often done
13    right before one party rests.
14            MR. PILCHAK:  I guess my problem is without having a
15    witness on the stand that provided foundation and context for
16    a particular statement, just simply admitting five pages of
17    multiple statements is improper.
18            And second of all, that the risk of confusion for the
19    jury in distraction on issues outweighs any probative value,
20    which in my view would be minimal given the way that answers
21    are filed, in essence knowing very little about the
22    plaintiff's case.
23            MR. FARRAR:  Your Honor, if I may just add to that, I
24    think it would be similar to at the beginning of the trial
25    when your Honor read the stipulated facts to the jury.  They
```

```
 1    didn't have any context in that moment for what any of that
 2    meant.  But they were, you know, I guess admissions by all
 3    parties involved in the case, agreement.
 4         And counsel's free to make reference to those
 5    stipulations at closing or during questioning.  I think it
 6    would be the same as the answer.
 7         THE COURT:  All right.  Well, I'm going to keep
 8    looking.  Okay.  Here's something that says evidence without
 9    witness.  Okay.  Here we are.  We're on answers to
10    interrogatories and all these things and whether they can be
11    admitted.
12         You know, I'm going to deny your request without
13    prejudice to me revisiting it after our next break.  And but
14    if you rest, we know that this is an open question.  But the
15    reasons for denying it are many, which is that the traditional
16    method of admitting evidence at a trial is to have a witness
17    identify it, put it in context, and to draw out from that
18    document or that Exhibit something that could be useful to a
19    jury.
20         And just having the Court admit the answer to a
21    complaint which is signed by Mr. Russell and Mr. Pilchak,
22    which is I think 902(8) says something about having it
23    notarized , which is this is not.  But let's just say this
24    seems like pretty legit.  The two lawyers on the case at the
25    time sign it.  But I think it could just only serve to confuse
```

143

```
 1    everyone.  This is just simply not something that a jury would
 2    know what to do with.
 3          So at this point I think it is -- I don't even know
 4    that it's more prejudicial than probative.  It's just simply
 5    confusing.  I don't know what rule that is.  But it's just not
 6    the way you try a case.  You don't just list off some exhibits
 7    that you're going to put in that have not been agreed upon.
 8    So which this was not agreed upon as an Exhibit.
 9          MR. PILCHAK:  And it's the other part of rule 403, is
10    the risk of confusion.  I mean, we usually cite that for
11    prejudicial effect.  But the risk of confusion the jury is in
12    403.
13          THE COURT:  Yeah, okay.  Thank you.  So at this
14    point, it is provisionally your request is denied.  And I'll
15    revisit it when -- by the time we talk about the jury
16    instructions and all of that, I will have looked through some
17    more materials.
18          MR. FARRAR:  Thank you, your Honor.
19          THE COURT:  Were there other exhibits?
20          MR. FARRAR:  No.
21          THE COURT:  And let me just tell you, what you would
22    want to do for your next trial is put all your exhibits and
23    then put which counts they go to or what claims, defenses,
24    etcetera, that they're going to go to and who is your witness
25    you're going to get it in through.  But this is just one.  And
```

January 25, 2016

1    so that's what we'll do with that.

2          MR. FARRAR:  All right.  In that case, the plaintiff

3    has no further witnesses with the -- just with the

4    understanding of what we just discussed.  That should we

5    revisit this issue later, we are reserving our right to call

6    another witness for the limited purpose of the answer.  Is

7    that --

8          THE COURT:  Well, no.  Your case is -- I mean, you

9    can't say we were counting on a particular ruling so we didn't

10   call a witness.

11         MR. FARRAR:  Your Honor, in that --

12         THE COURT:  What witness would you have -- who would

13   you call?

14         MR. FARRAR:  I guess, your Honor, in that case we

15   could call the plaintiff again to authenticate the answer for

16   that limited purpose.

17         THE COURT:  Well, the authentication -- okay.  You

18   can call Mr. Russell.  He signed it.

19         MR. FARRAR:  Or we can call Mr. Russell as well.  I

20   mean, he signed it.  All we would ask is did you prepare this

21   and is this the answer to the complaint.  And I think that

22   would satisfy any evidentiary issues.

23         MR. PILCHAK:  He's not on the witness list and I

24   would object to him being called.

25         THE COURT:  Yeah, and it's not rebuttal.  Okay.  What

January 25, 2016

145

```
 1    we're going to do is you will rest with the understanding that
 2    the Court will revisit this on a break and give it some more
 3    thought and may yet admit it.  But at this point, it will not
 4    be admitted.  And we will move on.  I think you should rest in
 5    front of the jury so that they hear that you rest.
 6              MR. FARRAR:  Thank you.
 7              MS. GUSFA:  Thank you.
 8              THE COURT:  We'll do that again.  But Mr. Pilchak, do
 9    you have something?
10              MR. PILCHAK:  No.
11              THE COURT:  Oh, okay.  So we'll get water and the
12    jury.
13              MR. FARRAR:  Thank you.
14              MS. GUSFA:  Thank you.
15              THE COURT:  Okay.  Fantastic.
16              Mr. Farrar, I just don't see in these affirmative
17    defenses anything that hasn't in one way or another been
18    discussed by defense.  I mean, if you want to make your
19    closing argument that defendant --
20              THE CASE MANAGER:  All rise for the jury.
21                        (Jury In)
22              THE COURT:  Okay.  Please be seated.  And Mr. Farrar,
23    Ms. Gusfa, does the plaintiff rest at this point?
24              MR. FARRAR:  Yes, your Honor.  The plaintiff rests.
25              THE COURT:  Okay.  Thank you, very much.  And what
```

January 25, 2016

```
1    that means is that the plaintiff has been presenting her case
2    in chief.  And now we move to the defendant bringing its
3    defenses on board.  Although, of course, you've heard
4    cross-examination so I think you're quite familiar with the
5    case.
6              MR. PILCHAK:  Defense will call Erica Hahn.
7              THE COURT:  Okay.  Fantastic.
8              Thereupon,
9                     E R I C A    H A H N ,
10   having been called as a witness and having been first duly
11   sworn testified as follows:
12             THE COURT:  We have a witness box right over there.
13                     DIRECT EXAMINATION
14   BY MR. PILCHAK:
15   Q.   Would you state your full name for if record?
16   A.   Erica Hahn.
17   Q.   And are you presently --
18             THE COURT:  And could you spell your full name?
19             THE WITNESS:  E-R-I-C-A, H-A-H-N.
20             THE COURT:  Thank you.
21   BY MR. PILCHAK:
22   Q.   Where do you reside?
23   A.   New Mexico.
24   Q.   Are you presently employed?
25   A.   No.
```

January 25, 2016

147

```
 1   Q.   When were you last employed?

 2   A.   June of last year.

 3   Q.   June of 2015?

 4   A.   Yes.

 5   Q.   What took you to new Mexico?

 6   A.   My significant other, my boyfriend got a job out there so

 7   we moved out there.

 8   Q.   And what was the nature of the job, if I might ask?

 9   A.   He is the event director for Albuquerque International

10   Balloon Fiesta.

11   Q.   And how were you employed say before October of 2008?  Do

12   you remember back that far?

13   A.   I worked for RE/MAX.  It was RE/MAX Platinum, RE/MAX All

14   Stars.

15   Q.   Okay.  And this was prior to the merger with The Michigan

16   Group?

17   A.   Correct.

18   Q.   You worked with who there?

19   A.   I worked with Sherry Duffie and Will Steinmetz among other

20   agents and such.

21   Q.   And that company had a trust account?

22   A.   Yes.

23   Q.   And then from October of 2008 did your employer change?

24   A.   Yes.  We merged with The Michigan Group and went over to

25   their building and became RE/MAX Platinum there.
```

1    Q.   And where did you work within RE/MAX Platinum after the

2    merger?

3    A.   Central office.

4    Q.   And you've used the term Central.  What would you -- how

5    would you describe Central?

6    A.   Accounting department.  Kind of the hub of the company.

7    Q.   And from October of 2008 up until -- March of 2011, to

8    whom did you report?

9    A.   Kandis Thompson.

10   Q.   And after March of 2011 until approximately August of 2012

11   to whom did you report?

12   A.   Sherry Duffie.

13   Q.   And why do you say that you reported to Sherry Duffie?

14   How -- what was it about your experience that says you reported

15   to Sherry Duffie?

16   A.   Well, when we first got over there and I worked in

17   Central, Kandis was the controller.  And so she is who I

18   reported to.  And then when she was leaving, Sherry took over

19   as the controller, so she was who I reported to.

20   Q.   Okay.  And who gave you day-to-day direction?

21   A.   Sherry and Jennie and Joe.

22   Q.   Okay.  And who did you mostly deal with in terms of

23   day-to-day direction on things within Central?

24   A.   Sherry.

25   Q.   And drawing your attention to I believe admitted Exhibit

January 25, 2016

```
 1   50 in this binder.  Let me just check my list.  This is Exhibit
 2   50.  And could you identify this document?
 3   A.   It's an e-mail from Sherry to myself.
 4   Q.   Okay.  And what was the nature of this?
 5   A.   Sending a letter to the state to petition a rent increase
 6   for a rental unit.
 7   Q.   How often would you get an e-mail like this from Sherry
 8   Duffie instructing you or directing you to engage in a
 9   particular activity?
10   A.   Well, we worked together on a daily basis.  So I don't
11   know if I would get an e-mail daily, weekly, whatnot.
12   Q.   How often would she provide direction like this whether
13   verbally or by e-mail to attend to certain duties?
14   A.   Probably daily or so.
15   Q.   Okay.  Turn to Exhibit 27.  Would Exhibit 27 be an example
16   of such an e-mail?
17   A.   Yes.
18   Q.   And what are the functions -- who else reported to Sherry
19   Duffie in your opinion?
20   A.   I know Linn Felker did when I was back there.
21   Q.   And how would you describe the reporting relationship
22   between say the Ann Arbor and Fenton offices in Central?
23   A.   We would work together as well because we were, you know,
24   it was one company.  So we were all kind of on the same page so
25   we would all work together.
```

```
 1    Q.   Do you know if Ms. Duffie -- if you've seen anything occur
 2    or heard Ms. Duffie say anything that caused you to believe
 3    that she had any authority over the Ann Arbor or Fenton
 4    offices?
 5    A.   Yeah.
 6    Q.   And what was that?
 7    A.   I know that she had authority especially over Ann Arbor.
 8    She was in the Ann Arbor office doing sort of the Central
 9    duties down there.  So I know she was in charge of the people
10    in that office as well when she came back to Brighton.
11    Q.   Okay.  And are you saying she had authority over that
12    office after she came back to Brighton?
13    A.   Yes.
14    Q.   And are you aware of any activities in the nature of
15    hiring, firing, discipline or anything like that that she --
16              MR. FARRAR:  Objection.  Leading.
17              THE COURT:  Could you rephrase the question?
18    BY MR. PILCHAK:
19    Q.   Did you or did you not ever see anything, see her exert
20    any hiring, firing authorities as far as you know?
21    A.   To my knowledge or to my understanding, yes.
22    Q.   And what is your understanding?
23    A.   It was my understanding that the people that were in Ann
24    Arbor especially because she was in that office she hired
25    someone to kind of take care of that office when she came back
```

January 25, 2016

1   to Brighton.  And I believe that that person was later fired by

2   her as well.

3   Q.   Do you know that person's name?

4   A.   I remember Barbara.

5   Q.   Do you remember a last name at all?

6   A.   I didn't know.

7   Q.   That's fine.  With regard to processes within Central,

8   were there or were there not any changes in processes after Ms.

9   Duffie came to Central after March of 2014 before you left the

10  department in August of 2012?

11  A.   Yes.

12  Q.   And who would initiate those changes in process?

13  A.   Sherry did change some things in process.  She worked

14  differently than Kandis did.  So she was kind of changing

15  things.

16  Q.   If you would turn to Exhibit 34.  Can you tell what the

17  process is here?

18  A.   Attaching a pending checklist that we would use with --

19  when a pending deal came in, the checklist would be done and

20  then the papers -- how the papers were, I guess, attached to

21  the file.

22  Q.   Okay.  And what other kind of processes do you recall

23  being in place in the office at Central, if you can?

24  A.   I'm not quite sure.

25  Q.   How was banking conducted?

January 25, 2016

```
 1              MR. FARRAR:  Objection.  Leading.
 2              THE COURT:  How was banking conducted?  That's fine.
 3    Overruled.
 4    BY MR. PILCHAK:
 5    Q.   How was banking conducted?  Do you know?
 6    A.   As far as like the accounting process?
 7    Q.   Let me ask you this, do you know how many banks or Central
 8    or the company used?
 9    A.   I believe just one bank.
10    Q.   Maybe this didn't occur during your employment.  We won't
11    talk about it.  Are you familiar with the term hit by a bus
12    manual?
13    A.   Yes.
14              THE COURT:  Hit by a --
15              MR. PILCHAK:  Hit by a bus manual.
16              THE COURT:  Oh.
17    BY MR. PILCHAK:
18    Q.   And what is that?
19    A.   It was kind of the book that or binder or book that
20    included everybody's job description.  So if anybody was hit by
21    a bus and needed someone else to take over their job, they kind
22    of had an understanding of how their job was done.
23    Q.   How were those manuals initiated?
24    A.   Sherry asked everyone to prepare kind of a job
25    description, a job manual for what they did.
```

1    Q.   Now, when we use the term job description, it sort of

2    means a listing of duties on one piece of paper with bullet

3    points, maybe like a resumé.  Is that what this was or is it

4    something different?

5    A.   More describing your day to day activity and how you do

6    everything.

7    Q.   Okay.  And what kind of things would you put in there?

8    How much pages would it end up consisting of?

9    A.   It depended on what job you did and how thorough you wrote

10   them down, I guess.

11   Q.   Okay.  All right.  And did you create one?

12   A.   Yes.

13   Q.   Would you look at -- well, let me ask you this.  From time

14   to time, did Ms. Duffie ever raise any issues or engage in any

15   corrections of your work?

16   A.   Yeah.

17   Q.   And would you turn to Exhibit 49, proposed Exhibit 49.

18   How would you identify proposed Exhibit 49?

19   A.   An e-mail from Sherry to myself asking --

20   Q.   Don't read it into the record.  But generally on what kind

21   of a subject?

22   A.   Contracts.

23   Q.   Okay.

24            MR. PILCHAK:  Move to admit proposed Exhibit 49.

25            THE COURT:  Is there any objection?

January 25, 2016

1          MR. FARRAR:  No, Your Honor.

2          THE COURT:  Okay.  It will be received.

3                    (Defense Exhibit No. D-49 Admitted

4                    Into Evidence)

5          MR. PILCHAK:  And may I display it, your Honor?

6          THE COURT:  Yes.

7   BY MR. PILCHAK:

8   Q.  And the e-mail speaks about please change your home agent

9   contracts to reflect three percent broker fee.  Do you know

10  what issue or event had occurred to require this e-mail?

11  A.  I don't remember what event happened.

12  Q.  But what is the direction?  Did you maintain a database or

13  any kind of computer file with regard to broker agents

14  contracts?

15  A.  Yes.  It was part of the system on how the commission

16  checks were cut.

17  Q.  Okay.  And the nature of this relates to having three

18  percent broker fee and five percent broker fees, correct?

19  A.  Correct.

20  Q.  In what way would it come to Ms. Duffie's attention

21  something that you had worked on in this regard?  Do you know?

22          MR. FARRAR:  Objection.

23          THE COURT:  The basis?

24          MR. FARRAR:  In what ways it would come to Ms.

25  Duffie's attention.  I think it's calling into her --

January 25, 2016

```
 1              THE COURT:  Oh, Ms. Duffie's attention?
 2              MR. FARRAR:  Yes.
 3              THE COURT:  Ask how it came to her attention or
 4    something she might know.
 5    BY MR. PILCHAK:
 6    Q.   In terms of the processes that you knew were in place or
 7    the activities that you knew Ms. Duffie to engage in, do you
 8    have any understanding as to how something you had worked upon
 9    would come to Ms. Duffie's attention?
10    A.   If she was in the system double checking it.
11    Q.   Okay.  And in this case, did you make the correction that
12    she had requested, if you know?
13    A.   I don't.  I assume I did, but I don't remember.
14    Q.   Okay.  All right.  Did there ever come a point in time
15    when your duties were changed or you were assigned different
16    duties between March of 2011 and August 2012 that you recall?
17    A.   Yeah, duties were kind of shuffled around.
18    Q.   And who would tell you which duties you were to attend to?
19    A.   It would be Sherry or someone or Jennie or Joe.
20    Q.   Okay.  You were engaged in dealing with agent broker
21    contracts, correct?
22    A.   Yes.
23    Q.   And so to an extent your duties touched Ms. Steudle's
24    activities, correct?
25    A.   Yes.
```

January 25, 2016

1   Q.  And so you would from time to time have to discuss matters

2   with Ms. Steudle, correct?

3   A.  Yes.

4   Q.  But in terms of who you considered your boss to be, who

5   did you consider your boss to be?

6              MR. FARRAR:  Objection.  Asked and answered.

7              THE COURT:  He can ask it again.  Overruled.

8              THE WITNESS:  Sherry was my direct supervisor.

9              MR. PILCHAK:  I have no further questions.

10             THE COURT:  Okay.  Do you have any cross-examination?

11             MR. FARRAR:  Yes, your Honor.

12             THE COURT:  All right.

13                          CROSS-EXAMINATION

14   BY MR. FARRAR:

15   Q.  Ms. Hahn, were you subpoenaed to be here today to testify?

16   A.  Not subpoenaed.

17   Q.  So no one ever served you with legal papers and said you

18   are ordered by law to come here today, right?

19   A.  No.

20   Q.  You're here because you want to be here, right?

21   A.  Well, I'm here because I was asked to be here.

22   Q.  You were asked.  And you could have said no, right?

23   A.  I suppose.

24   Q.  But you said yes because you wanted to testify for the

25   corporation, right?

January 25, 2016

157

1    A.   I guess.

2    Q.   Okay.  Well, before today now, you and I have never

3    spoken, right?

4    A.   Yes.

5    Q.   But you have obviously spoken to the company's attorneys,

6    right?

7    A.   Yes.

8    Q.   You've spoken to the company's attorneys actually on a few

9    occasions; am I right?

10   A.   A couple.

11   Q.   Well, you talked to them -- when you spoke to them,

12   obviously you were talking about your testimony, right?

13   A.   They were asking me questions.

14   Q.   And you were giving them answers?

15   A.   Um-hum.

16   Q.   Now, you -- prior to today you signed an affidavit.  Are

17   you aware of that?

18   A.   I don't remember.

19   Q.   Well, do you remember signing something about what you

20   claim you saw and observed when you were working at RE/MAX?

21   A.   I guess.  I remember signing something.

22   Q.   And by the way, that document that you signed, you would

23   agree that your testimony today is consistent with that

24   document?

25   A.   Um-hum.

January 25, 2016

```
1    Q.   And that document that's consistent with your testimony

2    today, that was actually written up by the defendant's

3    attorneys, right?

4    A.   I don't remember.  I mean, I don't -- if I could see the

5    document I could probably tell you.

6    Q.   Well, we'll get to that in a minute.  But you didn't write

7    it, right?

8    A.   I don't remember.

9    Q.   Well, if you had written a document about this case, isn't

10   that something you would remember?

11   A.   Maybe.

12   Q.   So your testimony is you're not sure?

13   A.   I would have to see the document to know.

14   Q.   Okay.  All right.  One moment.

15        MR. FARRAR:  Your Honor, may I approach the witness?

16        THE COURT:  Yes.

17        MR. FARRAR:  For the record, I'm showing the witness

18   what has been marked as D-86.

19        THE WITNESS:  Okay.

20   BY MR. FARRAR:

21   Q.   Now, Ms. Hahn, looking at that, does that refresh your

22   recollection as to whether or not you wrote it?

23   A.   Yes.

24   Q.   Okay.  So did you write that?

25   A.   I did not write it, but these are things that I said.
```

January 25, 2016

1   Q.   Okay.  And it was written by the attorneys for the

2   defendant, right?

3   A.   I don't know who wrote it.

4   Q.   Well, it was given to you after speaking with the

5   defendant's attorneys, right?

6   A.   Yes.

7   Q.   And what's the date on that document?

8   A.   July 13th, 2015.

9   Q.   And prior to that you signed another one on April 29th,

10  2015, right?

11  A.   I don't remember.

12  Q.   Do you agree it's possible you signed one?

13  A.   I agree it's possible.

14  Q.   And on April 29th, 2015, you were still employed by the

15  defendant, right?

16  A.   Yes.

17  Q.   So you were given a document.  You don't know who prepared

18  it.  But it was after speaking with the defendant's attorney

19  while you were still employed by the defendant, right?

20  A.   I suppose if I signed something in April, then yes.

21  Q.   And it's your testimony that what you wrote on the

22  affidavit, that's the same as what you're saying in Court,

23  right?

24          MR. PILCHAK:  Objection.  Conclusory.

25          THE COURT:  I'm not sure I heard the entire question.

1   What was the question?

2           MR. FARRAR:  I was just asking the witness if she's

3   testifying consistently today with what she'd sign.

4           THE COURT:  That's a fair question.  Overruled.

5           THE WITNESS:  Yes.

6   BY MR. FARRAR:

7   Q.   Okay.  Now, Ms. Hahn, you're -- and I can -- if I may

8   approach, I can take that back.  Thank you.  Now, Ms. Hahn,

9   you're currently living in new Mexico; is that right?

10  A.   Yes.

11  Q.   So how did you get out here in Michigan?

12  A.   I flew.

13  Q.   And who paid for your flight?

14  A.   RE/MAX did.

15  Q.   Okay.  Where are you staying while you're out here?

16  A.   In a hotel.

17  Q.   And who's paying for your hotel?

18  A.   RE/MAX.

19  Q.   And that's the same RE/MAX that's the defendant in this

20  case?

21  A.   Yes.

22  Q.   Ms. Hahn, are you familiar with something called the

23  RE/MAX vendors list?

24  A.   Yes.

25  Q.   And that's something you're responsible for updating,

January 25, 2016

1   right?

2   A.   When I was in Central office I did.

3   Q.   And approximately what period of time are we talking about

4   here?

5   A.   Prior to August 2012.

6   Q.   And the vendor list, as I understand it, is a list of

7   approved vendors that RE/MAX uses; is that right?

8   A.   The vendor list was kind of a compilation of vendors that

9   agents had used in the past.  If they had any relationships

10  with them, then they could kind of suggest, hey, this is who I

11  used in the past.

12  Q.   And obviously it's important to maintain that accurately.

13  Can we agree on that?

14  A.   If there were changes to it and somebody let us know.

15  Q.   And in addition to maintaining the vendors list, are you

16  familiar with a document called the who does what list?

17  A.   Yes.

18  Q.   And that's -- can you describe what that document is?

19  A.   It was sort of an internal document that gave a

20  description of who handled what duties.

21  Q.   And were you responsible for updating that?

22  A.   Yes.

23  Q.   And when you say it was an internal document, that was

24  something that was shared around the office?

25  A.   If the agents had questions of who to go to, then that

1    document kind of told a basis of who does what.

2    Q.   So basically anyone in the company, if they needed to find

3    out someone's title, someone's job duties, they could look at

4    that; is that right?

5    A.   Yeah.

6    Q.   Okay.

7         MR. FARRAR:  One moment, your Honor.

8    BY MR. FARRAR:

9    Q.   And the document called the who does what list, you would

10   agree it was used in RE/MAX's regular course of business,

11   right?

12   A.   Yeah.

13        MR. FARRAR:  Your Honor, I'd like to show the witness

14   what's been premarked as Plaintiff's Exhibit 1.

15        MR. PILCHAK:  Proposed.

16        MR. FARRAR:  Plaintiff proposed Exhibit 1.  Thank

17   you.

18        THE COURT:  Okay.  Let me take a look.  Oh, Exhibit

19   1.  I seem to have taken Exhibit 1 out.  What is Exhibit 1?

20        MR. PILCHAK:  We've had a lot of discussion --

21        THE COURT:  Oh, that's our one -- oh, sure.  You can

22   show it to her.

23        MR. FARRAR:  Thank you, your Honor.

24        THE COURT:  I've got it right here.

25        MR. FARRAR:  May the record reflect I've handed the

 1    witness what's been premarked as plaintiff's proposed Exhibit

 2    1.

 3    BY MR. FARRAR:

 4    Q.   Ms. Hahn, do you recognize that document?

 5    A.   Yes.

 6    Q.   And what do you recognize it to be?

 7    A.   The who does what list.

 8    Q.   And was this what you were responsible for updating during

 9    the time you worked at Central?

10    A.   Yes.

11    Q.   And is what I've handed you a fair and accurate copy of

12    that document?

13    A.   Yes.

14         MR. FARRAR:  Your Honor, at this time, defendants --

15    plaintiff moves for it to be admitted into evidence.

16         MR. PILCHAK:  Wish to voir dire.

17         THE COURT:  Certainly.  What that means, for the

18    jury, is that we're trying to sort out if this is an exhibit

19    that should be admitted.  And Mr. Pilchak will ask a couple of

20    questions during Mr. Farrar's examination to find out more

21    about the document.

22                    VOIR DIRE EXAMINATION

23    BY MR. PILCHAK:

24    Q.   Do you have any understanding as to whether the document

25    that was provided to you now was ever -- was an interim version

1   or a final version that was used?

2   A.   I don't think there was ever a final version of it.  As

3   things changed, the list changed.  So any duties that changed,

4   this had to change.  So it was always a work in progress.

5   Q.   Okay.

6          MR. PILCHAK:  I would object then, your Honor,

7   because it was always changing.

8          THE COURT:  Just the basis of your objection?

9          MR. PILCHAK:  Lack of foundation.

10         THE COURT:  Okay.  That's overruled.  And it will be

11  received.

12                       (Plaintiff's Exhibit No. P-1

13                       Admitted Into Evidence)

14         MR. FARRAR:  Thank you, your Honor.  May I approach

15  the witness?

16         THE COURT:  Yes.

17                  CROSS-EXAMINATION (CONTINUED)

18  BY MR. FARRAR:

19  Q.   Ms. Hahn, I'm showing you page 1 of Plaintiff's 1.  And I

20  believe it was your testimony just a few moments ago this is

21  the who does what list from RE/MAX Platinum?

22  A.   Yes.

23  Q.   And this is obvious, but obviously that's RE/MAX

24  Platinum's letterhead there?

25  A.   Um-hum.

1  Q.  And I'm drawing your attention to this word management.

2  This is a list of the managers at RE/MAX Platinum, correct?

3  A.  Yeah.

4  Q.  And if I turn to the second page -- and I apologize.  This

5  is a poor copy of them.  But we can agree that these are

6  photos, these black boxes would have been, and a clear copy

7  would have been people's photographs.

8  A.  Yes.

9  Q.  Sorry.  I'm just zooming in so it's clear.  And we can

10  agree that this is a list of the staff, right?

11  A.  A really old list of staff, yes.

12  Q.  Well --

13        THE COURT:  When you say the old list of staff, you

14  mean they're not the staff today?

15        THE WITNESS:  They're definitely not the staff today.

16        THE COURT:  You're listed there and you live in New

17  Mexico now.

18        THE WITNESS:  Yes.  It's definitely not the staff

19  today.

20  BY MR. FARRAR:

21  Q.  And this may be helpful if I show you the date on the

22  bottom and if we can kind of zoom in there.  We can agree that

23  as of July 2012 this was an accurate list?

24  A.  That's the date on there.

25  Q.  Hi, Kathy.  There we go.  And that's Ms. Duffie's name

1    here under the staff column; is that right?

2    A.   That is her name.

3    Q.   Thank you.

4         MR. FARRAR:   Excuse me one moment.

5    BY MR. FARRAR:

6    Q.   Ms. Hahn, you testified earlier that Ms. Duffie would

7    assign you work; is that right?

8    A.   Um-hum.   Yes.

9    Q.   But we can agree that there were times when you gave Ms.

10   Duffie direction, right?

11   A.   Because we worked together.

12   Q.   Right.   You worked together, right?

13   A.   We were in the same department.

14   Q.   And there were times when you would ask Ms. Duffie to do

15   things, tell her to do this, tell her to do that.   I mean, over

16   the course of the time you were there, we can agree on that,

17   right?

18   A.   Um-hum.

19   Q.   And we can also agree at times you and Ms. Duffie shared

20   work, right?

21   A.   Um-hum.

22   Q.   Now, let me ask you this, you -- when you were in Central,

23   you took a lot of time off to go hot air ballooning, right?

24   A.   Um-hum.

25   Q.   Sometimes it would be as many as 40 or 50 days off in a

1    year, right?

2    A.  I don't know how many days.

3    Q.  Well, can we agree it was in that ballpark?

4    A.  It's possible.

5    Q.  Okay.  And when you took off this time, Ms. Duffie would

6    get stuck sort of picking up some of the slack.  Would you

7    agree on that?

8    A.  I guess if I wasn't there then someone would have to pick

9    up the slack.

10   Q.  And Ms. Duffie was the one who would cover for you when

11   you were out of the office doing your work, right?

12   A.  Sure.

13   Q.  And in fact, when you were actually going to be out of the

14   office, you would tell people they can either contact Sherry or

15   Linn Felker in your absence, right?

16   A.  Those were the people in Central.

17   Q.  Okay.  And that's because you, Sherry, and Linn, were all

18   working as a team, right?

19   A.  In the same department, yeah.

20   Q.  And when you took the time off, Mr. DeKroub was the one

21   that actually approved your time off, right?

22   A.  I don't know that I ever specifically asked Joe for time

23   off.

24   Q.  Let me ask you this, Ms. Hahn.  Now, you have known Sherry

25   , Ms. Duffie, for a long time, right?

January 25, 2016

1   A.   Um-hum.

2   Q.   Even before the merger, right?

3   A.   Yes.

4   Q.   And is it fair to say that you and Ms. Duffie don't

5   exactly get along?

6   A.   I guess.

7   Q.   And you've had arguments with Ms. Duffie before?

8   A.   Everyone has arguments.  But yeah.

9   Q.   Now, are you familiar with someone by the name of Janice

10  Lamb?

11  A.   Yes.

12  Q.   And you know that Janice Lamb and Ms. Duffie used to share

13  office space, right?

14  A.   Um-hum.

15  Q.   And at the time you and Ms. Lamb would also have

16  conversation -- let me ask you this way, Ms. Lamb was a friend

17  at one point?

18  A.   She was a co-worker.

19  Q.   And you and her would have conversations near Sherry's

20  desk?

21  A.   I guess if we had to talk.

22  Q.   And Sherry complained that your conversations were

23  distracting people in the office and you took offense at that,

24  right?

25  A.   I don't remember.

1   Q.   And you took offense when Sherry complained that your time

2   off was putting a strain on Central, right?

3   A.   I don't remember.

4          MR. FARRAR:  I have no further questions, your Honor.

5          THE COURT:  Okay.  Thank you.

6          MR. PILCHAK:  I have a couple.

7          THE COURT:  Okay.

8                        REDIRECT EXAMINATION

9   BY MR. PILCHAK:

10  Q.   With regard to the who does what list, I believe you

11  indicated that it was -- that there had been a number of

12  different versions on that, correct?

13  A.   Yes.

14  Q.   And do you recall whether Ms. Duffie ever appeared on the

15  management page prior to that?

16  A.   I believe --

17         MR. FARRAR:  Objection.  Leading.

18         THE COURT:  Prior to what?

19         MR. PILCHAK:  Prior to the date of Exhibit 1.

20         THE COURT:  Overruled.

21         THE WITNESS:  I believe so.

22         MR. PILCHAK:  Okay.

23  BY MR. PILCHAK:

24  Q.   This is not marked as an Exhibit.  But do you remember the

25  date?

1   A.   I don't.

2   Q.   But you recall Ms. Duffie being on the management page

3   even before that Exhibit, correct?

4   A.   It's possible.

5   Q.   Would looking at such a document refresh your

6   recollection?

7   A.   Yeah.

8   Q.   Showing you a document.  Consisted of multi pages.  It was

9   printed out over the weekend.  The date in the lower right-hand

10  corner are not accurate.  But the other portions are.  Review

11  that and see if that refreshes your recollection.

12  A.   Yes.

13  Q.   And looking through the first pages --

14          MR. FARRAR:  I'm going to object.  I think we need a

15  sidebar regarding this document.

16          THE COURT:  Okay.  What is just the basis of your

17  objection, just the rule?

18          MR. FARRAR:  Never been produced before.

19          THE COURT:  Oh, it's just -- it's not an exhibit.

20  It's a refresh the recollection.  So I think we can proceed

21  without --

22          MR. FARRAR:  But I would just note my objection if

23  she's going to be reading from anything that's not in

24  evidence.

25          THE COURT:  Okay.  Well, let's see if she can read

January 25, 2016

```
 1    quietly to herself and let's see if that assists her memory.
 2    BY MR. PILCHAK:
 3    Q.   Have you reviewed the document?
 4    A.   Yes.
 5    Q.   In what year was it that Ms. Duffie appeared on the
 6    management page?
 7    A.   It was --
 8    Q.   You can flip forward, if you like.  Forward.
 9    A.   2011.
10    Q.   And in fact, what position was Ms. Duffie in when she was
11    listed on the management page?
12           MR. FARRAR:  Objection.
13           THE COURT:  Well, now from her memory.  She can put
14    the document down and see if she can remember.  And then if
15    you refresh your memory, you'll refresh your memory.
16    BY MR. PILCHAK:
17    Q.   Do you remember what position she was in when she was
18    listed on the management page?
19    A.   Closing coordinator.
20    Q.   And that was where?
21    A.   Ann Arbor.
22    Q.   And you worked under Ms. Duffie's supervision?
23           MR. FARRAR:  Objection.  Asked and answered.
24           THE COURT:  Sustained.
25    BY MR. PILCHAK:
```

January 25, 2016

172

```
 1    Q.   Did you consult with Ms. Duffie -- strike that.  I have no

 2    further questions.

 3              MR. FARRAR:  Yes, your Honor.

 4              THE COURT:  Mr. Farrar?

 5              MR. FARRAR:  Thank you.

 6                         RECROSS-EXAMINATION

 7    BY MR. FARRAR:

 8    Q.   Ms. Hahn, Mr. Pilchak just showed you a document.  And do

 9    you still have it in front of you?

10    A.   No.

11    Q.   Do you -- by the way, do you know when that document that

12    he just showed you was prepared?

13    A.   There was an e-mail attached to it from 2011.

14    Q.   But aside from the e-mail, do you have any personal

15    knowledge of when it was prepared?

16    A.   I don't know exactly when it was prepared.

17              THE COURT:  Did you prepare it?

18              THE WITNESS:  Yes.

19              MR. FARRAR:  May I see the exhibit again?

20              THE WITNESS:  I believe I prepared it.  I mean --

21              MR. FARRAR:  I have something written on mine.  I'm

22    happy to show it to the witness, but it might be easier if you

23    have -- your Honor, may I approach the witness?

24              THE COURT:  Certainly.

25    BY MR. FARRAR:
```

January 25, 2016

1   Q.   I'm turning your attention to the third page of this

2   document.   Do you see a date written in the bottom right-hand

3   corner of that page?

4   A.   On the third page?

5   Q.   Yes.

6   A.   January 23rd, 2016.

7   Q.   And can we agree that would be this past Saturday?

8   A.   I'm assuming that's when it was printed.

9   Q.   But you have no idea if that's when it was prepared or

10  not, right?

11  A.   I don't know when it was prepared.   I mean, I know it was

12  prepared while --

13  Q.   That's all.   No further questions.

14          THE COURT:   Okay.   Mr. Pilchak?

15                  REDIRECT EXAMINATION

16  BY MR. PILCHAK:

17  Q.   Ms. Hahn, is there any question in your mind that Ms.

18  Duffie appeared on the management page in 2011?

19          MR. FARRAR:   Objection.   Beyond the scope.

20          THE COURT:   Overruled.

21  BY MR. PILCHAK:

22  Q.   Is there any question that she appeared on the management

23  page before 2011?

24  A.   No.

25          MR. PILCHAK:   Nothing further.

January 25, 2016

1          MR. FARRAR:  Your Honor, one final question.

2          THE COURT:  Okay.

3                          RECROSS-EXAMINATION

4   BY MR. FARRAR:

5   Q.   Ms. Hahn, I'm showing you what's in evidence as

6   Plaintiff's Exhibit 1.  You would agree that as of -- let me

7   zoom in here.  As of July 18th, 2012, Ms. Duffie's name did not

8   appear anywhere on the management portion of this?

9   A.   I would agree with that.

10  Q.   And that on that same -- as of that same date, July 2012,

11  Ms. Duffie was very clearly listed as staff.  Can we agree on

12  that?

13  A.   I agree she's on the staff page.

14          MR. FARRAR:  No further questions.

15          THE COURT:  Okay.  Well, thank you, so much, Ms. Hahn

16  for being here.  I hope you have a safe trip home if you're

17  headed back to new Mexico.  You are released from this case

18  and you may step down.

19          THE WITNESS:  Thank you.

20          THE COURT:  Mr. Pilchak, do you have any other

21  witnesses you would like to call?

22          MR. PILCHAK:  Yes.

23          THE COURT:  And who would your next witness be?

24          MR. PILCHAK:  The next witness will be Linn Felker.

25          THE COURT:  Okay.

1           Thereupon,

2                   **L I N N    F E L K E R ,**

3  having been called as a witness and having been first duly

4  sworn testified as follows:

5           THE WITNESS:  Yes, I do.

6           THE COURT:  Fantastic.  Have a seat right there in

7   the witness box.

8           THE WITNESS:  I have to get my glasses.  They're on

9   the bench.

10           THE COURT:  Would you like some water?

11           THE WITNESS:  I would.

12           THE COURT:  Okay.  We'll get that for you.

13                   DIRECT EXAMINATION

14  BY MR. PILCHAK:

15  Q.  Would you state your full name for the record and spell

16  your full name for the court reporter, please?

17  A.  Linn, L-I-N-N.  Elizabeth, E-L-I-Z-A-B-E-T-H.  Felker, F

18  as in Frank-E-L-K-E-R.

19  Q.  And how are you currently employed?

20  A.  How am I currently employed?  I work full time for RE/MAX

21  Platinum.

22  Q.  Okay.  And how long have you worked for RE/MAX Platinum?

23  A.  Twenty-one years.

24  Q.  And continuously or --

25  A.  There was a period I think it was '07 that I went and

January 25, 2016

176

1    worked for one of the real estate agents at RE/MAX.  But

2    otherwise I've been there since '94.

3    Q.   Okay.  And then you recall there being a merger that the

4    company was involved in, correct?

5    A.   Right.

6    Q.   And before the merger -- well, where do you work right

7    now, what part of the company?

8    A.   I work in the accounting department and payables.

9    Q.   Is there a name for that at RE/MAX?

10   A.   It's called Central office.

11   Q.   Okay.  And have you always worked in Central?

12   A.   No.

13   Q.   When did you first start working in Central?

14   A.   '94 I went there as a receptionist part time.  My children

15   were small.  And I worked part time for a couple of years.  And

16   then I start going in Central part time part of the day in the

17   front office part of the day in the back office.  And I think

18   I've been full time since '98.

19   Q.   Full time where?

20   A.   In Central.

21   Q.   I see.  And before March of 2011, do you remember who you

22   reported to?

23   A.   Kandis Thompson.

24   Q.   And after March of 2011, who did you report to?

25   A.   Sherry Duffie.

1   Q.  And what is it that you saw or observed that prompts you

2   to say that Sherry Duffie supervised you?

3   A.  In my daily tasks, if I was doing -- I couldn't pay

4   anything.  Like I would open mail, give it to Sherry.  She

5   would give it back with approval.  So anything I had to pay, I

6   had to have approval from Sherry.

7   Q.  And anything else?

8   A.  Yeah.  I mean, I have lots of little tasks.  But we

9   inter-worked everyday.  We talked.

10  Q.  Okay.  In front of you there's a binder.  Would you turn

11  to the tab at 61 -- I'm sorry.  Yeah, 61.  I'm sorry, 51.  How

12  do you identify defendant's proposed Exhibit 51?

13  A.  As an e-mail between me and Sherry.

14  Q.  Yes.  And what's the general subject matter?

15  A.  To get a hold of Charter TV.

16          MR. PILCHAK:  And move to admit proposed Exhibit 51.

17          THE COURT:  Is there any objection?

18          MR. FARRAR:  No objection.

19          THE COURT:  Okay.  Then Exhibit D-51 is received.

20                      (Defense Exhibit No. D-51 Admitted

21                       Into Evidence)

22  BY MR. PILCHAK:

23  Q.  Ms. Felker -- may I display that, your Honor?

24          THE COURT:  Yes.

25  BY MR. PILCHAK:

178

```
 1    Q.   The paragraph in the small type is telling saying Kenneth

 2    Durrant wrote just got a phone call telling me we may be shut

 3    off in Fenton for internet, correct?

 4    A.   Yes.

 5    Q.   And who is Charter then?

 6    A.   Who was Charter then?

 7    Q.   Who is Charter?

 8    A.   Oh.  It's our cable internet.

 9    Q.   Okay.  And then Ms. Duffie has indicated in this exhibit

10    please follow up with Charter.  What would that require you to

11    do?

12    A.   Well, I believe that was actually -- that was directed at

13    Ken.  I was supposed to cut the check and Ken was going to get

14    a hold of Charter.

15    Q.   Well, it says Linn, please follow up with Charter.

16    A.   Yeah.

17    Q.   Did that require communication on your part?

18    A.   Probably.  I know I had to pay the bill.  I guess I called

19    it, too.  I don't remember exactly.

20    Q.   Would this be an example of the kinds of e-mails and

21    directions that you received from Ms. Duffie?

22    A.   Yeah.

23    Q.   Look at proposed Exhibit 52.  Would you -- how would you

24    identify that document?

25    A.   It's another e-mail between me and Sherry.
```

January 25, 2016

1   Q.   And what's the general subject matter?

2   A.   It's about awardable commission to do with closing for the

3   real estate agent that she wanted -- we had to go make a

4   correction on the close file.

5           MR. PILCHAK:  Move to admit proposed Exhibit 52.

6           THE COURT:  Is there any objection?

7           MR. FARRAR:  No, Your Honor.

8           THE COURT:  Okay.  D-52 is received.

9                         (Defense Exhibit No. D-52 Admitted

10                        Into Evidence)

11          MR. PILCHAK:  Thank you.  And may I display, your

12   Honor?

13          THE COURT:  Yes.

14   BY MR. PILCHAK:

15   Q.   And then the communication that occurred on July 8th, 2013

16   at 11:30, I'm showing awardable commission for Don Von's

17   buyer's agent Kathleen Conely, please find the transaction

18   correct for both Don and Kathleen.

19          What is the issue with having awardable commissions

20   for Don Von's buyer's agent in this e-mail?

21   A.   Buyer's agent can't have any awardable commission because

22   they are not -- they're classified different that they don't

23   get awardable commission.

24   Q.   Okay.

25   A.   So I just had to zero out for awardable commission.

January 25, 2016

1    Q.   Okay.  And given what you know about how Central operates

2    or how Ms. Duffie conducted her affairs, do you know how it is

3    that something like this would come to her attention?

4    A.   Because she looked at reports every month, you know,

5    looking for those types of things to be corrected.

6    Q.   Okay.  And would she correct your work from time to time?

7    A.   Yes.

8    Q.   Take a look at proposed -- strike that.  You said you had

9    -- you were required to have approval to pay anything?

10   A.   Yes.

11   Q.   Who was responsible for payables?

12   A.   Me and Sherry.

13   Q.   Turning your attention to proposed Exhibit 56.  How would

14   you identify that document?

15   A.   It's another e-mail between me and Sherry.

16   Q.   And what's the general subject matter with regard to this?

17   A.   It was a problem in the Fenton office.

18   Q.   Okay.

19            MR. PILCHAK:  Move to admit proposed Exhibit 56.

20            MR. FARRAR:  No objection.

21            THE COURT:  Okay.  Then D-56 is received.

22                          (Defense Exhibit No. D-56 Admitted

23                           Into Evidence)

24            MR. PILCHAK:  May I display, your Honor?

25            THE COURT:  Yes.

January 25, 2016

```
 1   BY MR. PILCHAK:
 2   Q.   Ms. Felker, how did Ms. Duffie sign off on her e-mail in
 3   this instance?
 4   A.   Administrative manager.
 5   Q.   And was that typical?
 6   A.   Yes.
 7   Q.   And with respect to the statement that says at the bottom
 8   please call Vickie in Fenton regarding Evon Perry's check.  Do
 9   you remember or do you recall what this incident was about?
10   A.   No, not exactly.
11   Q.   When you received an e-mail like this, would you respond
12   to it?
13   A.   Yes.
14   Q.   Okay.  And in this case the response involves what?
15   A.   Well, I called there and helped with the problem.
16   Q.   Okay.  How frequently did you get that kind of direction
17   from Ms. Duffie?
18   A.   Could be daily or every other day.  We e-mail each other a
19   lot back and forth.
20   Q.   Then turn to proposed Exhibit 59.  How would you identify
21   that document?
22   A.   An e-mail between me and Sherry.
23   Q.   And what's the general subject matter?
24   A.   It's about an agent that was terminated and I was going to
25   send her the documentation from the State of Michigan.
```

1  Q.  And do you know if there are any legal requirements with

2  regard to displaying offices or licenses in the office?

3  A.  We have to have them available for anybody.  We have them

4  in a book up in the front office.

5  Q.  Okay.

6          MR. PILCHAK:  And then move to admit proposed Exhibit

7  59.

8          THE COURT:  Is there any objection?

9          MR. FARRAR:  Your Honor, we would object on the

10  grounds it's repetitive.  But other than that, no objection.

11          THE COURT:  Okay.  Well, it will be received.

12                          (Defense Exhibit No. D-59 Admitted

13                          Into Evidence)

14  BY MR. PILCHAK:

15  Q.  And Ms. Felker, the licenses are out in the lobby,

16  correct, on the wall?

17  A.  No.  They're in a book.

18  Q.  Oh, they're in a book.  I see.  And was there any

19  particular reason that Ms. Duffie couldn't have just walked out

20  there herself and retrieved it from the book?

21          MR. FARRAR:  Objection.  Calls for speculation.

22          THE COURT:  Sustained.

23  BY MR. PILCHAK:

24  Q.  Are you familiar with the term hit by a bus manual?

25  A.  Yes.

January 25, 2016

1    Q.   And what would you describe that as?

2    A.   That was a book that she referred to that had codes for

3    everything and procedure manuals in it and had, you know,

4    directions in case something would ever happen to somebody.

5    Q.   Did you ever prepare one?

6    A.   I prepared a procedure manual for my daily task of

7    whatever position I was in at the time.

8    Q.   And what caused you to prepare that document?

9    A.   Because we were all asked to do that.

10   Q.   And if you turn to Exhibit 40.  Does this reference that

11   manual?

12   A.   Yes.

13   Q.   And this references a staff meeting, correct?

14   A.   Yes.

15   Q.   Did it occur from time to time that Ms. Duffie would call

16   staff meetings?

17   A.   Yes.

18   Q.   Are you familiar with a system where employees could work

19   more in one week or less in one week and then take time off the

20   next week or work more in the next week?

21   A.   Yes.

22   Q.   Okay.  And did you have any particular feelings about

23   that, good, bad or indifferent?

24            MR. FARRAR:  Objection.  Relevance.

25            THE COURT:  It's not relevant.  So sustained.

January 25, 2016

```
 1   BY MR. PILCHAK:
 2   Q.  Do you have a sense of how many employees utilized that
 3   system?
 4           MR. FARRAR:  Objection.  Relevance.
 5           THE COURT:  Overruled.
 6           THE WITNESS:  Some of us back in Central would do
 7    that.  We would bank or hours.
 8   BY MR. PILCHAK:
 9   Q.  And was it voluntarily or involuntarily?
10   A.  It was voluntary.
11           THE COURT:  It was voluntary in the sense that you
12    could be paid overtime if you didn't bank hours?
13           THE WITNESS:  Well, like sometimes I would be like
14    over four hours.  And then my mother, who's elderly, I would
15    have to take her to the hospital and I could then use my
16    hours.  I never -- I only used a few little cushion there for
17    doctor appointments for my mom basically.
18           THE COURT:  So if you worked 44 hours in a week, you
19    might use those four hours to visit with your mother?
20           THE WITNESS:  Right.
21           THE COURT:  But if you didn't use those hours, would
22    you be paid overtime?
23           THE WITNESS:  No.  But I never allowed them to get
24    like more than four.
25           THE COURT:  I see.  Okay.
```

1    BY MR. PILCHAK:

2    Q.   Was it generally your choice whether you would work more

3    than 40 hours?

4    A.   Yeah.

5              MR. PILCHAK:   I have no further questions.

6                         CROSS-EXAMINATION

7    BY MR. FARRAR:

8    Q.   Good afternoon, Ms. Felker.

9    A.   Hi.

10   Q.   You still work for the defendant, RE/MAX Platinum?

11   A.   I do.

12   Q.   Mr. DeKroub, Mr. Joe DeKroub, is still your current

13   employer?

14   A.   Yes, sir.

15   Q.   And you and Mr. DeKroub are friends, right?

16   A.   I guess so.  I don't hang out with him.

17   Q.   I mean, you see him socially.  You see him at work, right?

18   A.   I don't see him socially except at Christmas parties.

19   Q.   By the way, were you subpoenaed to testify here today?

20   A.   No, I was not.

21   Q.   So you are here voluntarily?

22   A.   Yes.

23   Q.   And in addition to Mr. DeKroub, you're also friends with

24   Joe DeKroub's wife, right?

25   A.   Not at all.

1    Q.   Not at all?  Well, you're friends with her on Facebook,

2    right?

3    A.   Yes.  But I don't hang out with her or anything.

4    Q.   Would you consider yourself friends with Joe DeKroub's

5    son?

6    A.   No.

7    Q.   Okay.  Now, you and I have never spoken before today,

8    right?  But you've spoken to the defense attorneys, right?

9    A.   Yes.

10   Q.   In fact, you've spoken to them on a few occasions?

11   A.   Yes.

12   Q.   And you've talked to them specifically about your

13   testimony today?

14   A.   I guess.

15   Q.   I'm sorry.  What was that?

16   A.   Yes.

17           THE COURT:  Can you speak up just a little louder so

18    that we can all hear?

19           THE WITNESS:  Oh.  Sorry.

20   BY MR. FARRAR:

21   Q.   Now, you told this jury that Ms. Duffie would, on

22   occasion, assign you work; is that right?

23   A.   Everyday.

24   Q.   But you would agree that you and Ms. Duffie also shared

25   work, right?

January 25, 2016

1    A.   Yes.

2    Q.   And sometimes Ms. Duffie would ask -- or strike that.

3    Sometimes you would ask Ms. Duffie nor help, right?

4    A.   Well, of course.

5    Q.   And that's because you were working together with her as

6    part of a team --

7    A.   I was her admin.  I worked under her.  I wasn't her equal.

8    Q.   So that's your testimony?

9    A.   I worked for Sherry.

10   Q.   Well, let me ask you this way, Ms. Felker.  You're here

11   testifying on behalf of your employer.  But in the past you've

12   told Ms. Duffie that you thought the defendant RE/MAX Platinum

13   was being unfair to her.  Do you remember that?

14   A.   No.

15   Q.   You thought they were being unfair to her for not paying

16   her overtime, right?

17   A.   I don't recall that.

18   Q.   Well, maybe you'll recall this.  You and Ms. Duffie, while

19   you were working together, you exchanged text messages, right?

20   A.   I guess.

21   Q.   And on one occasion in March of 2014, you sent her a text

22   message saying, quote, they are not being fair to you, right?

23   A.   I guess I did.

24   Q.   So even though you're here today on behalf of the

25   corporation, you would agree that the corporation, the

January 25, 2016

188

1    defendant, was being unfair to Ms. Duffie, right?

2    A.   Well, I was probably being sympathetic with her.

3    Q.   But you used the word, they are being unfair to you,

4    right?

5    A.   I did.

6         MR. PILCHAK:  May I object, your Honor?  This is

7    touching on a limine issue.

8         THE COURT:  This is also hearsay.  So sustained.

9         MR. FARRAR:  I was just asking the witness if she

10   said that.  That's all.

11        THE COURT:  Yeah.  But what she said out of court is

12   still -- even though it's her, it wasn't under oath.

13        MR. PILCHAK:  And I'm moving to strike all of that

14   testimony.  Because I don't believe any of it -- could we have

15   a sidebar.

16        THE COURT:  Yes.  Let's have a sidebar.

17                  (Bench Conference)

18        MR. PILCHAK:  I don't believe I have a copy of that

19   text.  But can I see it?

20        MR. FARRAR:  Well, I'm not using it to refresh her

21   recollection.

22        MR. PILCHAK:  Well, but it relates to an evidentiary

23   issue.

24        THE COURT:  Yeah.  We need to know --

25        MR. PILCHAK:  What's the date of it?  Well, it

1    doesn't say the date.  What date is it?

2             THE COURT:  Which in limine issue are you referring

3    to?

4             MR. PILCHAK:  This is referring to her departure.

5             THE COURT:  Because I did not know --

6             MR. PILCHAK:  Sure.

7             THE COURT:  Can I see it?  I don't know how it refers

8    to her departure.

9             MR. PILCHAK:  I can tell it's not referring to her

10   wage payments.  It's referring to the circumstances --

11            MR. FARRAR:  You're testifying to what it refers to.

12            MR. PILCHAK:  I'm not testifying in front of the

13   jury.  I'm trying to show the judge that you're bringing in --

14            THE COURT:  I don't -- you asked this witness if she

15   said she supports Duffie in her overtime.

16            MR. FARRAR:  No, I didn't ask that question.

17            THE COURT:  Okay.  What did you ask?  One at a time.

18   Stop.

19            MR. FARRAR:  In the past she has told Ms. Duffie she

20   thought they, as in the corporation, was being unfair to her.

21            THE COURT:  Right.

22            MR. FARRAR:  About how they treated her and they're

23   not paying her her wages.

24            THE COURT:  Okay.  But this doesn't relate to wages,

25   does it?

1          MR. PILCHAK:  This is after.

2          MR. FARRAR:  It's not -- we just have this little

3     piece.  We don't know.  But I think it's a fair question to

4     her, what was she talking about there.  And that was the

5     extent of the questioning.

6          MR. PILCHAK:  But he's tiptoeing into it because

7     that's what she's talking about.  The date of that is after

8     March 17th -- on or after March 17th she's saying she's unfair

9     --

10         MR. FARRAR:  I don't believe it was after March 17th.

11         MR. PILCHAK:  Well, let's see it.

12         THE COURT:  Let's see what she knows about whether

13    she sent the text, whether -- when it was.  And if she can't

14    place it before the termination then she can't say I was

15    referring to overtime.  Because the other fairness issues

16    aren't in this case.

17         MR. FARRAR:  I understand.

18         MR. PILCHAK:  How are we going to get that without

19    tainting the jury on the in limine issue?

20         THE COURT:  He's not going to ask any question -- you

21    have to stop when I'm talking.

22         MR. FARRAR:  Sorry.

23         THE COURT:  Mr. Farrar is ordered not to ask

24    questions about general fairness and general treatment at the

25    job.  Just about whether she sent a text indicating she

January 25, 2016

1    thought she shouldn't be paid overtime or it's unfair she's

2    not paid overtime.  If she doesn't say she did, just stop.

3              MR. FARRAR:  Just to be clear, I'll ask her you sent

4    this text saying the corporation was being unfair for not

5    paying her overtime; is that right?  Is that the question?

6              THE COURT:  I don't know when the text -- let's leave

7    the text out and just ask if she ever said -- go back a little

8    bit.  Ask, did you ever tell Ms. Duffie that the company was

9    being unfair in not paying you overtime.

10             MR. FARRAR:  Okay.

11             THE COURT:  Okay.

12             MR. PILCHAK:  Was that disclosed to us?  Because I've

13   never seen that document.  But there's Rule 26 disclosures.

14             THE COURT:  Okay.  Let's conclude our sidebar.  Thank

15   you.

16                         (Open Court)

17             THE COURT:  We're back now and I think Mr. Farrar has

18   another question.

19             MR. FARRAR:  Thank you, your Honor.

20   BY MR. FARRAR:

21   Q.   Ms. Felker, did you ever tell Ms. Duffie that you thought

22   the defendant was being unfair to her for not paying her

23   overtime?

24   A.   I guess I did in that text.  I didn't recall.

25   Q.   Now, and you would agree, Ms. Felker, that Ms. Duffie was

 1   working a lot.  Would you agree on that?

 2   A.   I would agree.

 3   Q.   In fact, I believe even the e-mail or the e-mail that was

 4   just shown to you a few minutes ago by Mr. Pilchak referenced

 5   her working on Saturday.  Did you see that?

 6   A.   Yes.

 7   Q.   And you'd agree that Ms. Duffie, on occasion, worked long

 8   hours and weekends and late nights, right?

 9   A.   I agree.

10           MR. FARRAR:  Nothing further.

11           THE COURT:  Okay.

12           MR. PILCHAK:  Can I have that text, please?

13                       REDIRECT EXAMINATION

14   BY MR. PILCHAK:

15   Q.   Ms. Felker, nothing about this text you sent references

16   anything about overtime, right?

17   A.   No.

18           MR. FARRAR:  Objection.  Leading.

19           THE COURT:  Sustained.

20   BY MR. PILCHAK:

21   Q.   Do you know whether that text had anything to do with

22   overtime or not?

23   A.   I don't.  Because I don't remember it.  I don't remember

24   that conversation at all honestly.  So I don't know and I can't

25   -- I've only heard what he -- I don't see the whole context of

January 25, 2016

```
 1   it.
 2   Q.   And with regard to the text that prompted you to say
 3   you're not being fair, looking at the bottom of the text
 4   specifically what was the subject matter?
 5   A.   Stress.  Stressful place to work.
 6            THE COURT:  Can you speak a little louder?
 7            THE WITNESS:  Oh.  A stressful place to work.
 8            THE COURT:  Okay.
 9   BY MR. PILCHAK:
10   Q.   And as you sit here right now, do you know one way or the
11   other if your feelings about on this particular day on this
12   particular text had anything to do with the way they were
13   paying Ms. Duffie as opposed to it being a stressful place to
14   work?
15            THE COURT:  Just a minute.  We have an objection?
16            MR. FARRAR:  Object to the form and I believe asked
17    and answered.
18            MR. PILCHAK:  Well --
19            THE COURT:  Can you break the question down?  I think
20    it has been asked and answered.  So if you're just asking
21    whether it relates to the overtime, we already have an answer.
22   BY MR. PILCHAK:
23   Q.   Now that you've seen the full text, do you have a greater
24   insight as to what you felt was unfair?
25   A.   Her workload.  I think that was what the subject matter
```

January 25, 2016

1   was.  I had no idea how she was paid or if she was paid

2   overtime.  We've never ever conversed about her pay.

3   Q.   Okay.

4            MR. PILCHAK:  I have no further questions.

5            THE COURT:  Okay.

6            MR. FARRAR:  Nothing further from us, your Honor.

7            THE COURT:  Okay.  Fantastic.  All right.  Well, you

8   are released to step down.  And thank you, so much, for being

9   here.  Mr. Pilchak, do you have any more witnesses?

10           MR. PILCHAK:  I'm going to call Kandis Thompson.

11           THE COURT:  Okay.

12           MR. PILCHAK:  Should we just charge right ahead with

13  her or --

14           THE COURT:  Would the jury like a break?  Looks like

15  we could use a break.  So let's do that.  Please rise for the

16  jury.

17                      (Jury Out)

18           THE COURT:  On the issue of admitting evidence

19  without witnesses, apparently that can be done or is done

20  where things are self-authenticating or are authentic pursuant

21  to a particular rule.  9028 specifically requires -- this is

22  referring back to plaintiff's proposal to admit the answer to

23  the complaint into evidence.  9028 I am going to try to locate

24  again.  Specifically requires -- hold on.  I'm almost there.

25           9028 requires that a document -- says that a document

1    accompanied by a certificate of acknowledgment that is

2    lawfully executed by a notary public or another officer who is

3    authorized to take acknowledgements.

4           Now, admittedly Mr. Pilchak and Mr. Russell are

5    officers of the court and they sign that they're submitting

6    it.  So I think it's close.  But I think the more important

7    issue is 403 and the degree of confusion that can be created

8    by this document.

9           It includes all sorts of legal language we have no

10   context for in terms of testimony about what any of the words

11   mean.  And I think at a risk of not over or underestimating

12   the jury, it's -- I think it would create confusion to have a

13   document of that nature.  And if anything, I think it creates

14   confusion in favor of the defendants because they're denying

15   all of your allegations.

16          But I don't personally understand having read it

17   twice or three times now what it could possibly be used for in

18   this case that would not be confusing.  So on that basis it

19   will be excluded.

20          However, I would just comfort the plaintiff and

21   plaintiff's counsel in that in all of those issues that are

22   affirmative defenses or in the answer , Mr. Pilchak and Mr.

23   Dare are bringing out through their evidence what their

24   position is in them.  So you can certainly argue it.

25          You heard -- you can say in closing.  You heard Mr.

```
 1    Pilchak blame Ms. Duffie for being the payroll administrator
 2    or something like that.  I think that's the closest I could
 3    get to what you might be possibly getting at.
 4                MR. FARRAR:  Okay.
 5                THE COURT:  So you'll just do that in your closing.
 6                MR. FARRAR:  Thank you, your Honor.
 7                THE COURT:  Okay.  So let's just take a short like
 8    five-minute break and we'll be back.  Is there anything else
 9    at this point?
10                MR. FARRAR:  No.
11                THE COURT:  Okay.
12                          (Brief Recess)
13                THE COURT:  Okay.  Anything before we bring the jury
14    in?
15                MR. FARRAR:  No.
16                THE COURT:  And your next witness is Kandis Thompson?
17                MR. PILCHAK:  Kandis Thompson.
18                THE COURT:  Okay.  All right.  Then we'll get the
19    jury.  And we'll conclude at 4:00 so we can get to work on the
20    jury instructions.
21                THE CASE MANAGER:  All rise for the jury.
22                          (Jury In)
23                THE COURT:  Okay.  Please be seated.  And Ms.
24    Thompson, would you like to step forward?
25                MR. PILCHAK:  And for the record, defense will call
```

January 25, 2016

```
 1  our next witness, Kandis Thompson.

 2           THE COURT:  Okay.

 3               Thereupon,

 4          K A N D I S    T H O M P S O N ,

 5  having been called as a witness and having been first duly

 6  sworn testified as follows:

 7           THE COURT:  Have a seat in the jury box or the

 8  witness box.  The jury box is full.

 9                    DIRECT EXAMINATION

10  BY MR. PILCHAK:

11  Q.  Would you state your full name for the record?

12  A.  Kandis Kay Thompson.

13  Q.  And would you spell it for the court reporter?

14  A.  K-A-N-D-I-S, K-A-Y, T-H-O-M-P-S-O-N.

15  Q.  Are you married, Ms. Thompson?

16  A.  Yes.

17  Q.  And do you have children?

18  A.  Yes.

19  Q.  And what is your educational level?

20  A.  I have a bachelor's degree in accounting and information

21  systems.

22  Q.  Say that again.  In what?

23  A.  Accounting information systems.

24  Q.  So the bachelor's degree is in accounting information

25  systems?
```

1    A.   Yes.

2    Q.   Okay.  And what year did you get that degree?

3    A.   I believe I completed it in 1992.

4    Q.   And how old were you in 1992?

5    A.   Twenty-eight.

6    Q.   Were you employed while you obtained your degree?

7    A.   Yes.

8    Q.   And how were you employed?

9    A.   I worked for Michigan Group.

10   Q.   Okay.  And with regard to your degree, did any of the

11   coursework that you took for your accounting information

12   systems degree involve any instruction on payroll practices?

13   A.   No.

14   Q.   When did you first become employed by The Michigan Group?

15   A.   I was 25.  It was in 1990.

16   Q.   Okay.  Who were the owners of The Michigan Group in 1990?

17   A.   Joe DeKroub and Fred Madley.

18   Q.   How do you spell Madley?

19   A.   M-A-D-L-E-Y.

20   Q.   And what were your initial responsibilities there?

21   A.   I worked in the accounting department.

22   Q.   Okay.  And did you work under supervision?

23   A.   Alongside Fred Madley's stepdaughter, Carol Madley.

24   Q.   And what were your initial dudes, say right from the very

25   beginning?

January 25, 2016

```
 1   A.   Accounts payable, accounts receivable.

 2   Q.   And then what did Carol Madley do?

 3   A.   She did all of the accounting functions.  And I was

 4   brought in to assist her with all of them.  So as time went on,

 5   my responsibilities increased.

 6   Q.   Okay.  Do you remember what your initial compensation was?

 7   A.   25,000.

 8   Q.   And over the years -- now, did you work continuously for

 9   The Michigan Group from 1990 through say March of 2011?

10   A.   I did except for one year that I took off when our second

11   child was born.

12   Q.   Okay.

13   A.   I stayed home that year.

14   Q.   And over the period of time, did your responsibilities

15   increase?

16   A.   Yes.

17   Q.   And in what way did your responsibilities increase?

18   A.   It encompassed all accounting aspects of maintaining the

19   checking account, general checking account, escrow checking

20   account.  Complying with state law, real estate law as far as

21   how the escrow account had to be monitored, the records that

22   had to be kept for it.  In the event of an audit, which I would

23   be the person that would have to provide the documentation if

24   the state came in to audit the escrow account.

25   Q.   Okay.
```

January 25, 2016

200

1   A.   Bank reconciliation, payroll, reports for Joe.

2   Q.   Okay.  And that $25,000 compensation, did that ever

3   change?

4   A.   Yes.

5   Q.   How did it change specifically?  How did you get

6   compensation increases?

7   A.   I would go to Joe.

8   Q.   Had you observed Joe's practice and habit in regard to pay

9   increases?

10   A.   It was you had to ask.

11   Q.   Are you familiar with the term Central?

12   A.   Yes.

13   Q.   And how would you describe Central?

14   A.   That it's the accounting central function of the business.

15   Q.   And did you have -- did the company give you a title?

16   A.   No.

17   Q.   And did you use a title?

18   A.   Yes.

19   Q.   And what title did you use?

20   A.   Controller.

21   Q.   And why did you use the term controller?

22   A.   It summed up what I did.  I controlled the functions --

23   bless you -- of the accounting department.

24   Q.   Okay.  And did you have people reporting to you prior to

25   March of 2011?

1    A.    Yes.

2    Q.    And during the course of time that you were -- let me ask

3    you this.  When did the company first start referring to

4    anything by the term Central?

5    A.    I don't recall exactly.  I can't recall.

6    Q.    Okay.

7    A.    Just kind of was there.

8    Q.    And for whatever period of time that you were in charge of

9    Central as an entity, did there -- were there or were there not

10   hirings and firings?

11   A.    There were.

12   Q.    Okay.  And how would those come about?

13   A.    If it was someone under my supervision or -- it would be

14   based on my recommendations if it was something that I felt

15   necessary I would go to Joe and talk to him.

16   Q.    Okay.

17   A.    There were times that he would ask me, you know, what do

18   you think about this or that or like the receptionist.

19   Q.    Okay.  And what did you find resulted from your

20   recommendations?

21   A.    I'm not sure I understand your question.

22   Q.    You said you made recommendations.  What was the result of

23   you making recommendations?

24   A.    Joe would -- sometimes he would say, yes, I agree with

25   that.  Go with that.  Or if he had any input otherwise, he

1    would speak.

2    Q.   Okay.  What kind of tools are used in an accounting office

3    like Central?

4    A.   Computer hardware, software.

5    Q.   Okay.  And what kind of computer software was Central

6    using up until March of 2011?

7    A.   Software program called AccountMate.

8    Q.   And anything else?

9    A.   There's -- for the real estate aspect of things, there's a

10   Realty Management System we refer to often as RMS.  The company

11   that makes it is called brokerWOLF.

12   Q.   Okay.  And --

13   A.   I'm sorry.  The company name was called Lone Wolf.  The

14   product is now called brokerWOLF.

15   Q.   I see.  Okay.  Let me shift gears a little bit and talk

16   about you mentioned the escrow account.  Can you tell the jury

17   what are the implications of having an escrow account at least

18   with respect to the work in Central?

19   A.   It was our function to make sure that we kept very

20   detailed records as to whose money was being held, when was it

21   received, the amount, of course, and also when -- for what

22   property it related to.  And the trail of events with that

23   money to the point that it became a zero balance for that

24   transaction.

25              There's what's called trust transaction review sheets

January 25, 2016

1    that would detail that history of transactions and you would

2    have to keep those.  We have a file cabinet full of the

3    transactions that came to a zero balance and we have to keep

4    those on file for minimum of seven years.

5             And then anything that was currently outstanding had

6    to be in another file.  So at any given time you could go

7    through that drawer and add up everything and it should equal

8    what's in the trust account.

9    Q.  All right.  And what role did the -- did you as the

10   controller of Central play in terms of all those requirements?

11   A.  It was my responsibility to make sure that it was held in

12   compliance and that information on each of those trust

13   transaction reviews or what it needed to be so that if the

14   State of Michigan came in to review any files, all the records

15   were accurate.

16            We also needed to keep track of all of the check

17   stubs of monies written out of the escrow account and they

18   could take those and cross reference them with the trust

19   transaction reviews to see how the money was dispersed and to

20   who it went to.

21   Q.  Okay.  And in terms of day to day requirements, what did

22   that require of you in terms of your attention to those issues?

23   A.  Daily I review the escrow cards -- the trust transaction

24   reviews before they get attached to the previous ones.  So for

25   instance, if somebody had a thousand dollar earnest money

January 25, 2016

1    deposit and then they -- the deal fell, when they gave us the
2    deposit we would have one trust transaction review.  And then
3    if the deal fell later on and the money had to be returned to
4    them, that creates a new trust transaction review that gets
5    stapled on top of the other one.  And that's now a zero trust
6    transaction card.
7    Q.   There's been some testimony with regard to Mr. Bill
8    Russell, who's seated right behind me here.  And my question to
9    you is drawing your attention to the time period of 2007 to
10   December 31st of 2011, do you know whether or not he was
11   affiliated in any way with The Michigan Group or any of its
12   other related entities?
13   A.   No, he was not.
14   Q.   How long did you continue in the job of controller in
15   Central after being in the position?  Did there come any point
16   in time when you left the position?
17   A.   From when I first started?
18   Q.   Yes.  And besides the year you took off for your second
19   child?
20   A.   Okay.  I left in March of 2011.
21   Q.   And what prompted you to leave the position in March of
22   2011?
23   A.   I became a loan officer.
24   Q.   And why did you become a loan officer?
25   A.   I hoped to increase my income.

January 25, 2016

205

1    Q.   Was there any reason why you needed to increase your

2    income?

3    A.   Yes.

4    Q.   And what was that?

5    A.   My husband, at the time, was a builder.  And with the

6    economic conditions what they were, the building company was

7    struggling.  And the income that he had been able to draw from

8    that was no longer there.  And we didn't have medical benefits.

9    We had to pay for those out of pocket.  So it was becoming

10   harder and harder to meet bills.

11   Q.   And in what way would becoming a loan officer resolve that

12   problem?

13   A.   The pay structure of a loan officer is based on

14   commission.  And I hoped to be able to do well at it and

15   hopefully make more than I had at RE/MAX.

16   Q.   And in fact, did you take that position?

17   A.   Yes, I did.

18   Q.   And did you end up making more than you had made as

19   controller?

20   A.   Yes, I did.

21   Q.   Did you have discussions with anybody in preparation for

22   you to leave the controller position?

23   A.   I did speak with Joe.

24   Q.   Okay.  And for what purpose?

25   A.   To discuss my thought process and that I had hoped to be

1    able to do that.  Because if I was going to do it, I wanted to

2    work for Michigan United Mortgage, which at the time was his

3    company.

4    Q.   Okay.  And did you have any discussions in any way

5    regarding Central and what would go on there if you left the

6    position?

7    A.   Joe asked if I felt Sherry was able to take my position.

8    Q.   And what did you tell him?

9    A.   I told him that I felt she could.  She had frequently on

10   multiple occasions mentioned to me that she had ran her

11   parent's business.  So I felt if she had that history and that

12   she was pretty much my capacity at the RE/MAX prior to our

13   merger, then I felt she was -- would be able to handle the job.

14   Q.   Okay.  After you made those statements to Mr. DeKroub, did

15   the company engage in any search or to look for any other

16   candidates?

17   A.   No.

18            MR. FARRAR:  Objection.  Form.  If she knows.

19            THE COURT:  If you know, yeah.  Why don't you

20    rephrase your question.

21   BY MR. PILCHAK:

22   Q.   Preparatory to you moving to Michigan United Mortgage, are

23   you aware of any search that the company made to look for any

24   candidate other than Ms. Duffie?

25   A.   No.

1   Q.   And so who then filled your position after you left as far

2   as you know?

3   A.   Sherry Duffie.

4   Q.   Will you open to tab 7?  I'm showing you Ms. Duffie's

5   resumé.  And with regard to the bullet points there, does --

6   did you perform the first duty in your role as controller?

7   A.   Yes.

8   Q.   And did you do it personally or did you delegate it?

9   A.   Delegate.  There were some times I would do it personally

10  if my assistant wasn't there.

11  Q.   Okay.  And who generally did you delegate it to?

12  A.   At what time?  Now?

13  Q.   Just before you left, for example.

14  A.   Erica Hahn and Linn Felker and Sherry Duffie.

15  Q.   Okay.  And the second bullet point that says payroll and

16  tax reporting for RE/MAX Platinum and Select Title, LaVita

17  Bistro Restaurant and Michigan United Mortgage, did you engage

18  in that duty as part of your employment?

19  A.   Yes.

20  Q.   And did you delegate payroll duties?

21  A.   Payroll would be -- if I was there, I would do payroll.

22  If I wasn't there, Sherry could do it.

23  Q.   Okay.  Anybody else?

24  A.   Pam Shearer knew how to do payroll as well.

25  Q.   Did Erica or Linn Felker do payroll?

1    A.    No.

2    Q.    Is there any particular reason why?

3    A.    It wasn't necessary to cross-train that many people.   If I

4    wasn't there, we had two people back up.   So I didn't see the

5    need.

6    Q.    Looking at the third bullet point, implementation of

7    procedures, let's say, to process real estate transactions and

8    assure all documentation to be complete and in compliance with

9    state real estate laws.

10            Did you have involvement in that duty when you were

11   the controller?

12   A.    Yes.

13   Q.    What kind of procedures were required to process real

14   estate transactions and assure documentation to be complete?

15   A.    Trust transaction reviews.   Bank -- the banking -- bank

16   reconciliations.

17   Q.    Are there any -- is there any requirement as to what a

18   file must contain?

19   A.    Yes.   We have closing files.   When a file has an offer on

20   it that's called a pending status.   And there would be certain

21   documentation at that time that had to be in a transaction.

22   And then when a transaction closes, that would be the close

23   status.   And there would be a checklist of things that needed

24   to be in the file such as the HUD statement, the warranty deed.

25   Q.    And that was the job of the controller to assure that the

1  files ultimately contained that?

2  A.  Yes.

3  Q.  And then we talked about the next bullet, maintaining

4  escrow account in compliance with state real estate laws.  Do

5  you see that?

6  A.  Yes.

7  Q.  In looking through the remainder of the duties, with the

8  possible exception of the one that mentions liaison with RE/MAX

9  of Michigan Regional, did you attend to all of those duties in

10 your role as controller?  And with the possible exception of

11 the last one.

12        MR. FARRAR:  I would object to the question, to the

13 extent there is one.

14        THE COURT:  Overruled.  I think the question is

15 whether you did the list of duties there with the bullet

16 points except the ones --

17        THE WITNESS:  I'm just having trouble reading them.

18        THE COURT:  We're very close to four o'clock.

19        MR. PILCHAK:  This will be the last question for

20 today.

21        THE COURT:  Perfect.  Good place to stop then.

22        MR. PILCHAK:  Can we stop right there then?

23        THE COURT:  Why don't we get this one done.

24        THE WITNESS:  And the year end tax preparation for

25 accounting firm -- yes.  Yes.

January 25, 2016

1   BY MR. PILCHAK:

2   Q.   And the two that you didn't do are what?

3   A.   I was not the liaison with RE/MAX of Michigan to do the

4   monthly reporting.  And then I didn't convert the entities to

5   QuickBooks in 2012.

6            THE COURT:  Okay.  Well, then, what we'll do is, Ms.

7   Thompson, I swore you in when you arrived here.  And you can

8   step down.  And you'll be under oath when you return to

9   testify tomorrow morning.  And let me make sure that we're

10  starting at nine o'clock tomorrow.  Yes.  That's good with

11  everybody.  Okay.

12           So we'll be back here at nine o'clock.  Okay.  So you

13  may step down.  And then for our jury, it's the same thing I

14  keep telling you about please get some rest.  Drive carefully.

15  And do not talk about the case among yourselves or with anyone

16  else.  And should anyone approach you, be sure to let me know.

17  To talk about the case, that is.  Okay.  So please rise for

18  the jury.

19                        (Jury Out)

20           THE COURT:  Okay.  Please be seated.  Now, we need to

21  work on the jury instructions.  And we can -- Jesse, did you

22  put a copy of the standard instructions?  Okay.  What I'd like

23  to do is maybe just go upstairs and work on them in chambers.

24  We'll be off the record.  And if there are objections, we'll

25  get those put on the record in the morning.  We're off on the

January 25, 2016

```
1    record now.
2                        (Proceedings Concluded)
3                    -           -           -
4
5
6
7
8
9               CERTIFICATE OF OFFICIAL COURT REPORTER
10        I, Jeseca C. Eddington, Federal Official Court
11   Reporter, in and for the United States District Court Eastern
12   District of Michigan, appointed pursuant to provisions of Title
13   28, United States Code, Section 753, do hereby certify the
14   foregoing 211 pages are a true and correct transcript of the
15   proceedings had in the matter of SHERRY L. DUFFIE versus THE
16   MICHIGAN GROUP, INCORPORATED - LIVINGSTON, doing business as
17   RE/MAX PLATINUM, Case No. 14-14148 held on February 25, 2016.
18
19   /s/ JESECA C. EDDINGTON                  4/29/2016
     Jeseca C. Eddington, RMR, CRR, FCRR      Date
20   Federal Official Court Reporter
21
22
23
24
25
```